**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE DISTRICT OF DELAWARE**

_____

| | | |
|---|---|---|
| In re: | ) | Chapter 11 |
| | ) | |
| NORTHSHORE MAINLAND SERVICES INC., *et al.*,[1] | ) | Case No. 15-_____ (__) |
| | ) | |
| Debtors. | ) | (Joint Administration Requested) |
| | ) | |

_____

**DECLARATION OF THOMAS M. DUNLAP**
**IN SUPPORT OF CHAPTER 11 PETITIONS AND**
**FIRST DAY PLEADINGS OF NORTHSHORE MAINLAND**
**SERVICES INC. AND ITS AFFILIATED DEBTORS AND DEBTORS IN POSSESSION**

I, Thomas M. Dunlap, hereby declare under penalty of perjury:

1.      I am the designated representative and/or President of each of the above-captioned debtors and debtors in possession (each, a "Debtor" and, collectively, the "Debtors")[2] and have served in various capacities for each entity since I joined the company in 2010.  Among other things, I served as Chairman, President, and Director of Northshore Mainland Services Inc. ("Northshore") from August 10, 2012 to March 16, 2015, and also have served as the President of each of the other Debtors since August 2012.  Prior to my appointment as President of the Debtors, I served as Executive Vice President, Development and Construction, for most of the Debtors as well.

2.      I have over 30 years of management experience in the Resort and Hospitality development industry.  Before being employed by Baha Mar, I was President of

---

[1]    The Debtors in these chapter 11 cases, along with the last four digits of the lead Debtor's federal tax identification number, are as follows:  Northshore Mainland Services Inc. (9087); Baha Mar Enterprises Ltd.; Baha Mar Entertainment Ltd.; Baha Mar Land Holdings Ltd.; Baha Mar Leasing Company Ltd.; Baha Mar Ltd.; Baha Mar Operating Company Ltd.; Baha Mar Properties Ltd.; Baha Mar Sales Company Ltd.; Baha Mar Support Services Ltd.; BML Properties Ltd.; BMP Golf Ltd.; BMP Three Ltd.; Cable Beach Resorts Ltd.; and Riviera Golf Ventures Ltd.

[2]    The Debtors and their direct and indirect non-debtor subsidiaries are collectively referred to herein as "Baha Mar."

Washington, D.C.-based Revolution Places Development, and in such capacity was responsible for the development of Cacique, Costa Rica®, a $1 billion[3] project in Costa Rica, as well as the Miraval® wellness resort brand.  Prior to that, I was a Partner with East West Partners and was the senior project development executive for The Highlands at Northstar®, a ski destination resort anchored by a newly constructed $300 million Ritz Carlton Hotel and Residences®.  Prior to that, I spent 15 years with the Walt Disney Company as Senior Vice President for Walt Disney Imagineering.  In such capacity, I was responsible for the project management, design, development and construction of a variety of projects including Disney Vacation Club Resorts®, Disney Cruise Line® ships, terminals and the Castaway Cay private island located in The Bahamas.  I also oversaw the development of a portfolio of hotel projects in Paris, Florida, and Hong Kong.

3.     Concurrently with the filing of this declaration (the "Declaration") on the date hereof (the "Petition Date"), each of the Debtors has filed in the United States Bankruptcy Court for the District of Delaware (the "Court") a voluntary petition for relief under chapter 11 of title 11 of the United States Code, 11 U.S.C. §§ 101–1532 (the "Bankruptcy Code"), commencing the chapter 11 cases (the "Chapter 11 Cases").

4.     The Debtors have requested certain relief in "first day" applications and motions filed with the Court (collectively, the "First Day Pleadings")[4] in order to minimize potential adverse effects of the commencement of the Chapter 11 Cases and to maximize the value of their estates.  I submit this Declaration to assist the Court and other parties in interest in understanding the circumstances that led to the commencement of the Chapter 11 Cases and in

---

[3]    All monetary amounts herein are in U.S. dollars.

[4]    Capitalized terms used but not defined herein have the meanings ascribed to them in the First Day Pleadings or the Prepetition Credit Facility (as defined herein), as applicable.

support of the Debtors' chapter 11 petitions for relief and the First Day Pleadings.

5.  Except as otherwise indicated herein, all facts set forth in this Declaration are based on my personal knowledge, my discussions with other members of the Debtors' senior management and other personnel, my knowledge and review of relevant documents including the Debtors' books and records, or my opinion based on my experience, knowledge, and information concerning the Debtors' operations and financial condition.  If called upon to testify, I would testify competently to the facts set forth in this Declaration.  I am authorized to submit this Declaration on behalf of the Debtors.

6.  I am familiar with the contents of each First Day Pleading (including the exhibits to such motions) and the facts set forth therein are true and correct to the best of my knowledge, and the relief sought in each First Day Pleading will allow for an orderly transition of the Debtors into the Chapter 11 Cases and ultimately permit the Debtors to complete the construction of their projects, open their businesses to the public, and maximize the value of their businesses.  Further, it is my belief that the relief sought in the First Day Pleadings is in each case narrowly tailored and necessary to achieve the goals identified above, and, accordingly, best serves the interests of the Debtors' estates and their stakeholders.

7.  Parts I and II of this Declaration provide an overview of the Debtors' businesses, organizational structure, and capital structure.  Part III provides an overview of the circumstances leading to the commencement of the Chapter 11 Cases.  Part IV discusses the objectives of the Chapter 11 Cases, and Part V discusses the bases for relief sought in the First Day Pleadings, which the Debtors believe are critical to administering the Chapter 11 Cases and preserving and maximizing the value of the Debtors' estates.

## I.       Description of the Debtors

### A.       The Debtors' Businesses

8.       As set forth in greater detail below, the Debtors' Project (as defined below) is approximately 97% complete and, when fully completed, will be one of the largest employers in The Bahamas.  However, as a result of extensive construction delays and missed deadlines as well as other performance failures by CCA (as defined below), the Project's general contractor and construction manager, the Project's opening has been delayed twice.  During the first such delay, CCA acknowledged that the original construction completion date would not be met.  As a result of this lead time, the Debtors were able to swiftly implement measures to ensure their ability to operate through at least early April 2015 without generating post-opening revenue or requiring additional liquidity to survive.  The second missed construction completion date, however, proved disastrous as CCA effectively provided no advance notice that the March 27, 2015 deadline would not be met.  This resulted in the Debtors having ramped up to employ over 2,000 employees hired in anticipation of the Project's opening, at an increased cost of approximately $4 million per month, in addition to other significant sunk costs such as operating supplies, advertising, and promotional activities.  Due to the considerable construction delays, additional expenses incurred mitigating CCA's breaches and failures to perform, extended operations costs, the significant costs of hiring and retaining the new employees in the hope of opening the Project, the lack of meaningful revenue generation, and the absence of a definitive construction completion date, the Debtors exhausted their liquidity and were forced to commence the Chapter 11 Cases.

#### a.   Origin of the Project

9.       Baha Mar owns, and is in the final stages of developing, a 3.3 million square foot resort complex located in Cable Beach, Nassau, The Bahamas (the "Project").  The

4

heart of the Project will consist of four new hotels, including 2,323 guest rooms, a new Las Vegas-style casino, convention center, a new premier Jack Nicklaus Signature 18-hole golf course, as well as many other first class amenities.  As of the Petition Date, the Project is one of the most significant single-phase resorts currently under development in the western hemisphere. Once completed and fully operational, it will be one of the largest integrated destination resorts in the Caribbean, employing thousands of people.

10.     As a result of the Project, the Cable Beach of the future will stand in stark contrast to the Cable Beach of recent history.  In the 1950s and 1960s, Cable Beach was the go-to destination in The Bahamas for international vacationers.  With the passage of time, however, the existing facilities became dated and drew fewer guests – a decline exacerbated by the multi-phased development and completion of the Atlantis resort on nearby Paradise Island in the 1970s and 1980s.  By the turn of the century, Cable Beach had become a passed-by area on the Island of New Providence, despite its proximity to, among other things, the government offices that house the Prime Minister of The Bahamas and a major international airport.  This prompted then (and current) Prime Minister Perry Christie to solicit the advice of a prominent resident of the Island, Sarkis Izmirlian (the "Developer").

**b.  Developer's Efforts to Make Project A Reality**

11.     In response to the Prime Minister's request, the Developer presented a concept to revitalize Cable Beach, proposing to completely redevelop the area by consolidating nearly 1,000 acres of land with 3,000 feet of beachfront, re-routing Nassau's main road around the perimeter of the property, and erecting a state of the art resort anchored by four new luxury hotels and a Las Vegas-style casino, bringing significant new tourism revenue and jobs to the region.  Moreover, to make his concept a reality, the Developer committed to making an investment in the Project (which investment is now approaching $900 million) as well as to take

on the responsibilities of soliciting the necessary financing, negotiating complex single-phase development contracts, and overseeing the Project development through a successful completion.

12. With the support of The Bahamian Government, the Project commenced in 2005. The Developer began to acquire what eventually totaled more than 30 individual parcels of land spanning nearly 1,000 acres to be consolidated and contributed to the Project.[5] As part of that process, the Developer acquired and continued to operate three pre-existing hotels on Cable Beach: (a) the Nassau Beach Hotel, which was subsequently closed and demolished; (b) a Radisson® hotel then-owned by the Bahamian government, which the Developer, having borrowed and invested nearly $100 million to renovate, rebranded as a Sheraton® and contributed to the Debtors, and which is now operated as a Melia® hotel and all-inclusive resort (the "Melia"); and (c) the Wyndham Hotel and Crystal Palace Casino ("Crystal Palace"), which the Developer and then the Debtors operated until de-flagging and closing the hotel on November 12, 2014, and the casino on February 12, 2015.[6]

13. By the beginning of 2008, the Developer had acquired the necessary land along Cable Beach and secured commitments for substantial financing and elite hotel and casino brand participation, as well as had engaged architects, designers, and engineers. Later that same year, however, substantially all of the financial and branding commitments procured by the

---

[5]   As of the Petition Date, all such parcels are owned in fee simple by Baha Mar Ltd. and/or its affiliates, with the exceptions of (a) a few parcels that continue to be owned by the Bahamas government but are scheduled to be conveyed or leased to Baha Mar Ltd (or an affiliate), and (b) one parcel for which title is held by a neighboring resort that is to be conveyed to Baha Mar Ltd (or an affiliate) in accordance with a letter of intent between the parties.

[6]   Since ceasing operation of the Crystal Palace, the Debtors have used and continue to use the hotel facilities as office space and living quarters for many employees of their contractors and subcontractors working on the Project. Additionally, in early 2015, the Debtors used both the hotel and casino premises as a training facility to train a large number of their employees and staff in anticipation of Project opening on March 27, 2015 (as discussed further below). The Debtors have no present intention to restart operations at the Crystal Palace. Once the Project has been completed and is fully operational, the Debtors may decide to renovate and re-open the hotel or demolish it for new developments.

Developer fell away as a result of the onset of the global financial crisis.  At that point, the Project was abruptly wound down.

14.     In early 2009, the Developer met with China Construction America Inc. ("CC America"), a company incorporated and headquartered in New Jersey, in an attempt to restart the Project.  CC America is a wholly owned subsidiary of China State Construction Engineering Corp. Ltd. ("CSCEC").  CSCEC is majority-owned by China State Construction Engineering Corp. – a state-owned enterprise of the People's Republic of China.  In exchange for being retained as general contractor and construction manager and receiving other financial accommodations, CC America helped obtain debt financing for the Project from The Export-Import Bank of China ("CEXIM Bank").  CEXIM Bank – itself a state-owned enterprise of the People's Republic of China – is a policy bank that provides financing to support the investment of Chinese capital and employment of Chinese labor forces throughout the world.[7]

### c.   Creation of Debtors and Commencement of Project Construction

15.     On March 9, 2009, the Developer and CSCEC entered into a contract for the construction of the Project (the "Main Construction Contract").  By an Assignment and Assumption Agreement dated December 8, 2010, the respective rights and obligations under the Main Construction Contract were assigned and assumed by Baha Mar Ltd. and CCA (Bahamas) Ltd. ("CCA"), a Bahamian international business corporation and wholly owned subsidiary of CC America.  On February 14, 2011, Baha Mar Ltd. issued a Notice to Proceed to CCA, effective May 1, 2011, with a contractual construction completion schedule of 44 months, subject to certain agreed adjustments.  Additionally, on May 12, 2011, CSCEC as Guarantor executed a Completion Guarantee in favor of Baha Mar Ltd. (and Citicorp International Limited

---

[7]   See Mission Statement, available at http://english.eximbank.gov.cn/tm/en-TCN/index_617.html. ("The Bank's mandate is to …assist Chinese companies with comparative advantages in their offshore project contracting and outbound investment …."

as Offshore Security Agent and Trustee for and on behalf of CEXIM Bank) for the due and punctual performance by CCA of each and all of the obligations, warranties, duties and undertakings under the Main Construction Contract (the "Completion Guarantee").

16.    On May 31, 2010, Baha Mar Ltd., as Obligor, and certain of the Debtors, as Guarantors, entered into a Facility Agreement with CEXIM Bank which, together with related simultaneously and subsequently entered agreements, established the financing commitments of the key parties and the governing terms thereof.  In summary, as described more fully below, the Project contemplated $3.5 billion of financing, consisting of, among other things (a) a $2.45 billion secured debt facility provided by CEXIM Bank, (b) a $150 million preferred equity commitment provided by a subsidiary of CSCEC, China State Construction Engineering Corporation (Bahamas) Ltd. ("CSCEC (Bahamas)"), and (c) an $850 million common equity investment by the Developer.  The common equity investment of the Developer consisted of cash, land for the Project along Cable Beach and the three hotels then-operating thereon, as well as other commitments.  The Facility Agreement contemplated a "Group Restructuring" of Baha Mar Ltd. and its subsidiaries, the implementation of which is responsible for the Debtors' present organizational structure and allocation of businesses and assets (as discussed further below).

17.    By the end of July 2011, the Debtors had entered into management and cooperation agreements (the "Brand Agreements") with key brands Hyatt®, Rosewood®, and Mondrian® (subsequently replaced by SLS Lux®) (collectively, the "Brands") to operate three of the four new hotels, with the Debtors deciding to self-brand the fourth hotel and new casino. The Brand Agreements contemplated that the Brands would contribute an aggregate amount of $59 million in "key money" to the Project, the substantial majority of which is due upon the Project's opening.

18.     With its financing in place and key brand agreements near execution, construction on the Project finally broke ground in February 2011.

### d.  The Project

19.     Once completed and fully operational, the Project will include the following four new hotels with 2,323 guest rooms (inclusive of 284 condos and villas), a casino, and a convention center:

    a.  <u>Baha Mar Casino & Hotel</u>:  A 100,000 square foot Las Vegas-style casino and premiere hotel with 1,068 rooms and suites, designed to appeal to international casino clientele, and boasting dedicated VIP entrances, suite levels, and VIP/premium gaming areas.  Once the Project is completed, the Baha Mar Casino & Hotel will be operated by GGAM Bahamas Holdings, LLC.

    b.  <u>The Grand Hyatt Hotel® and Convention Center at Baha Mar</u>:  A premiere hotel with 733 rooms and suites designed to cater to business guests utilizing the connected convention center, which boasts 84,000 square feet of stand-alone, flexible facility space capable of accommodating large-scale performances, events and conferences, including three ballrooms of 33,000, 18,000, and 15,000 square feet, and 18,000 square feet of additional meeting and board rooms allowing the convention center to accommodate a variety of events concurrently.  Once the Project is completed, the Grand Hyatt Hotel® and Convention Center at Baha Mar will be operated by Hyatt Services Caribbean LLC.  In addition, the hotel has certain for-sale residential condominium units, a number of which are under contract.

    c.  <u>The Rosewood® at Baha Mar</u>:  A "luxury" hotel with 232 rooms and suites designed to appeal to upscale guests, featuring its own ballroom, meeting facilities, private spa and salon.  Once the Project is completed, Rosewood® at Baha Mar will be operated by Rosewood Hotels & Resorts LLC.  In addition, the hotel has certain for-sale residential condominium and villa units, a number of which are under contract.

    d.  <u>The SLS Lux® at Baha Mar</u>:  A "lifestyle" hotel with 299 rooms and suites designed to appeal to younger guests who prefer a more modern and trendy hotel.  Once the Project is completed, the SLS Lux® at Baha Mar will be operated by SBE Hotel Management LLC.  In addition, the hotel has certain for-sale residential condominium and villa units, a number of which are under contract.

<u>See</u> Pictures of Project, attached hereto as <u>Exhibit B</u>.

20.     At the Project, it is planned that guests at any of the four new hotels will have access to the following amenities which are central to the Baha Mar guest experience:

a. <u>Golf Course</u>:  A premier Jack Nicklaus Signature 18-hole golf course.

b. <u>ESPA at Baha Mar</u>:  A 30,000 square foot destination spa and equipped aerobic gym facility, as well as a full salon operated by Espa International (US) Inc.

c. <u>Restaurant and Retail Outlets</u>:  Over 30 restaurants, bars and lounges, several of which are branded by some of the most famous names in the culinary world, as well as over three dozen shops and galleries hosting retail tenants ranging from local artisans to high-end brands such as Rolex, Tiffany, and Cartier.

d. <u>Beach and Beachfront Amenities</u>:  A 3,000 feet span along clear blue water on one of the world's most beautiful white sand beaches, as well as beachfront amenities including a 300 foot pier, numerous lagoon pools, and landscaped paths and waterways housing exotic plant life and a live animal sanctuary where guests can interact with native sea life such as sting rays and sharks.

e. <u>Other Amenities</u>:  A fountain-show lake, nine tennis courts, and significant landscaped grounds and gardens.

**e.     The Debtors' Operations and Employees as of Petition Date**

21.     As noted above, the governing agreements called for a 44-month completion schedule for the Project.  As the result of adjustments under the Main Construction Contract based upon the date CCA commenced on-site construction under the Superstructure Frame Work Package portion of the Project, which began no later than September 19, 2011, the construction completion date for the Project was November 20, 2014.  In reliance on this schedule, the Debtors scheduled the opening of Baha Mar for December 2014.  As of the Petition Date, however, the Project has not been completed or opened to the public, for the reasons discussed below.

22.     Notwithstanding the status of the Project, the Debtors currently employ (excluding Melia) over 2,400 employees and staff at an average monthly payroll of $7.5 million

as of the Petition Date.  Approximately $4 million of that average monthly payroll is attributable to 2,070 of the Debtors' employees that were hired in early 2015 in anticipation of the Project being completed and opened to the public on March 27, 2015.  Over 1,700 of these recent hires are rank and file employees that the Debtors spent significant time and resources training to be prepared to operate the Project by the end of March 2015.  Since that time, the Debtors' management has worked diligently to keep as many of these employees busy on various projects around the Project property as well as on off-site public works projects around New Providence Island.  Notwithstanding the commencement of the Chapter 11 Cases, it is the Debtors' intention to continue to operate, fund payroll for the Project, and evaluate all alternatives, until further court hearings which are anticipated to take place in three weeks' time.

24. In addition, the Debtors will continue to employ nearly 1,000 employees and staff to operate the Melia in the ordinary course during the Chapter 11 Cases.  The staff of the Melia operate the approximately 700 guest-room facility and its surrounding amenities as a hotel and an all-inclusive style resort, where guests have direct access to a portion of the Project's beachfront as well as a number of pools and amenities, and can choose from several restaurants, lounges, and bars on the Melia premises.  It is also the Debtors' intention to continue to operate the Melia after the Project is completed and the four new hotels are opened.

**B.      Organizational Structure**

24. A chart showing the Debtors' organizational structure as of the Petition Date is attached hereto as **Exhibit A**.  As reflected in the chart, the majority of the common shares of BML Properties Ltd. ("**BML**"), a Bahamian company, are ultimately owned for the benefit of, among others, the Developer.

25. BML owns 100% of the common shares in Baha Mar Ltd. and CSCEC (Bahamas) owns 100% of the preferred stock.  In turn, Baha Mar Ltd. owns 100% of the equity

in (a) Baha Mar Land Holdings Ltd., a company that is the direct and indirect owner of the Project and borrower under the Prepetition Credit Agreement (as defined below), (b) Baha Mar Operating Company Ltd., a holding company, and (c) Riviera Golf Ventures, Ltd., a joint venture company with the Government of The Bahamas and the owner of the Jack Nicklaus Signature 18-hole golf course.  Baha Mar Land Holdings Ltd. owns 100% of the equity in (d) Baha Mar Properties Ltd., an operating company that operates the Melia, (e) BMP Three Ltd., a land holding company that owns the land on which the Wyndham Hotel and Crystal Palace Casino are situated, (f) BMP Golf Ltd., a land holding company that owns the land on which the former Cable Beach golf course was situated, and (g) Baha Mar Sales Company Ltd., a company that manages and arranges the sale of residential condominium and villa units in the Project.  Baha Mar Operating Company Ltd. owns 100% of the equity in (h) Baha Mar Entertainment Ltd., a holding company, (i) Baha Mar Support Services Ltd., a company that provides operating support in the form of common shared services for the Project, (j) Baha Mar Leasing Company Ltd., a company that manages leasehold interests on behalf of land holding Debtors, (k) Cable Beach Resorts Ltd., a company that employs certain employees of the Debtors, (l) Northshore Mainland Services Inc., a Delaware corporation that leases and manages the Debtors' call centers in New Jersey and Florida, and performs general sales and marketing duties for the Project, (m) Baha Mar Enterprises Ltd., an operating company that will operate the Baha Mar Casino.

26.    The Debtors' offices are located at 8403 Southpark Circle, Suite 670 Orlando, FL 32819, and at One Baha Mar Boulevard, Nassau, New Providence, The Bahamas. In addition to the leases mentioned above, the Debtors also lease an office in Hong Kong that focuses on Asia market business development.

## II.    Prepetition Capital Structure[8]

27.    As of the Petition Date, the Debtors' unaudited balance sheets reflected total assets of approximately $3.1 billion and total liabilities of approximately $2.7 billion.  The Debtors' material debt obligations principally consist of approximately $2.4 billion in loans under a secured credit agreement with CEXIM Bank, approximately $140 million allegedly owed to CCA under the Main Construction Contract, and approximately $123 million in trade debt.

### A.    Secured Debt

28.    Certain of the Debtors are party to that certain Facility Agreement, dated as of May 31, 2010, as amended by the Facility Amendment, dated as of January 28, 2011, (as further amended, restated, supplemented, or otherwise modified from time to time, the "Prepetition Credit Agreement"), by and among Baha Mar Ltd., as borrower, Baha Mar Land Holdings Ltd., BMP Gold Ltd., Cable Beach Resorts Ltd., Baha Mar Entertainment Ltd. and Baha Mar Operating Company Ltd. (together, the "Original Guarantors"), BMP Three Ltd., Baha Mar Enterprises Ltd., Baha Mar Properties Ltd. and Northshore Mainland Services Inc. (together, the "Additional Guarantors")[9], CEXIM Bank as original lender and arranger, and Citicorp International Limited, in its capacity as facility agent and offshore security agent (the "Offshore Security Agent").  With the exception of BML Properties Ltd.,[10] the Original Guarantors and the Additional Guarantors (collectively, the "Guarantors" and, together with Baha Mar Ltd., the "Obligors") under the Prepetition Credit Agreement have pledged

---

[8]    The following summary is qualified in its entirety by reference to the operative documents, agreements, schedules, and exhibits.

[9]    The Additional Guarantors became parties to the Prepetition Credit Agreement by each entering into an Additional Guarantor Accession Deed, each dated as of January 31, 2011.

[10]    Note: BML Properties has pledged all of its stock in Baha Mar Ltd. to the Onshore Security Agent (as defined herein).

substantially all of their assets as collateral to secure the Prepetition Credit Facility (as described below).

29.     Under the Prepetition Credit Agreement, the Debtors have outstanding debt in the aggregate principal amount of $2,337,876,519 under a $2.45 billion term loan facility (the "<u>Prepetition Credit Facility</u>").[11]     Borrowings under the Prepetition Credit Facility bear interest at a rate per annum equal to the aggregate of the applicable: (i) 3.9 percent; and (ii) LIBOR, and interest on an overdue amount is payable at a rate of 1 percent above such rate. The Prepetition Credit Facility matures on January 31, 2026 – the fifteenth anniversary of the first utilization date, which was January 31, 2011.

30.     In connection with the Prepetition Credit Agreement the Obligors' entered into various security and pledge agreements, including without limitation:

a.  Debenture between Baha Mar Ltd and certain of the other Debtors, as Chargors, and Citibank, N.A., Bahamas Branch (the "<u>Onshore Security Agent</u>"), dated as of January 31, 2011, in which Chargors pledged bank accounts, real property, plant and machinery and intellectual property rights.

b.  Security Agreement between Northshore Mainland Services Inc., as Security Provider, and the Offshore Security Agent, dated as of January 31, 2011, in which the Pledgor pledged all personal property, including but not limited to all bank accounts.

c.  Owner Packages Account Pledge, between CCA Bahamas Ltd., as Security Provider, and the Offshore Security Agent, dated as of January 26, 2011 in which CCA Bahamas Ltd. pledge certain accounts.

d.  Deposit Accounts Pledge Agreement between Baha Mar Ltd., Baha Mar Properties Ltd., BMP Three Ltd., Cable Beach Resorts Ltd., and Baha Mar Enterprises Ltd., as Security Providers, and the Offshore Security Agent, dated as of January 31, 2001, in which the Security Providers pledged certain accounts.

---

[11]    $112,123,481 remains available under the Prepetition Credit Facility.

### B.      Unsecured Debt

#### a.  Alleged Indebtedness to CCA

31.      Prior to the Petition Date, in various negotiations with the Debtors management and/or in proceedings before the Dispute Resolution Board pursuant to the Main Construction Contract (discussed further below), CCA has alleged it has accrued but unpaid construction amounts and claims of approximately $140 million in the aggregate.  The Debtors, in reliance upon the opinion of their Chartered Quantity Surveyors, vigorously dispute most if not all of these allegations, and many of the disputed claims are subject to pending or future litigation between the Debtors and CCA, its subcontractors, and/or CSCEC (based on the Completion Guarantee).  Moreover, the Debtors believe that, with respect to certain alleged claims asserted by CCA, any potential liability on the part of the Debtors may be subject to future recovery or offset for CCA's construction delays and other performance failures (see below).  In any event, the Debtors believe the amount, if any, for which they could be held liable to CCA will prove to be substantially less than the amount alleged above, even before set-off of the substantial amounts owed by CCA to the Debtors.

#### b.  Trade Debt

32.      As of the Petition Date, the Debtors estimate that they have approximately $123 million of unsecured trade debt and other outstanding operating expenses, including construction payables (other than those payable to CCA), general operating payables, and significant amounts of past-due utilities and gaming related taxes due to the Government of The Bahamas.

### C.      Preferred and Common Equity Interests

33.      Baha Mar Ltd. has a total of 1,550,000,000 common shares issued (represented by Certificates No. 3, 4, 6 and 7), all of which are owned by BML.  In addition,

Baha Mar Ltd. has 150,000 Series A Preferred Shares issued (represented by Certificate No. 5), which are owned by CSCEC (Bahamas).  All of Baha Mar Ltd.'s shares are pledged pursuant to the Pledge of Shares Agreement between BML Properties Ltd. and CSCEC, both as independent Chargors, in favor of Onshore Security Agent, dated as of January 28, 2011, in which Chargors each pledged to the Onshore Security Agent "all the shares owned by it from time to time" in Baha Mar Ltd.[12]  In addition, the shares of certain of the Debtor subsidiaries of Baha Mar Ltd. are pledged pursuant to the following agreements:

a. Stock Pledge Agreement between Baha Mar Operating Company Ltd., as Pledgor, in favor of the Offshore Security Agent, dated as of January 31, 2011, in which Pledgor pledged its shares in Northshore Mainland Services Inc. to the Offshore Security Agent.

b. Pledge of Shares Agreement between Baha Mar, Ltd., Baha Mar Land Holdings Ltd. and Baha Mar Operating Company, as Chargors, in favor of the Onshore Security Agent, dated as of January 31, 2011 in which Chargors each pledged their shares in Baha Mar Land Holdings Ltd., Baha Mar Operating Company Ltd., Cable Beach Resorts Ltd., Baha Mar Entertainment Ltd., Baha Mar Enterprises Ltd., Baha Mar Properties Ltd., BMP Three Ltd. and BMP Golf Ltd. to the Onshore Security Agent.

## III.   Key Events Leading to Commencement of the Chapter 11 Cases

### A.   Repeated Construction Delays and Breaches

34.   As noted above, CCA agreed to a schedule for the Project which anticipated construction completion by November 20, 2014 as well as to liquidated damages for late completion.  Although CSCEC (operating through its various subsidiaries) is one of the world's largest contractors, it had little experience in constructing single-phase resort projects of the size and complexity of the Project.  In June 2011, to address this concern, CCA agreed that it would partner with one or more experienced contractors on the Project.  No such partnerships

---

[12]   Pursuant to the Charge Over Shares Agreement between BML Properties Ltd., as Chargor, in favor of CSCEC (Bahamas), as the Chargee, dated as of January 28, 2011, Chargor pledged to Chargee certain shares of Baha Mar Properties Ltd. as a second ranking pledge.

ever materialized.

35.     In response to the Debtors' subsequent inquiries, CCA instead agreed to hire more than two dozen top-level personnel from Las Vegas with experience constructing projects similar to the Project.  Less than a dozen such people were ultimately hired, however, and all but a few of them had left the Project within a year.  Moreover, although CCA required the Debtors to obtain approval from the Government of The Bahamas for 5,000 worker permits, CCA's work force never reached that level, even at peak staffing, and on average was substantially lower.

36.     From the onset of construction, CCA often failed to provide periodically-required procurement schedules or comply with certain of its reporting requirements, which were key to the Debtors' planning, quality control and insurance coverage.  As a result, the Debtors had to dispatch their own personnel at a significant unplanned cost over the life of the Project to monitor construction, perform spot inspections, and ensure the safety of the worksite, among numerous other tasks.

37.     By early 2013, notwithstanding CCA's repeated assurances to the Debtors, the Government of The Bahamas, and CEXIM Bank, it had become clear that, absent corrective measures, CCA would not meet the construction completion schedule.  As a result, the Debtors demanded that CCA, among other things, increase its manpower to accelerate the work. Consequently, on May 17, 2013, Baha Mar Ltd. and CCA entered into a Memorandum of Understanding ("MOU"), witnessed by the Bahamian Ambassador for the Peoples Republic of China, setting out agreed items, including increasing the amount of labor working on the Project, interior finish packages, and target construction completion dates.  These completion dates included a commitment by CCA that the Debtors would receive 100% access to, at a minimum,

the key ballrooms and meeting rooms of the convention center on or before March 31, 2014.

38.    Within a short period after it was executed, however, CCA breached the MOU by, among other things, failing to increase staffing and management.  CCA further failed to provide the Debtors with access to any part of the convention center by March 31, 2014, as the MOU had required.  Beginning shortly thereafter, the Debtors attempted to negotiate a resolution with CCA and its parent company CSCEC, but ultimately were unsuccessful.

39.    On May 16, 2014, Baha Mar Ltd. commenced proceedings to seek relief from the Dispute Resolution Board ("DRB") pursuant to the Main Construction Contract. Following submissions by the parties, in which Baha Mar Ltd. sought relief with respect to CCA's breaches regarding the convention center, the DRB issued a Decision and Opinion on August 13, 2014 in which it ruled, among other things, that CCA had been proceeding in breach of the Main Construct Contract "with respect to the timing and content of the Construction Schedules" and by "failing to proceed expeditiously with adequate forces sufficient to comply with the [Main Construction] Contract."  The DRB also ruled that CCA had a continuing obligation to maintain a workforce at the levels demonstrated during the DRB hearings.

40.    As of the Petition Date, both Baha Mar Ltd. and CCA continue to have claims pending before the DRB pursuant to the Main Construction Contract, as well as the November 19, 2014 Meeting Minutes (as defined below).

**B.    CCA's Failure to Achieve Construction Completion by November 2014**

41.    By September 2014, following months of increasingly contentious relations with CCA and CCA's blatant disregard for the DRB ruling, it became clear that CCA would not complete the Project in time to open by its December 2014 target date.  The Debtors swiftly implemented measures that ensured their ability to operate through at least early April 2015 without generating post-opening revenue or requiring additional liquidity to survive.

Among other things, the Debtors' reduced their existing staff, postponed new staffing hires, and delayed marketing and advertising expenditures slated for its pre-opening launch campaign. Moreover, in extending their budget, the Debtors also had to account for additional quarterly payments to CEXIM Bank of $25 million each.

42.     While implementing these measures, the Debtors unsuccessfully continued to negotiate an agreed schedule for a revised construction completion date for the Project with CCA, which refused to make any concessions unless and until the Debtors accepted responsibility for and made advance payments of the contractor's backlog of disputed costs and change orders.

43.     In November 2014, in-person negotiations were held in Beijing among CEXIM Bank, the Debtors, and CCA.  At the conclusion of those negotiations, meeting minutes were signed on November 19, 2014 among Baha Mar Ltd., CCA and CEXIM Bank (the "Meeting Minutes").  The Meeting Minutes reflected the agreement of the Debtors to essentially "buy" dates certain for the construction completion of the Project in an effort to mitigate the impact of CCA's breaches of its commitments to achieve such completion as required by the Main Construction Contract.  Specifically, in exchange for receiving from the Debtors a total of $54 million of advances on disputed claims, CCA agreed (a) that "upon January 19, 2015, except for the wedding chapel and elevator tower, the rest of the Convention Centre will be Substantially Complete and ready for operational start for paying guests," and (b) to "Substantial Completion of the Project … to achieve operational start for paying guests in hotels including amenities" by March 27, 2015.  To ensure that it met these now-delayed milestones, CCA further agreed to take measures for the "improvement of work productivity" and the "enhancement of on-site management."

**C.      CCA's Further Failure to Achieve Construction Completion by March 2015**

44.      On December 5, 2014, at a meeting of Baha Mar Ltd.'s board of directors, CCA re-assured the board that the Project would open on March 27, 2015.  In reliance on this reassurance, the board – including CSCEC (Bahamas)'s appointee – voted unanimously to commence taking reservations for the new hotels and convention center from the public starting March 27, 2015.

45.      In early January 2015, the Developer and the Prime Minister of The Bahamas met in Beijing with representatives of CEXIM Bank and CCA.  During these meetings, CCA representatives confirmed that the Project would open on March 27, 2015.

46.      Following these assurances and already having made advanced payments to CCA totaling $54 million in accordance with the Meeting Minutes, the Debtors began to prepare for their new targeted opening dates.  Between January 1, 2015 and March 27, 2015, the Debtors hired an additional 2,070 employees and staff needed to operate the Project at an aggregate additional cost of more than $4 million per month.  These new hires included over 1,700 employees for whom the Debtors spent significant time and money training for positions in the Project's new hotels and casino.  In addition, the Debtors spent substantial funds on their pre-opening marketing and advertising campaigns, fully stocking their facilities with food and beverage supplies and other inventories, and stocking their vault with the $4.5 million in cash necessary to open the casino.

47.      CCA failed to complete the convention center for the agreed upon opening date of January 19, 2015.  In numerous subsequent meetings, however, CCA continued to give the Debtors detailed assurances that the entire Project (including the convention center) would be completed and ready for opening by March 27, 2015.  Moreover, as was typical throughout the life of the Project, I met in person with the President of CCA on multiple occasions each week.

At none of these meetings did the President inform me that CCA would not complete the Project on time.

48.    During this time, CCA executives began asking the Debtors to release retainage amounts – funds the Debtors are contractually obligated to pay only when the Project is "Substantially Completed" – which amount is currently approximately $70 million. Additionally, CCA began to submit inflated invoices for work.  For example, the Debtors received monthly pay applications from CCA for the period February through May 2015 in an aggregate amount of $343.8 million for work in respect of which CEXIM Bank's own independent project monitor countersigned at a value stated to be worth only $76.1 million.

49.    CCA failed to complete construction by March 27, 2015 without providing any effective advance notice to the Debtors.  Upon admitting such failure, rather than provide a new construction completion date, CCA preferred to discuss payment and funding issues.  Shortly thereafter, CCA ceased all material work on the Project.

50.    As a result, the Debtors were forced to cancel months' worth of room reservations and group meeting events and provide numerous customers with vouchers, refunds, and in certain cases were required to find customers suitable accommodations elsewhere, all at a cost in excess of $6 million.  The Debtors suffered many other damages as well, including significant harm to the Baha Mar name and reputation.  The Debtors also incurred substantial sunk costs that they must expend once again to open the Project.  In short, the missed opening date of March 27, 2015 was devastating for the Debtors.

**D.    Efforts to Resolve CCA's Breach and Obtain Additional Funding**

51.    Since the beginning of April 2015, without the ability to generate revenue from the completed Project, the Debtors have been operating in a severe liquidity crunch. Compounding matters, CCA has refused to repay the Debtors the portion of the $54 million it

received pursuant to the November 19, 2014 Meeting Minutes, which it had agreed to pay back if it missed its completion milestones.    Moreover, CEXIM Bank has refused to advance the remaining amount of approximately $112 million available under the Prepetition Credit Facility absent certain unattainable conditions, including additional equity contributions.

52.    In fact, the Developer took steps to enable BML to make its equity contribution of $15 million on March 20, 2015.[13]    At that time, an additional equity contribution of $30 million was required for the Debtors to continue to borrow under the terms of the Prepetition Creditor Agreement,[14] and pursuant to a Sponsor Support Agreement dated January 28, 2011 (the "Sponsor Support Agreement"), BML and CSCEC had agreed to make such contributions equally.    Nevertheless, despite demand by the Debtors, CSCEC has never made its corresponding $15 million equity shortfall contribution under Sponsor Support Agreement. Furthermore, the construction completion delays caused by CCA continue to postpone the contribution of as much as $52 million of "key money" that the Brands agreed to pay the Debtors under the Brand Agreements before and upon opening of the Project.

53.    By the end of May 2015, it became clear to the Debtors that, without a negotiated resolution, they would run out of cash by the end of June 2015, if not sooner. Accordingly, the Debtors began contingency planning, including for a potential chapter 11 filing. Nevertheless, during such time, the Debtors continued to engage in constant negotiations with CEXIM Bank, CCA, and CSCEC in an effort to achieve a consensual resolution that would bring CCA back to work to finish the Project as soon as possible while providing the Debtors with the necessary liquidity.

---

[13]    In addition, the Developer, in his capacity as CEO of Baha Mar Ltd., has not drawn a salary in over 3 years and took steps to have his previously drawn salary refunded to the Debtors.  The Debtors have received this refund.

[14]    Borrowings by the Debtors under the Prepetition Credit Agreement are subject to a debt-to-equity ratio covenant. .

54.    On three separate occasions in the last two months, the Debtors'
management team has travelled to Beijing to meet with representatives of CEXIM Bank, CCA,
and CSCEC.  Unfortunately, no resolution was reached.  With its cash exhausted and no other
viable options for pursuing continued negotiations, the Debtors commenced the Chapter 11
Cases on the Petition Date.

E.    **Post-petition Financing**

55.    In anticipation of commencing the Chapter 11 Cases, the Debtors
consulted with their advisors regarding post-petition financing, as the Debtors' financial
projections indicated that the Debtors require up to $30,000,000 of financing to continue to
operate and fund the Project until further court hearings, which are anticipated to take place in
three weeks' time, during which time either the disputes with CCA, CSCEC, and CEXIM Bank
are resolved or an alternative arrangement is found.

56.    The Debtors identified the Developer as the most likely source of post-
petition financing, given the dispute with CCA, the present uncertainty of when the Project will
open, and the Developer's vast knowledge of the assets, history with the Debtors, and substantial
investments in the Debtors.  After good faith negotiations, the Debtors ultimately concluded
(after consultation with their advisors) that the proposed post-petition financing facility (the "DIP
Facility") is the best post-petition financing option available to the Debtors, based on the short
amount of time that would have been available to complete the necessary due diligence and
negotiate and document alternative DIP financing, no third-party lender would have been able to
provide DIP financing in time to meet the Debtors' needs given the size of the Project and the
complexity of the capital structure.  Moreover, in light of such time constraints and the present
lack of Project construction completion, any form of post-petition financing on an unsecured
basis would plainly have been unobtainable.  Accordingly, on the date hereof, the Debtors have

filed a motion seeking approval of the DIP Facility on an interim bases, which will provide sufficient liquidity to allow the Debtors to fund the orderly administration of the Chapter 11 Cases.

## IV.   The Chapter 11 Cases

### A.     Objectives of the Chapter 11 Cases

57.    The Debtors still believe that a negotiated solution is possible among the existing parties to the Project that would lead to its completion and successful opening. Nevertheless, as a result of their strained liquidity, the Debtors could not continue to operate in the ordinary course.   The Debtors believe that chapter 11 is the best available means for preserving and maintaining the Project and then achieving their ultimate goal of becoming an operational word-class resort.

58.    To position themselves to achieve that goal, in addition to continuing operations of the Melia without interruption, the Debtors will continue to operate and fund payroll for the Project until further court hearings, which are anticipated to take place in three weeks' time.   During such time, the Debtors will explore avenues to finish construction, secure any necessary additional financing through a chapter 11 recapitalization, and monetize certain assets, the most significant of which are their construction claims against CCA, its subcontractors, and/or CSCEC (under the Completion Guarantee).[15]   Only after these steps are taken will the Debtors be able to re-start "pre-opening" functions followed by a full opening. The Debtors believe that this proposed course of action represents the best strategy to maximize value for all of their various stakeholders.

---

[15]    The claims that Baha Mar Ltd. is continuing (or intending) to pursue in relation to the construction delays and disputes amount to an aggregate estimated value in excess of $200 million.

59. Establishing a sound financial foundation and expeditiously finishing the Project will result in an increase in value far exceeding the costs to complete the Project, thereby unlocking the Project's significant value as a going concern for the benefit of all interested parties, including the social and economic welfare of The Bahamas. Indeed, once completed, Baha Mar will generate nearly 5,000 new jobs and have an annual payroll in excess of $130 million, representing 12% of the GDP of The Bahamas.

## V.    First Day Pleadings

60. Concurrently with their chapter 11 petitions, the Debtors are filing the following First Day Pleadings:

a. Debtors' Motion for Entry of Order (I) Directing Joint Administration of Related Chapter 11 Cases, and (II) Granting Related Relief ("Joint Administration Motion");

b. Debtors' Motion for Entry of Order (I) Authorizing the Debtors To Prepare Consolidated List of Creditors in Lieu of Submitting Required Mailing Matrix and (II) Granting Related Relief ("Creditor Matrix Motion");

c. Debtors' Motion for Entry of Order Granting (I) Extension of Time To File Schedules and Statements and (II) Related Relief ("Motion To Extend Time");

d. Debtors' Application for Entry of Order (I) Authorizing Employment and Retention of Prime Clerk LLC as Claims and Noticing Agent Effective *Nunc Pro Tunc* to Petition Date and (II) Granting Related Relief ("Prime Clerk Application");

e. Debtors Motion for Entry of Order (I) Enforcing and Restating Automatic Stay and Ipso Facto Provisions, (II) Authorizing Northshore Mainland Services Inc. To Act as Foreign Representative, and (III) Granting Related Relief ("Automatic Stay Motion");

f. Debtors' Motion for Entry of Order (I) Authorizing Debtors To, In Ordinary Course, (A) Use Cash Management System, Bank Accounts, and Business Forms and (B) Perform Intercompany Transactions, (II) Authorizing Banks and Financial Institutions To Honor and Process All Related Checks and Electronic Payment Requests, (III) Waiving Guidelines of Section 345(b) of Bankruptcy Code, and (IV) Granting Related Relief ("Cash Management Motion");

g.  Debtors' Motion for Entry of Order (I) Authorizing, Debtors To (A) Pay
Prepetition Wages, Salaries, and Other Compensation, and Employee
Benefits, and (B) Continue Existing Employee Benefit Plans and Programs,
(II) Scheduling a Hearing Date for Approval of an Incentive Program, (III)
Authorizing Banks and Financial Institutions To Pay All Checks and
Electronic Payment Requests, and (III) Granting Related Relief ("Employee
Wages Motion");

h.  Debtors' Motion for Entry of Order (I) Authorizing, but Not Directing,
Debtors To (A)  Maintain Existing Insurance Programs and (B) Pay All
Obligations in Respect Thereof, (II) Authorizing Banks and Financial
Institutions To Honor and Process All Related Checks and Electronic Payment
Requests, and (III) Granting Related Relief ("Insurance Motion");

i.  Debtors' Motion for Entry of Interim and Final Orders (I) Determining That
Utility Providers Have Been Provided With Adequate Assurance of Payment,
(II) Approving Proposed Adequate Assurance Procedures, (III) Prohibiting
Utility Providers from Altering, Refusing, or Discontinuing Utility Services,
(IV) Determining That Debtors Are Not Required To Provide Any Additional
Assurance, (IV) Scheduling Hearing To Consider Entry of Final Order, and
(VI) Granting Related Relief ("Utilities Motion");

j.  Debtors' Motion for Entry of Order (I) Authorizing, but Not Directing,
Debtors To Pay Taxes and Fees, (II) Authorizing Banks and Financial
Institutions To Honor and Process All Related Checks and Electronic Payment
Requests, and (II) Granting Related Relief ("Taxes Motion");

k.  Debtors' Motion for Entry of Order (I) Authorizing, but Not Directing,
Debtors To (A) Maintain Certain Customer Programs and (B)  Pay
Obligations in Respect Thereof, (II) Authorizing Banks and Financial
Institutions To Honor and Process All Related Checks and Electronic Payment
Requests, and (III) Granting Related Relief  ("Customer Programs Motion");

l.  Debtors' Motion for Entry of Order (I) Authorizing, but Not Directing,
Payment of Critical Vendor Claims in Ordinary Course of Business,
(II) Authorizing Payment of 503(b)(9) Claims, (II) Authorizing Banks and
Financial Institutions To Honor and Process All Related Checks and
Electronic Payment Requests, and (IV) Granting Related Relief ("Critical
Vendors Motion"); and

m.  Debtors' Motion for Entry of Interim and Final Orders (I) Authorizing
Debtors To Obtain Post-petition Financing, (II) Granting Liens and Super-
Priority Claims, (III) Authorizing Use of Cash Collateral, (IV) Granting
Adequate Protection to Prepetition Secured Lenders, (V) Scheduling Hearing
To Consider Entry of Final Order, and (VI) Granting Related Relief ("DIP
Motion").

61.     As noted above, the relief sought in the various First Day Pleadings would allow the Debtors to, among other things, (a) establish certain administrative procedures to promote a seamless transition into the Chapter 11 Cases, (b) continue the Debtors' ongoing operations and preserve the Project's viability, (c) obtain debtor-in-possession financing and use cash collateral in the operation of the Debtors' businesses, and (d) protect the Debtors' assets and interests from any improper actions that may be taken by third parties.

62.     Several of the First Day Pleadings request authority to pay certain prepetition claims.  I am informed by the Debtors' advisors that Rule 6003 of the Federal Rules of Bankruptcy Procedure provides, in relevant part, that the Court shall not consider motions to pay prepetition claims during the first 21 days following the filing of a chapter 11 petition, "except to the extent relief is necessary to avoid immediate and irreparable harm."  In light of this requirement, the Debtors have limited their request for immediate authority to pay prepetition claims to those circumstances where the failure to pay such claims would cause immediate and irreparable harm to the Debtors and their estates.  Notably, this relief is especially appropriate given that the Debtors' foreign creditors may (a) not respect the automatic stay or the orders of a court in the United States, (b) otherwise seek relief before foreign courts, or (c) take such other actions that harm the Debtors' ongoing operations or encumber the preservation of the Project's viability.

63.     Below are a brief discussion of the Debtors' operational First Day Pleadings and an explanation of why, in my belief, such motions are critical to the successful prosecution of the Chapter 11 Cases.  More fulsome descriptions of the facts regarding the Debtors' operations, and the bases for the relief requested in the operational motions, can be found in each relevant First Day Pleading.

**Cash Management Motion**

64.     Pursuant to the Cash Management Motion, the Debtors seek entry of an order (a) authorizing the Debtors to, in the ordinary course of their businesses, (i) use the Cash Management System, Bank Accounts, and Business Forms (without reference to the Debtors' status as a debtors in possession) and (ii) perform Intercompany Transactions, (b) authorizing the Cash Management Banks to (i) maintain, service, and administer the Bank Accounts and (ii) honor and process all payment requests consistent with the relief requested therein, (c) waiving the Debtors' compliance with the guidelines set forth in section 345(b) of the Bankruptcy Code, and (d) granting such other and further relief as requested therein or as the Court otherwise deems necessary or appropriate.

65.     I believe that the relief requested in the Cash Management Motion is necessary and appropriate in order to avoid any interruptions to the operation of the Debtors' businesses.  I believe that authorizing the Debtors to, among other things, continue operating the Cash Management System, maintain existing Business Forms, and continue Intercompany Transactions is essential to the Debtors' operational stability and restructuring efforts.   The Debtors maintain a relatively complex Cash Management System.  In my opinion, continued use of the Cash Management System will facilitate the Chapter 11 Cases by, among other things, avoiding administrative inefficiencies and expenses associated with disrupting this system and minimizing delays in the payment of post-petition obligations.  Moreover, I believe that allowing the Debtors to continue Intercompany Transactions, as well as to continue performing certain other status quo cash management operations, such as maintaining current Business Forms, will ensure (a) that the Debtors' businesses will be uninterrupted by the commencement of this bankruptcy and (b) the preservation of the Project's viability, thereby allowing the efficient

administration of the Chapter 11 Cases and maximizing the value of the Debtors' estates.

**Employee Wages Motion**

66.     Pursuant to the Employee Wages Motion, the Debtors request entry of an order (a) authorizing the Debtors, in their sole discretion, to (i) pay amounts relating to the prepetition Employee Obligations and Employee Benefit Programs and (ii) continue existing Employee Benefit Programs, (b) authorizing banks and other financial institutions to receive, process, honor, and pay all checks and electronic payment requests relating to the foregoing, (c) setting a hearing date that is anticipated to be three weeks after the Petition Date, and (d) granting such other and further relief as requested therein or as the Court otherwise deems necessary or appropriate.  The Debtors are not requesting authority to pay any amounts over the Statutory Cap to any individual Employee or Contractor on account of such Employee's prepetition Employee Obligations or Employee Benefit Programs, provided, however, that the Debtors, in their sole discretion, will pay in full, and not subject to the Statutory Cap, the Reimbursable Expenses, Payroll Obligations, the Prepetition SOI Claims, the Prepetition Black Mountain Claims, on-going processing fees for SOI and Black Mountain, Payments in Lieu of Notice, Repatriation Payments, Severance Payments and any and all other payments that are required to be paid in full under applicable law.

67.     I believe the relief requested in the Employee Wages Motion is necessary and appropriate in order for the Debtors' to manage their businesses, which requires the continued commitment of their employees, temporary workers, and independent contractors.  I believe that the Debtors' business operations will need to be the sole focus of their workforce during the Chapter 11 Cases, and the Debtors cannot afford for these individuals to be distracted by unnecessary concern over the payment of their wages and other benefits in the ordinary

course of operations.  Additionally, the Debtors anticipate operating a world-class resort and will need to be able to retain and employ the most qualified individuals in order to provide the level of excellence necessary to attract a global clientele, notwithstanding the Chapter 11 Cases. Accordingly, the Debtors' success in their restructuring efforts is highly dependent on the continued service and support of their workforce.

**Insurance Motion**

68.    Pursuant to the Insurance Motion, the Debtors request entry of an order (a) authorizing, but not directing, the Debtors to (i) maintain the Insurance Programs on an uninterrupted basis in accordance with their historical practices, (ii) pay all Insurance Obligations, whether relating to the prepetition or post-petition period, (b) authorizing financial institutions to honor and process all checks and electronic payment requests related to the foregoing, and (c) granting such other and further relief as is requested therein or as the Court otherwise deems necessary or appropriate.

69.    I believe that the relief requested in the Insurance Motion is necessary and appropriate because the continuation of the Insurance Programs and payment of the Insurance Obligations are imperative to the Debtors' continued operations, ability to restructure, and preservation of value of their estates.  It is essential for the Debtors to carry insurance in their day-to-day operations, or they run the risk of, among other harms, incurring financial responsibility and legal liability for potential occurrences not covered by insurance.  Moreover, in many cases, coverage provided by the Insurance Policies is required by the regulations, laws, and contracts that govern the Debtors' commercial activities.

70.    The Debtors need to minimize the risks associated with operating their businesses.  Even a brief delay or suspension in the Debtors' ability to pay the Insurance

Obligations could create significant risk that the Debtors would void or otherwise lose the benefits of the Insurance Programs.  Accordingly, maintaining the Insurance Programs and paying the Insurance Obligations ensure that the value of the Debtors' estates is maximized for the benefit of all stakeholders.

**Utilities Motion**

71.     Pursuant to the Utilities Motion, the Debtors request entry of an order (a) determining that the Utility Providers have been provided with adequate assurance of payment within the meaning of section 366 of the Bankruptcy Code by virtue of the Proposed Adequate Assurance, (b) approving the Adequate Assurance Procedures as proposed therein, (c) prohibiting the Utility Providers from altering, refusing, or discontinuing Utility Services on account of prepetition amounts outstanding or on account of any perceived inadequacy of the Adequate Assurance Procedures, (d) determining that the Debtors are not required to provide any additional assurance beyond what is proposed in this Motion, (e) scheduling the Final Hearing to consider entry of the Final Order, and (e) granting such other and further relief as requested therein or as the Court otherwise deems necessary or appropriate.

72.     I believe the relief requested in the Utilities Motion is necessary and appropriate because uninterrupted Utility Services are essential to the Debtors' ongoing operations and the Project's viability and, therefore, are essential to the success of the Debtors' reorganization.  If the Utility Providers refuse or discontinue service, even for a brief period, the Debtors would suffer immediate and irreparable harm, and the disruption would cause potential safety hazards. Thus, it is imperative that the Utility Providers continue to provide their Utility Services without interruption.   In addition, I am informed and believe that the proposed

Adequate Assurance Procedures are consistent with procedures that courts in this district have regularly approved in other large chapter 11 cases.

**Taxes Motion**

73.     Pursuant to the Taxes Motion, the Debtors request entry of an order (a) authorizing, but not directing, the Debtors to pay any unpaid Taxes and Fees, whether arising prepetition or post-petition, as such Taxes and Fees become due in the ordinary course of business, (b) authorizing financial institutions to honor and process all checks and electronic payment requests relating to the foregoing, and (c) granting such other further relief as requested therein or as the Court otherwise deems necessary or appropriate.

74.     I believe that the relief requested in the Taxes Motion is necessary and appropriate because the Debtors' failure to pay prepetition Taxes and Fees could materially and adversely impact their business operations, impair the value of the Debtors' estates, and threaten the Debtors' reorganizations in several ways.  First, the Taxing Authorities could initiate audits of the Debtors, which would unnecessarily divert the Debtors' focus and attention from the tasks required by the reorganization process at a critical time for their businesses.  Second, the Taxing Authorities may attempt to suspend the Debtors' operations, file liens, seek to lift the automatic stay, and/or pursue other remedies that not only would be administratively burdensome to the Debtors' estates, but could also have disastrous consequences on the Debtors' business operations.  Third, the Debtors' failure to pay such Taxes or Fees to the Taxing Authorities could cause the Debtors to incur late fees, penalties, and other charges.  Accordingly, I believe that the ability to pay unpaid Taxes and Fees, whether arising prepetition or post-petition, will greatly assist the Debtors in maximizing the value of their estates.

**Customer Programs Motion**

75.     Pursuant to the Customer Programs Motion, the Debtors request entry (a) authorizing, but not directing, the Debtors, in their sole discretion, to (i) continue the Customer Programs and (ii) honor and pay Customer Obligations arising prior to the Petition Date, (b) authorizing and directing banks and other financial institutions to receive, process, honor, and pay all checks presented for payment and electronic payment requests relating to the foregoing, and (c) granting such other and further relief as requested therein or as the Court otherwise deems necessary or appropriate.

76.     I believe that the relief requested in the Customer Programs Motion is necessary and appropriate to preserve the value of the Debtors' estates with respect to both the Debtors' current operations (i.e., the Melia) and the Project's unopened operations.  I believe that ability to continue the Customer Programs and honor and pay the Customer Obligations in the ordinary course is critical.  The Debtors operate in a highly competitive sector and the success and viability of the Debtors' business is dependent upon the loyalty and confidence of their customers.  Any failure to maintain the Customer Programs or pay the Customer Obligations could result in the Debtors' losing support from their loyal customers, and could tarnish the Debtors' reputation in the marketplace.  I believe that if the Debtors failed to honor the Customer Programs or pay the Customer Obligations in the ordinary course and without interruption, they would almost certainly suffer an irreparable loss of customer support and confidence and revenues would dwindle to the ultimate detriment of the Debtors' estates and all stakeholders.

**Critical Vendors Motion**

77.     Pursuant to the Critical Vendors Motion, the Debtors request entry of an order (a) authorizing, but not directing, the Debtors to pay the Critical Vendor Claims as such

claims become due in the ordinary course of business, (b) authorizing the payment of 503(b)(9) Claims as such claims become due in the ordinary course of business, (c) authorizing financial institutions to honor and process all related checks and electronic payment requests, and (d) granting such other and further relief as requested therein or as the Court otherwise deems necessary or appropriate.

78.    I believe the relief requested in the Vendors Motion is necessary and appropriate because the nature of the Debtors' businesses and extent of their operations make payment on account of the Critical Vendor Claims essential to the preservation of the Debtors' businesses and value of the Debtors' estates for all creditors and parties in interest.  I believe that the Debtors need to maintain and continue their relationships with various vendors, agents, suppliers, and customers in order for the Debtors to continue to operate their businesses.  If the Debtors are not able to fulfill the Critical Vendor Claims, the Debtors' businesses would be threatened by the risk that vendors, agents, suppliers, and customers could terminate their relationships with the Debtors or take other actions that could have a potentially deleterious effect on the Melia, the Debtors' businesses as a whole, and the Debtors' ability to reorganize.

79.    In assessing strategies to continue doing business with the Critical Vendors, the Debtors have considered the availability of alternative protections for each Critical Vendor, such as prepayment and payment-in-advance or on-delivery.  Because many of the Critical Vendors are the only practical source of such goods and services, such payment alternatives are not available.  The Debtors have, therefore, determined that paying the Critical Vendor Claims is the most effective way to ensure that such Critical Vendors will continue to (a) supply goods and services both now and in the future and (b) provide favorable credit terms to the Debtors as they enter into the Chapter 11 Cases.

80.    The Debtors have reviewed their accounts payable and prepetition vendor lists in order to identify those creditors most essential to their operations during the Chapter 11 Cases, i.e., the Critical Vendors.  The Debtors identified the Critical Vendors using the following criteria: (a) whether certain quality specifications or other requirements of the Debtors' customers prevent the Debtors from obtaining a vendor's product(s) or service(s) from alternative sources within a reasonable timeframe; (b) whether, if a vendor is not a single source supplier, the Debtors have sufficient product in inventory to continue their operations while a replacement vendor is put in place; and (c) whether a vendor meeting the foregoing criteria is able or likely to refuse to ship product to the Debtors post-petition if its prepetition balances are not paid.  As a result of the foregoing analysis, the Debtors managed to reduce its Critical Vendors to the following categories: (v) laundry/linen service; (w) food distribution; (x) alcoholic and non-alcoholic beverage distribution; (y) fuel; and (z) personnel provided under secondment.

81.    Moreover, I believe that the relief set forth in Critical Vendors Motion is especially appropriate given that the Debtors' foreign creditors may (a) not respect the automatic stay or the orders of a court in the United States, (b) otherwise seek relief before foreign courts, or (c) take such other actions that harm the Debtors' ongoing operations or encumber the preservation of the Project's viability.  Accordingly, I believe that the relief requested is necessary to maximize the value of the Debtors' estates for the benefit of all stakeholders.

**DIP Motion**

82.    Pursuant to the DIP Motion, the Debtors request entry of an order (a) authorizing the Debtors to obtain and guarantee the up to $80,000,000 DIP Facility under the terms of the DIP Term Sheet, with up to $30,000,000 on an interim basis under the Interim Order

and the other DIP Finance Documents, (b) authorizing the Debtors to execute and deliver the Note from the Debtors in favor of the DIP Lenders, and upon entry of the Final Order additional DIP Finance Documents consistent with the terms of the DIP Term Sheet (or as may be required by law) and to perform such other and further acts as may be required in connection with the DIP Finance Documents, (c) allowing superpriority administrative expense status of the DIP Obligations in the Chapter 11 Cases and authorizing the Debtors to grant to the DIP Agent on its behalf and on behalf of the DIP Lender automatically perfected security interests in and liens on the DIP Collateral, (d) authorizing the use of Cash Collateral by the Debtors effective as of the Petition Date, (e) granting adequate protection to the Prepetition Agents for their benefit and the benefit of the Prepetition Lenders, (f) vacating and modifying the automatic stay imposed by section 362 of the Bankruptcy Code to the extent necessary to implement and effectuate the terms and provisions of the Interim Order and the Final Order, (g) scheduling the Final Hearing to consider entry of the Final Order, and (h) granting related relief.

83.    To help assure that we move down this path efficiently, the Developer is arranging the funding for the DIP Facility.  This financing will, among other things, enable Baha Mar to pay for goods and services provided by vendors after the commencement of the process.  To that end, in mid-June 2015, the Debtors and their advisors began negotiations with the Developer regarding debtor-in-possession financing.  In the days that followed, the Debtors and the Developer negotiated in good faith the terms and conditions of the financing and the use of cash collateral.  These negotiations ultimately resulted in the DIP Facility for which the Debtors are seeking approval.

84.    It is my understanding that the Moelis & Company LLC (the Debtors proposed investment banker and financial advisor to Northshore Mainland Services, Inc.)

believed it highly unlikely that a third party lender would have had sufficient time to conduct due diligence on the Project and provide DIP financing on an interim basis. Without the need for extensive time for due diligence, the DIP Lenders were able to negotiate and provide interim financing to the Debtors on reasonable terms that allow the Debtors to continue paying necessary business expenses during these cases.

85.     It is my understanding that the Debtors propose to use the proceeds of the DIP Facility to support the Debtors' operations in chapter 11, which will be substantially downsized to the level necessary to preserve the value of the Project (operate continuing business/hotel) because of the contractor's refusal to complete the Project. Accordingly, the DIP Facility will be used to fund the wages, salaries and benefits of those employees that remain with the Debtors, pay severance as required by law, procure necessary goods and services (and maintain trade terms with the Debtors' vendors), finance the costs of these Chapter 11 Cases, and meet certain other working capital needs.

86.     Additionally, the Debtors have approximately $9.33 million in cash on hand as of the Petition Date. Substantially all of that amount is held in bank accounts that are subject to Prepetition Agents' asserted liens. The Debtors propose and seek authority pursuant to this Motion to use such cash as follows:

      a.  <u>Melia Cash</u>.   The Debtors will continue to operate the Melia (as defined above) during the Chapter 11 Cases. As of the Petition Date, approximately $3.25 million is held in bank accounts that are used to support the operations of the Melia (the "<u>Melia Cash</u>"). The Debtors propose to continue to use the Melia Cash in the ordinary course of business to support operations at Melia

and will not use the Melia Cash to pay expenses of any other Debtor entity without further Order of the Court.

b. <u>Customer Deposits</u>.   As of the Petition Date, approximately $20 million is held in accounts used to hold, honor and pay customer deposits in the ordinary course of business (the "<u>Customer Deposit Cash</u>").   The Debtors propose to continue to use the Customer Deposit Cash to meet their obligations with respect to customer deposits in the ordinary course of business.

c. <u>All Other Cash</u>.   The Debtors propose to use the balance of their cash on hand to generally finance their operations in the Chapter 11 Cases, subject to the DIP Budget.

87.   Aside from cash generated by the Melia property (as discussed above), the Debtors do not anticipate generating any cash through operations.

88.   I believe the relief requested in the DIP Motion is necessary and appropriate because the Debtors need the funds to be provided pursuant to the DIP Facility and use of Cash Collateral to preserve the value of its estate.   Approval of the DIP Facility and the use of cash collateral will enable the Debtors to preserve and maintain the Project and operate Melia, while satisfying their current and ongoing operating expenses, including post-petition wages and salaries, utilities, taxes, and vendor costs.   Absent access to the DIP Facility and the use of cash collateral, the Debtors' operations would come to an immediate halt, resulting in irreparable harm to their businesses and, ultimately, their ability to timely open their businesses.   Accordingly, I believe the proceeds of the DIP Facility and the access to cash collateral are critical to support the Debtors' operations and restructuring activities through the

pendency of the Chapter 11 Cases, which will provide an effective means of maximizing the value of the Debtors' estates.

**Automatic Stay Motion**

89.     Pursuant to the Automatic Stay Motion, the Debtors request entry of an order (a) enforcing and restating the automatic stay and *ipso facto* provisions of the Bankruptcy Code, (b) authorizing Northshore Mainland Services Inc. to act as the foreign representative on behalf of the Debtors' estates in any judicial or other proceedings in a foreign country, including any proceedings in The Bahamas, and (c) granting such other and further relief as requested therein or as the Court otherwise deems necessary or appropriate.

90.     Given the nature and organizational structure of the Debtors' businesses, the Debtors regularly and extensively transact with vendors and suppliers of goods and services located outside the United States, particularly in The Bahamas.  These foreign creditors and counterparties are not likely to be familiar with the Bankruptcy Code, particularly with respect to the various protections it affords to chapter 11 debtors, including the automatic stay.  As such, I believe that there is risk that certain foreign creditors and counterparties will not adhere to, or respect, the automatic stay or the orders of a court in the United States.  Any such act by a foreign creditor or counterparty in contravention of the Bankruptcy Code could cause a severe disruption to the Debtors' ability to operate their businesses, successfully open the Project, and expeditiously exit bankruptcy protection.

91.     I believe that the relief requested in the Automatic Stay Motion is necessary to inform any affected parties of the existence of sections 362 and 365 of the Bankruptcy Code and the protections that they afford the Debtors and their assets regardless of where such assets are located.  I believe that entry of the proposed order will also help protect the

Debtors and their assets from any improper actions that may be taken by parties located in foreign jurisdictions that may be unaware of the protections of the Bankruptcy Code and may unwittingly violate it.

92.      In addition, the Debtors intend to seek assistance from the Supreme Court of The Commonwealth of The Bahamas in order to further protect the Debtors' assets and operations in The Bahamas.  In order to seek such relief, the Debtors must be authorized to act as a "foreign representative" on behalf of the Debtors' estates to seek such relief from the Supreme Court of The Commonwealth of The Bahamas.  Accordingly, the Debtors seek authorization from the Court to act as a "foreign representative" for purposes of protecting the assets and interests of the Debtors' estates.

93.      In sum, I believe that the relief requested is necessary to maximize the value of the Debtors' estates for the benefit of all stakeholders.

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing is true and correct to the best of my knowledge and belief.

Dated:  June 29, 2015

Thomas M. Dunlap
President
Baha Mar Ltd., *et al.*