**UNITED STATES BANKRUPTCY COURT**
**DISTRICT OF DELAWARE**

---------------------------------------------------------------x
:
*In re*                                       :          **Chapter 11**
:
**NORTHSHORE MAINLAND SERVICES**             :          **Case No. 15-11402 (KJC)**
**INC., et al.,**[1]                         :
:
**Debtors.**                                 :          **(Jointly Administered)**
:
:          Hearing Date: 08/17/15 at 11:00 a.m.  (ET)
---------------------------------------------------------------x          Objection Deadline: 08/10/15 at 4:00 p.m. (ET)

**MOTION OF CEXIM TO DISMISS THE BAHAMIAN DEBTORS'**
**CHAPTER 11 CASES PURSUANT TO SECTIONS 105(a) AND 1112(b) OR,**
**IN THE ALTERNATIVE, SECTION 305(a) OF THE BANKRUPTCY CODE**

Subject to the reservation of rights herein, The Export-Import Bank of China

("**CEXIM**") hereby moves (the "**Motion**") for entry of an order dismissing the chapter 11 cases

of certain debtors and debtors in possession in the above-captioned cases.  In support of this

Motion, CEXIM respectfully represents as follows:

**Preliminary Statement**[2]

1.        This Court is being asked to preside over the restructuring of fourteen

entities incorporated in The Bahamas, with assets and creditors in The Bahamas, and with

businesses closely tied to and reliant upon the Bahamian Government.  The lack of any

meaningful connection to the United States is glaring and, more importantly, an obstacle to a

successful reorganization.  Without the ability to assert jurisdiction over or enforce orders against

---

[1] The Debtors in these chapter 11 cases, along with the last four digits of the lead Debtor's federal tax identification number, are as follows: Northshore Mainland Services Inc. (9087); Baha Mar Enterprises Ltd.; Baha Mar Entertainment Ltd.; Baha Mar Land Holdings Ltd.; Baha Mar Leasing Company Ltd.; Baha Mar Ltd.; Baha Mar Operating Company Ltd.; Baha Mar Properties Ltd.; Baha Mar Sales Company Ltd.; Baha Mar Support Services Ltd.; BML Properties Ltd.; BMP Golf Ltd.; BMP Three Ltd.; Cable Beach Resorts Ltd.; and Riviera Golf Ventures Ltd.

[2] Capitalized terms used but not defined in the Preliminary Statement shall have the meanings ascribed to them in the rest of the Motion.

the Bahamian Debtors' assets and creditors, this Court simply cannot effect the relief necessary

to enable these debtors to restructure their businesses and liabilities.  In these circumstances,

dismissing the chapter 11 cases is in the best interests of the Bahamian Debtors and their

creditors.

2.      Creditors reasonably expected their relationships with the Bahamian

Debtors would be governed by Bahamian—and not U.S. bankruptcy—law.  The Bahamian

Debtors are organized under Bahamian law, have Bahamian offices, are developing a Bahamian

resort, employ over 2,000 Bahamian citizens, and executed with key creditors, including

CEXIM, significant contracts that are governed by Bahamian law.  The assets around which the

Bahamian Debtors seek to reorganize are real property and fixtures located in The Bahamas—

assets that cannot be divorced from Bahamian land or Bahamian law.  And the vast majority of

the Bahamian Debtors' creditors are non-U.S. entities who conducted business in The Bahamas

with the Bahamian Debtors.  Any creditor who lent under these circumstances never would have

expected that its bargained-for rights might suddenly be stripped from it through the back-door

of a U.S. chapter 11 case.

3.      The Bahamian Debtors recognized the extent of their ties to The Bahamas

and accordingly sought to protect their assets and put some legs on these chapter 11 cases by

seeking recognition and an agreement to enforce the automatic stay and this Court's orders by

the Bahamian Court—and lost.  Likewise, the Bahamian Government has denounced the

legitimacy of these U.S. proceedings and initiated a competing proceeding in The Bahamas.

Because this Court lacks the ability to bind the Bahamian Government and other foreign

creditors over whom this Court has no personal jurisdiction, there is no possibility of a successful

reorganization here.  Postpetition liens cannot be enforced, transfers will not be recognized,

2

postpetition financing is unavailable, and any chapter 11 plan and purported discharge will be ineffective.  Without the support of both the Bahamian courts and the Bahamian Government, the Bahamian Debtors cannot accomplish the objectives of chapter 11.

4.       Dismissal of these chapter 11 cases, however, will clear the path to an efficient and fair restructuring of the Bahamian Debtors under Bahamian law with the full support of the Bahamian Government and Bahamian courts.  The Bahamian Government has sought appointment of provisional liquidators capable of operating the Bahamian Debtors' businesses, protecting the interests of secured and unsecured creditors, and providing for an equitable resolution of these cases.

5.       Principles of comity also strongly support dismissal of these chapter 11 cases.  The Bahamian Government has significant economic interests in the success of the Baha Mar Resort.  Accordingly, this Court should refuse the Bahamian Debtors' invitation to apply U.S. bankruptcy law in blatant disregard for the paramount interests of the Bahamian Government and the reasonable expectations of their creditors and, instead, find that the totality of the circumstances warrants dismissal of the Bahamian Debtors' chapter 11 cases.

## Jurisdiction

6.       The Debtors allege that this Court has jurisdiction to consider this matter pursuant to 28 U.S.C. §§ 157 and 1334 and that venue is proper before this Court pursuant to 28 U.S.C. §§ 1408 and 1409.  The Court always has the inherent jurisdiction to determine its own jurisdiction.

## Reservation of Rights

7.       CEXIM's submission of this Motion and any other filings in support of the Motion is not in any way a submission to, or admission of, this Court's jurisdiction or authority

3

to resolve any matter involving CEXIM, and CEXIM expressly reserves all rights and defenses with respect thereto.

**Background**

A.    **The Bahamian Debtors and Baha Mar Resort**

8.    On June 29, 2015, Northshore Mainland Services Inc. ("**Northshore**") and fourteen of its Bahamian affiliates (collectively, the "**Debtors**") commenced these chapter 11 cases in the U.S. Bankruptcy Court for the District of Delaware (the "**Court**").  All of the Debtors, with the sole exception of Northshore,[3] are incorporated under the laws of The Bahamas (the "**Bahamian Debtors**").  *See* Declaration of Thomas M. Dunlap in Support of Chapter 11 Petitions and First Day Pleadings of Northshore Mainland Services Inc. and its Affiliated Debtors and Debtors in Possession [D.I. 3, ¶ 25] (the "**First Day Dec.**").

9.    The Bahamian Debtors own and operate businesses based in The Bahamas.  They are developing a large-scale resort located in Cable Beach, Nassau, that consists of four hotels, a convention center, casino, golf course, spa, restaurants and retail outlets, pool and beach amenities, and more (the "**Baha Mar Resort**").[4]  *Id.* ¶¶ 19-20.  They own the real property and buildings that comprise the Baha Mar Resort and employ approximately 2,400 employees in The Bahamas to operate the resort.  Recognition Proceeding, Debtors' Affidavit of Patrick H. Ryan (June 30, 2015) ¶ 15, a copy of which is attached as Exhibit B ("**Ryan Aff.**"); First Day Dec. ¶¶ 22-25.  The completed Baha Mar Resort is projected to generate more than 5,000 new jobs in The Bahamas, have an annual payroll in excess of $130 million, and generate

---

[3] Northshore is incorporated in Delaware.

[4] In connection with acquiring the land to develop the Baha Mar Resort, the Bahamian Debtors also acquired three existing hotels at Cable Beach, the Nassau Beach Hotel, the Wyndham Hotel, and the Radisson.  First Day Dec. ¶ 12.  The Nassau Beach Hotel was subsequently closed and demolished, the Wyndham Hotel was eventually closed and used by the Debtors for office space and housing needs, and the Radisson was renovated and rebranded as a Melia hotel.  *Id.*

4

$36 billion in cumulative GDP through 2034, representing 12% of The Bahamas' total GDP.[5]
Recognition Proceeding, Bahamian Government's Affidavit of Sir Baltron Bethel (July 13,
2015) ¶ 8, a copy of which is attached as Exhibit C ("**Bethel Aff.**").

   10. The history and the future of the Baha Mar Resort are closely linked with
the Commonwealth of The Bahamas (the government and the representatives thereof, including
the Attorney General, the "**Bahamian Government**").  The Baha Mar Resort was first
conceived at the request of the Bahamian Government and has been developed with the
government's close support and cooperation.  First Day Dec. ¶¶ 11, 12.  At the onset of
development, certain of the Bahamian Debtors entered into various agreements with the
Bahamian Government, including an agreement that contemplated a minimum investment of $1
billion by the Debtors towards the construction and development of the hotel properties at Cable
Beach, as well as various land granting agreements.  Recognition Proceeding, Bahamian
Government's Affidavit of John Rolle (July 6, 2015) ¶¶ 4-6, a copy of which is attached as
Exhibit D ("**Rolle Aff.**"); Bethel Aff. ¶¶ 4-7.  Consequently, a substantial portion of the land on
which the resort is being developed was granted by the Bahamian Government to the Bahamian
Debtors for the specific purpose of developing the Baha Mar Resort.  *See* Bahamian Government
Writ (July 2, 2015), a copy of which is attached as Exhibit E ("**Gov't Writ**").  The Bahamian
Government owns certain additional parcels of land that are necessary to complete the
development of the Baha Mar Resort.  Bethel Aff. ¶¶ 7, 19; First Day Dec. ¶ 12 n.5.  The
Bahamian Government has agreed to invest over $1.2 billion in concessions to facilitate the
development of the Baha Mar Resort, including a twenty year exemption on real property tax,
forgiveness of import duties during the construction period, sharing the costs of developing

---

[5] The statistics included in this paragraph assume that the Baha Mar Resort opened on time, but the numbers are still illustrative of the project's significant impact.

infrastructure, and participating in a joint venture that owns the resort's golf course.  Bethel Aff.

¶¶ 7, 9; First Day Dec. ¶ 25.  Additionally, the Bahamian Debtors will need various licenses,

work permits, and approvals from a range of Bahamian governmental agencies to complete

construction and open and operate the Baha Mar Resort.

   11. The Bahamian Debtors claim that they owe approximately $123 million in

unsecured debts to creditors who are largely located in The Bahamas and, by the Debtors' own

admission, are not subject to the jurisdiction of this Court.  *See* Ryan Aff. ¶¶ 13-14; First Day

Dec. ¶ 32.  In particular, the Bahamian Debtors allegedly owe the Bahamian Government

approximately $59 million, which amount is spread across more than seven different

governmental agencies.  Rolle Aff. ¶¶ 6-14; Recognition Proceeding, Bahamian Government's

Supplemental Affidavit of John Rolle (July 13, 2015) ¶¶ 3-7, a copy of which is attached as

Exhibit F ("**Supp. Rolle Aff.**").

   12. In addition to the claims of the Bahamian creditors, the Bahamian Debtors

have other foreign creditors with substantial claims.  CEXIM, the Bahamian Debtors' largest

secured creditor is owed approximately $2.34 billion (plus interest, fees, and expenses).  First

Day Dec. ¶ 29.  CEXIM is a state-owned enterprise organized under the laws of the People's

Republic of China, is headquartered in Beijing, and has no offices in the United States ("**U.S.**").

First Day Dec. ¶ 14; http://english.eximbank.gov.cn/en/.  Moreover, CCA Bahamas, Ltd.

("**CCA**"), the contractor for the Baha Mar Resort and the Bahamian Debtor's largest unsecured

creditor, is allegedly owed approximately $140 million.  First Day Dec. ¶ 27.  CCA is a

Bahamian International Business Company with its principal place of business located in The

Bahamas and is an indirect subsidiary of China State Construction Engineering Corp. Ltd, which

is majority-owned by a state-owned enterprise of the People's Republic of China.  *Id.* ¶ 14;

6

Recognition Proceeding, CCA's Affidavit of Daniel Li (July 16, 2015) ¶ 1, a copy of which is attached as Exhibit G ("**Li Aff.**").

> **B.      CEXIM Loans Money to the**
> **Bahamian Debtors to Develop the Baha Mar Resort**

13.      CEXIM provided the Debtors a secured debt facility of up to $2.45 billion to help fund the development of the Baha Mar Resort under that certain Facility Agreement, dated March 31, 2010, as amended by the Facility Amendment, dated January 28, 2011 (as further amended, restated, supplemented, or otherwise modified from time to time, the "**Prepetition Credit Agreement**"). First Day Dec. ¶ 28.

14.      Baha Mar Ltd., one of the Bahamian Debtors, is the borrower under the Prepetition Credit Agreement. *Id.* ¶ 28. Certain of the Bahamian Debtors guaranteed the obligations under the Prepetition Credit Agreement and granted a security interest to CEXIM over substantially all of their assets pursuant to that certain Debenture, dated January 31, 2011, between certain of the Bahamian Debtors and Citibank N.A., Bahamas Branch as Onshore Security Agent  (the "**Debenture**"), as well as through various pledges. *Id.* ¶ 28.  As a result, CEXIM is the Bahamian Debtors' largest secured creditor with a lien on substantially all of their assets, including their real property and buildings located in The Bahamas.  *See id.*

15.      The Prepetition Credit Agreement is governed by English law, and the Debenture—which grants liens on the Bahamian Debtors' real property and buildings—is governed by Bahamian law.  In connection with entering into the Debenture , CEXIM consented to the jurisdiction of the Bahamian courts.  The only place to legally and effectively enforce the Debenture—particularly because the collateral primarily consists of real property—is in The Bahamas.

7

C.      **The Debtors Began Experiencing Liquidity Issues**

16.     In the fall of 2014, for reasons that remain in dispute between the Debtors and CCA, it became evident that the Baha Mar Resort would not be completed by the December 2014 target date.  First Day Dec. ¶ 41.  The Debtors assert that the construction delays and additional funding required therewith resulted in the Debtors having to make modifications to the project budget, reduce staff, and delay pre-opening activities, and strained their liquidity.  *See id.*

17.     To address these funding and construction issues, the Debtors, CEXIM, and CCA participated in extensive discussions, including in-person meetings held in Beijing in November 2014 and January 2015.  *Id.* ¶¶ 43-45.  These negotiations ultimately resulted in revised completion dates for the Baha Mar Resort.  *Id.*  Following those meetings, Baha Mar Resort encountered additional construction delays that led to an inability to meet the already-revised opening date of March 27, 2015.  *Id.* ¶¶ 46-49.  Throughout the spring of 2015, CEXIM continued to engage with the Debtors, CCA, and the Bahamian Government in an effort to bridge differences and find a way to fund and complete the Baha Mar Resort.  *See id.* ¶¶ 51-54; Bethel Aff. ¶ 12.

D.      **The Bahamian Debtors File for Chapter 11 Amid Ongoing Negotiations with CEXIM, CCA, and the Bahamian Government**

18.     In the midst of ongoing negotiations, and despite having minimal (if any) connection to the U.S., the Bahamian Debtors (together with Northshore) filed for chapter 11 protection in this Court.

19.     The Bahamian Debtors asserted that their primary goal in chapter 11 is to finance, complete and open the Baha Mar Resort to the public, and in the service of that goal, they plan to use chapter 11 to obtain (i) debtor in possession ("**DIP**") financing to fund payroll and to continue operations, (ii) the protections of the automatic stay to prevent their creditors

8

from exercising remedies against their assets in The Bahamas, and (iii) breathing room to engage

in discussions with key parties to fund and complete the project.  Recognition Proceeding,

Debtors' Affidavit of Mark Shinderman ¶ 40-46, a copy of which is attached as <u>Exhibit H</u>

("**Shinderman Aff.**").

20.    The Bahamian Debtors alleged that their only real option for additional

funding was a DIP loan from Granite Ventures (the "**DIP Lender**"), an entity formed by Sarkis

Izmirlian, a Bahamian resident and owner of the Bahamian Debtors.  First Day Dec. ¶¶ 10, 24,

56.

21.    Notwithstanding the Bahamian Debtors' surprise chapter 11 filing,

CEXIM continued to work with the Debtors to try to resolve the differences between the key

stakeholders to allow for the completion of the Baha Mar Resort.  As of the date of this Motion,

CEXIM, along with the Bahamian Debtors, CCA, and the Bahamian Government had

participated in two rounds of postpetition, in-person negotiations in Beijing, but were unable to

reach a consensual resolution.

### E.    The Bahamian Court Refuses to Recognize these Chapter 11 Cases

22.    On June 30, 2015, the Bahamian Debtors filed the *Originating Summons*

(as amended July 6, 2015) in the Supreme Court for the Commonwealth of the Bahamas (the

"**Bahamian Court**") requesting an order that would, *inter alia*, recognize these chapter 11 cases

and give effect to the automatic stay (the "**Recognition Application**"), a copy of which is

attached as <u>Exhibit I</u>.

23.    The Bahamian Government, CEXIM, CCA, and Cable Bahamas Ltd. (one

of the Bahamian creditors) each filed objections to the Recognition Application, arguing, *inter

alia*, that (i) the chapter 11 cases do not qualify as a "foreign proceeding" for recognition

9

pursuant to relevant provisions of the Companies (Winding Up) Amendment Act of 2011, (ii) the Bahamian Court lacks jurisdiction to impose the relief sought, and (iii) recognizing the chapter 11 cases and granting a stay against all proceedings and the enforcement of security interests would be against public policy in The Bahamas.

24.      The Bahamian Court held a hearing on the Recognition Application on July 20, 2015.  The Bahamian Court took the matter under advisement and then, on July 22, 2015, issued an oral ruling denying recognition of these chapter 11 cases and refusing to grant any ancillary relief.[6]

25.      As a consequence of this denial, the Debtors' DIP financing facility is in default.  The terms of the proposed order approving the DIP financing on an interim basis required that the Bahamian Court enter an order approving the Recognition Application within seven days of the Petition Date.  Interim Order Authorizing Debtors in Possession to Obtain Postpetition Financing, dated July 1, 2015 [D.I. 52] (the "**Interim DIP Order**").  Failure to do so is an event of default and grounds for termination of the DIP financing.  *Id.* ¶ 23.  Upon information and belief, the DIP Lender has not yet provided the Bahamian Debtors any funds pursuant to the Interim DIP Order.  In light of this liquidity gap, the Bahamian Government paid outstanding payroll obligations for the Debtors' thousands of Bahamian employees.  Bethel Aff. ¶ 21.  On July 16, 2016, the Bahamian Prime Minister indicated that the Bahamian Government will fund a second round of payroll obligations for the Baha Mar Resort's Bahamian employees.  Address by Prime Minister, Right Honourable Perry G. Christie, M.P. to Nation on Baha Mar Negotiations and Proceedings (July 16, 2015), a copy of which is attached as Exhibit J ("**PM Address**").

---

[6] It is anticipated that a written decision will be delivered by August 5, 2015.

WEIL:\95409277\12\99910.5482

26.     The refusal of the Bahamian Court to recognize the chapter 11 cases or to enforce the automatic stay in The Bahamas also means that orders entered by this Court with respect to the Bahamian Debtors and their assets effectively have no force or effect in The Bahamas.  For example, any liens granted over the Bahamian Debtors' assets by this Court under the Interim DIP Order or that may be granted in the future under a final DIP order would not be enforceable against property located in The Bahamas.  Likewise, any priorities granted by order or under the Bankruptcy Code will not be recognized or enforced.  Additionally, any order approving a sale or transfer of substantially all of the Bahamian Debtors' assets, whether pursuant to a chapter 11 plan or a section 363 sale, will also be meaningless as against property located in The Bahamas, effectively crippling the transaction.  Furthermore, should a creditor in The Bahamas who is not subject to this Court's personal jurisdiction exercise its rights against the Bahamian Debtors' properties, it could do so with impunity.  Similarly, any restructuring of debt under a chapter 11 plan and the ultimate discharge will not be enforceable.

E.     **The Bahamian Government Seeks Appointment
of Provisional Liquidators to Facilitate a Bahamian Restructuring**

27.     On July 16, 2015, the Bahamian Government filed a *Winding Up Petition* requesting that the Bahamian Debtors be wound up pursuant to Bahamian insolvency law (the "**Wind-up Proceeding**") and sought the appointment of two individuals from PricewaterhouseCoopers Advisory (Bahamas) Limited as provisional liquidators of the Bahamian Debtors.  Winding Up Petition, Supreme Court of the Bahamas (July 16, 2015), a copy of which is attached as <u>Exhibit K</u> (the "**Wind-up Petition**").

28.     The Bahamian Government filed the Wind-up Petition to facilitate a restructuring of the Bahamian Debtors in The Bahamas.  *See* Wind-up Petition.  The Wind-up Proceeding will be controlled by the provisional liquidators under the supervision of the

11

Bahamian Court, rather than any existing equity owner or current management.  Wind-up

Proceeding, Bahamian Government's Affidavit of Antoinette Bonamy (July 16, 2015) ¶ 3, 41,

75, a copy of which is attached as <u>Exhibit L</u> ("**Bonamy Aff.**"); PM Address.  The provisional

liquidators, if appointed, will be impartial professionals who act to ensure that the interests of the

Bahamian Debtors' unsecured creditors are protected.  PM Address.

        29.      The Bahamian Government envisions the role of the provisional

liquidators to expedite the resolution of the disputes plaguing the Bahamian Debtors and to

prepare a restructuring plan for the Baha Mar Resort that will result in the earliest possible

opening date.  Bonamy Aff. ¶ 81; PM Address.  As referenced in the Prime Minister's address,

Bahamian courts have in the past successfully used a process analogous to the provisional

liquidation process as an effective tool for reorganizing a company's affairs.   PM Address.  In

such case, after the successful reorganization of the company, the official liquidators were

dismissed and executive authority was restored to a new board of directors.  The Bahamian

Government can use the provisional liquidation process to restructure the Bahamian Debtors

with a similarly successful outcome.

        30.      On July 16, 2015, the Prime Minister of the Bahamas, Right Honorable

Perry G. Christie, M.P, addressed the people of The Bahamas concerning the state of the affairs

of the Baha Mar Resort.  PM Address.  He emphasized the "enormous economic and

employment implications for The Bahamas" and explained how the Bahamian Government was

working diligently to ensure the timely completion of the project.  *Id.*  The Prime Minister

stressed the importance of the project to The Bahamas and the Bahamian Government's decision

to initiate the Wind-up Proceedings:

> [I]t goes without saying that the completion of the Baha Mar resort is a matter of
> the utmost national importance. **Baha Mar must open!** Whilst we certainly

remain open to further discussions, my Government has taken the decision to seek to bring the Baha Mar development project under the control and supervision of the Bahamian Supreme Court, right here in The Bahamas. Consequently, on the advice of our Bahamian, U.K, and U.S. lawyers, The Attorney General has today filed a winding up petition in the Bahamas Supreme Court against the 14 Bahamian entities that filed for Chapter 11 protection in the United States at the end of June. These compulsory or involuntary winding-up proceedings are designed to work in very similar terms as a chapter 11 but with the stark difference that they will be controlled by provisional liquidators under the supervision of the Bahamian Courts rather than being controlled by [the Debtors]. These liquidators, if appointed by the court, will be neutral and impartial professionals of the highest quality and of impeccable credentials.

*Id.* The Prime Minster concluded by cautioning that "were the [Chapter 11] processes to continue in the U.S., the fate of this Bahamian project, its Bahamian employees and the international reputation of the sovereign nation of The Bahamas would be in jeopardy," and unequivocally declared that "[t]here should be a Bahamian solution to this Bahamian issue and the majority of the key parties in this matter recognize and support that position." *Id.*

**Relief Requested**

31.    Based on the foregoing, these cases do not belong in a U.S. chapter 11 proceeding.  As discussed below, the Bahamian Debtors' strong ties to The Bahamas, coupled with the imposition of a competing Bahamian insolvency regime that will neither recognize nor enforce orders of these chapter 11 cases, means that a U.S. chapter 11 restructuring of the Bahamian Debtors was never expected and cannot be achieved.  Accordingly, CEXIM respectfully requests that this Court enter an order dismissing the Bahamian Debtors' chapter 11 cases pursuant to sections 105(a), 305(a), and/or 1112(b) of section 11 of title 11 of the United States Code (the "**Bankruptcy Code**") and Rule 1017 of the Federal Rules of Bankruptcy Procedure (the "**Bankruptcy Rules**").

13

## Basis for Relief

I.    **Dismissal Is Warranted Because Reorganization of the Bahamian Debtors Under Chapter 11 Was Never Contemplated and Cannot Be Successful.**

32.    Section 1112(b)(1) of the Bankruptcy Code provides that the Court shall dismiss a chapter 11 petition "for cause," provided dismissal is in the best interests of creditors and the debtor's estate.  11 U.S.C. § 1112(b)(1); *see In re SGL Carbon Corp.*, 200 F.3d 154, 159 (3d Cir. 1999).  Although section 1112(b)(4) lists matters that constitute sufficient "cause," the list is not exhaustive and courts may consider the "totality of the circumstances" in determining whether sufficient cause exists.  *In re Yukos Oil Co.*, 321 B.R. 396, 410 (Bankr. S.D. Tex. 2005); *see also SGL Carbon*, 200 F.3d at 160 (noting that the factors enumerated in section 1112(b)(4) are "not exhaustive and . . . a court may consider whether other facts and circumstances qualify as 'cause.'").  Importantly, courts may find sufficient cause if a debtor is unable "to effectuate a plan" or where there is not a "reasonable possibility of a successful reorganization within a reasonable period of time."  *In re Am. Capital Equip., LLC*, 688 F.3d 145, 161, 162 n. 10 (3d Cir. 2012) (holding that "the 'inability to effectuate a plan' remains a viable basis for dismissal because the listed examples of cause [in section 1112(b)] are not exhaustive."); *see also Bronson v. Thompson (In re Bronson)*, 2013 WL 2350791, at *8 (B.A.P. 9th Cir. May 29, 2013) ("When it becomes apparent to the court that the debtor will not be able to confirm and effectuate a plan within the foreseeable future, the bankruptcy court should exercise its discretion under § 1112(b) to dismiss or convert.").   Once cause is demonstrated, the court must ascertain whether granting a motion to dismiss is in the best interests of creditors and the debtor's estate.  *McKenna v. Official Comm. of Unsecured Creditors*, 2011 WL 221473, at *2 (D.R.I. May 31, 2011).

33.    At least one court has found the requisite cause to dismiss a chapter 11 petition under section 1112(b) where (i) the majority of the debtor's assets were located in a

foreign jurisdiction; (ii) the vast majority of the debtor's business and financial activities

occurred and continued to occur in a foreign jurisdiction; (iii) the debtor sought to avail itself of

the chapter 11 proceedings and U.S. law in an attempt to alter the creditor priorities that would

be applicable in the law of other jurisdictions; (iv) the debtor failed to present evidence that the

U.S. court was uniquely qualified to resolve issues arising under foreign law; (v) activities

necessary for the debtor's successful reorganization required the cooperation of the foreign

government; (vi) it was unclear that the U.S. court could obtain personal jurisdiction of the

pertinent parties sufficient to grant the relief sought in the chapter 11 proceedings; and (vii) the

debtor's size and business had a substantial impact on the foreign jurisdiction's economy.  *Yukos*

*Oil*, 321 B.R. at 410, 411.  The facts are analogous here.

A.  The Bahamian Debtors' Chapter 11 Cases Lack Any
     Meaningful Connection to the U.S. and Contravene Creditor Expectations.

34.    The Bahamian Debtors' chapter 11 cases should be dismissed because the

Bahamian Debtors, their assets, the majority of their creditors, and the legal issues that must be

resolved to effectuate a successful reorganization lack any meaningful connection to the United

States.  *See Yukos Oil*, 321 B.R. at 411 (noting that the debtor's ability to effectuate a

reorganization was extremely unlikely, absent the cooperation of the Russian government,

because most of the debtor's assets were located in Russia); *In re Spanish Cay*, 161 B.R. 715,

726 (Bankr. S.D. Fla. 1993) (finding it impermissible for a foreign debtor to use chapter 11 to

restructure interests in real property located in a foreign jurisdiction where foreign law controlled

the rights of the parties).

35.    The Bahamian Debtors are organized under Bahamian law, own buildings

and land in The Bahamas, operate their businesses out of The Bahamas, employ mostly

WEIL:\95409277\12\99910.5482

Bahamian citizens, and contract with mostly Bahamian vendors.  Put simply, there is no meaningful tie that binds the Bahamian Debtors, their assets, or their creditors to the U.S.

36.      By commencing their chapter 11 cases in the U.S., the Bahamian Debtors upset the reasonable expectations of all their foreign creditors.  These foreign creditors, by doing business in The Bahamas, recognized that they would be subjecting themselves to Bahamian laws.  *See Canada S. Ry. Co. v. Gebhard*, 109 U.S. 527, 537 (1883) (stating that parties to a contract with a foreign corporation "impliedly subject" themselves to the laws of the foreign corporation's jurisdiction); *Spanish Cay*, 161 B.R. at 725 ("As a matter of law, creditors dealing with the Debtors knew or should have known that they were dealing with a Bahamian company and that they would be bound by the laws of the Bahamas.").  Indeed, the Bahamian Debtors granted liens on their assets in The Bahamas pursuant to security documents governed by Bahamian law.  What is decidedly not true, is that any of the foreign creditors of the Bahamian Debtors "impliedly subjected" themselves to the jurisdiction of a U.S bankruptcy court.

37.      Moreover, the Bahamian Debtors should not be permitted to use their chapter 11 cases as a mechanism to alter foreign creditors' rights and priorities under Bahamian law, or to increase leverage in out-of-court negotiations with the Bahamian Government, CEXIM, and other foreign creditors.  *See Yukos Oil*, 321 B.R. at 411 (finding that the debtor's attempt to "substitute United States law" in the place of Russian and international law, and to "use judicial structures of the United States in an attempt to alter creditor priorities that would be applicable in the law of other jurisdictions" was a factor that weighed in favor of dismissal under section 1112(b)).  Foreign creditors, including CEXIM, engaged in business with the Bahamian Debtors with the reasonable assumption that their rights would be subject to and enforceable under Bahamian law.  These chapter 11 cases constitute an attempt by the Bahamian Debtors to

16

conduct an end-run around the creditors' reasonable expectations and should not be recognized by this Court.

B.  The Bahamian Debtors Cannot Effectuate a
Plan or Successfully Reorganize Under Chapter 11.

38.     The Bahamian Debtors cannot effectuate a chapter 11 plan because the provisions of the Bankruptcy Code and orders of this Court (i) will not be enforced by Bahamian courts and (ii) are not enforceable by this Court against foreign creditors and other entities who are not subject to this Court's personal jurisdiction.  As a result, and as described further below, foreign creditors can, consistent with applicable foreign law, continue to exercise their rights with respect to the Bahamian Debtors' assets located in The Bahamas, and there will be no way to bind the substantial majority of the Bahamian Debtors' significant creditors to any relief granted to the Bahamian Debtors by this Court.  Accordingly, the Bahamian Debtors' chapter 11 cases should be dismissed.

39.     "[T]o enjoin a party from commencing or prosecuting a foreign proceeding . . .  the Court must be authorized to exercise personal jurisdiction over that entity pursuant to the Due Process Clause of the Fifth Amendment to the U.S. Constitution."  *In re Mak Petroleum, Inc.*, 424 B.R. 904, 905 (Bankr. M.D. Fla. 2010); *Hobson v. Travelstead (In re Travelstead)*, 227 B.R. 638, 655 (D. Md. 1998) ("Even though the court may have *in rem* jurisdiction over the debtor's property, *in personam* jurisdiction is required before the court may restrain a defendant from interfering with that property); *Fotochrome, Inc. v. Copal Co.*, 517 F.2d 512, 516-17 (2d Cir. 1974) (holding that a "stay cannot be effective . . . without *in personam* jurisdiction over the creditor who has begun an action in a foreign tribunal that is not within the jurisdiction of the United States.").

17

40.     Although U.S. bankruptcy courts have in rem jurisdiction over property of the estate "wherever located and by whomever held," "the Bankruptcy Court may not be able to secure compliance with such orders except to the degree that it may either assert personal jurisdiction over those now in possession of [the debtor's] assets or obtain cooperation from courts in foreign jurisdictions where [the debtor's] assets are held."  *GMAM Inv. Funds Trust I v. Globo Comunicacoes e Participacoes S.A. (In re Globo Comunicacoes e Participacoes S.A.),* 317 B.R. 235, 250 n. 9 (S.D.N.Y. 2004); *see also Milbank v. Philips Lighting Elec. N. Am. (In re Elcoteq, Inc.),* 521 B.R. 189, 199 ("A bankruptcy court's powers over foreign property are carried out either through in personam jurisdiction over others with interests in such property or through the cooperation of foreign courts."); *Sinatra v. Gucci (In re Gucci),* 309 B.R. 679, 683-84 (S.D.N.Y. 2004) ("If a creditor causes property of a title 11 estate to be seized in a foreign country, that creditor has violated the automatic stay.  Whether that creditor can be punished, however, is a function of that creditor's amenability to United States process.").  Accordingly, absent cooperation from the Bahamian courts or this Court having the ability to obtain personal jurisdiction over the Bahamian Debtors' creditors, this Court cannot enforce against those creditors any provisions of the Bankruptcy Code or relief the Court may grant the Bahamian Debtors in their chapter 11 cases.

41.     The Bahamian Court has refused to recognize the Bahamian Debtors' chapter 11 cases, enforce the automatic stay, or grant alternative relief sought by the Bahamian Debtors under Bahamian Law.  Therefore, this Court can only enforce its orders against those creditors over which it has personal jurisdiction.  Because many of the Bahamian Debtors' creditors are located in The Bahamas and likely lack sufficient contacts with the U.S. to be subject to personal jurisdiction, the efficacy of any orders entered in these chapter 11 cases is in

18

question.  *See Spanish Cay*, 161 B.R. at 726 ("It most likely would be futile to maintain a Chapter 11 case in the United States" because any "orders for further encumbrances on or orders of sale of property of the estate by [the U.S. bankruptcy court] may not be recognized or approved by the Bahamian authorities.").

42.     Similarly, the Court cannot compel the cooperation (or compliance) of the Bahamian Government in any effort to reorganize the Bahamian Debtors in the U.S.  As described above, the Bahamian Government has significant interests at stake with the Baha Mar Resort and its cooperation is a key component of successful completion of the project.  The Bahamian Debtors simply cannot effectuate a chapter 11 plan without the cooperation of, or the ability to bind, the Bahamian Debtors' creditors, including the Bahamian Government.  *See id.* at 725 (noting that the potential for a successful chapter 11 reorganization was "questionable at best" and "may be impossible" where the orders of the U.S. bankruptcy court "may be given no effect in The Bahamas" and "the various Bahamian creditors and governmental agencies" with claims against the debtor's estate were not subject to U.S. bankruptcy court's jurisdiction).

43.     For example, the Bahamian Debtors cannot fund the U.S. proceeding.  The proposed DIP facility is in default because the Bahamian Court denied recognition of these cases.  Interim DIP Order at ¶ 23.  The DIP financing is further conditioned on receipt of certain regulatory approvals from the Bahamian Government, which have not been granted.  *Id.* at Exhibit A.  The Bahamian Debtors admit that it is unlikely that any potential financing source would lend to them on an unsecured basis (*see* Interim DIP Order at ¶ I), but without recognition of these chapter 11 cases by the Bahamian Court, any priorities or postpetition liens granted to a postpetition lender by this Court will not be enforceable.

19

44.     In addition, because it is unlikely that the Bankruptcy Code or the orders of this Court are enforceable against a substantial number of the creditors of the Bahamian Debtors or the Bahamian Government, the Bahamian Debtors will not be able to effectively: (i) compel counterparties to executory contracts to continue to perform postpetition—or assume, assign, or reject such contacts—pursuant to section 365 of the Bankruptcy Code; (ii) sell assets located in The Bahamas pursuant to section 363 of the Bankruptcy Code; (iii) enforce any reordering of creditor priorities or restructuring of outstanding debt; or (iv) enforce any discharge under the Bankruptcy Code.  The only certain effect of these chapter 11 cases is to unnecessarily deplete the assets of the Bahamian Debtors' estates by incurring additional administrative and professionals' fees.

45.     By contrast, there is an alternative forum available to ensure an efficient, effective, and equitable reorganization of these debtors—the Bahamian Court.  The Bahamian Government already commenced a liquidation proceeding and moved to appoint provisional liquidators in The Bahamas.  The Bahamian courts have jurisdiction over the substantial majority of the Bahamian Debtors' creditors and assets, and can enforce the orders necessary to effectively reorganize the Bahamian Debtors' businesses.  Further, any provisional liquidator appointed in connection with the restructuring of the Bahamian Debtors in The Bahamas is expressly charged with ensuring the equitable distribution of estate assets to all creditor constituencies—including unsecured creditors.  Accordingly, the Bahamas is the proper forum to adjudicate the issues between the Bahamian Debtors and their creditors.

C.  Principles of International Comity Require
     Dismissal of the Bahamian Debtors' Chapter 11 Cases.

46.     Deferring to The Bahamas as the appropriate forum to resolve these cases also is consistent with principles of comity.  International comity is "the recognition which one

20

nation allows within its territory to the legislative, executive or judicial acts of another nation . . . ." *Hilton v. Guyot*, 159 U.S. 113, 164 (1895); *Somportex Ltd. v. Phila. Chewing Gum Corp.*, 453 F.2d 435, 440 (3d Cir. 1971).  "Comity should be withheld only when its acceptance would be contrary or prejudicial to the interest of the nation called upon to give it effect." *Somportex*, 453 F.2d at 440.

47.    The Third Circuit has explained that granting comity to foreign proceedings is "particularly appropriately applied in the bankruptcy context because of the challenges posed by transnational insolvencies."  *Stonington Partners, Inc. v. Lernout & Hauspie Speech Prod. N.V.*, 310 F.3d 118, 126 (3d Cir. 2002); *see also Cunard S.S. Co. Ltd. v. Salen Reefer Servs. AB*, 773 F.3d 452, 458, 460 (2d Cir. 1985) (granting comity to foreign insolvency proceedings "enables the assets of a debtor to be dispersed in an equitable, orderly, and systematic manner, rather than a haphazard, erratic or piecemeal fashion.  Consequently, American courts have consistently recognized the interest of foreign courts in liquidating or winding up the affairs of their own domestic business entities.").

48.    In accordance with this principle, U.S. bankruptcy courts have dismissed actions between litigants in circumstances in which a foreign bankruptcy proceeding is pending, and equitable principles demand that all claims against the debtor's limited assets be addressed in a single proceeding.  *See Yukos Oil*, 321 B.R. at 408, 409 (collecting cases).  This concern becomes amplified when the debtor's assets consist of real property located in a foreign jurisdiction.  In such circumstances, there is a compelling interest to have the disposition of such property governed by the laws of the country in which it is located.  *See Spanish Cay*, 161 B.R. at 725.

49.    In *Spanish Cay*, the court held that it was appropriate to apply the principle of comity to defer to Bahamian courts and Bahamian law to govern any insolvency proceeding involving the debtor because (i) the debtor was a Bahamian company and (ii) the debtor's principal asset was real property located in The Bahamas. *Id.* ("These factors weigh heavily in favor of abstention and dismissal of these proceedings.").  Similarly, in *Yukos Oil*, although the court held that principles of comity alone were an insufficient basis to dismiss the debtor's chapter 11 case, the court held that comity "must be considered in connection with a determination of whether cause exists for dismissal pursuant to section 1112(b) of the Bankruptcy Code."  321 B.R. at 409.

50.    Here, principles of comity weigh in favor of dismissing the Bahamian Debtors' chapter 11 cases.  The Bahamian Debtors were organized under Bahamian law for the sole purpose of developing the Baha Mar Resort, which was conceived at the behest of the Bahamian Government and nurtured with their support.  *See supra* ¶¶ 8–10.   Indeed, the Bahamian Debtors' most significant assets consist of land within the sovereign territory of The Bahamas, some of which the Bahamian Government granted to or agreed to grant to the Bahamian Debtors.  *See supra* ¶ 10.  The Bahamian Government also has a significant economic interest in the Baha Mar Resort, having committed over $1.2 billion of concessions and other resources to help facilitate development, which when complete is expected to have a massive, positive impact on Bahamian GDP and employment.  *See supra* ¶¶ 9, 10.  Further, the Bahamian Debtors remain dependent on certain agencies of the Bahamian Government for the success of their businesses, to obtain necessary permits, licenses, and other approvals.  *See supra* ¶¶ 10, 11.  Put simply, the Bahamian Government's interest in the Baha Mar Resort goes to the very core of its sovereign interest in developing its economy, land, and work force.

22

51.     Despite the critical importance of the Baha Mar Resort to the Bahamian Government and the Bahamian people, they are not a part of these proceedings.  The Debtors seek to avoid reorganizing the Bahamian Debtors in a Bahamian court, and hang the propriety of their chapter 11 cases on the thin thread of one shell entity formed in Delaware.  The tenuous connections that Northshore has to the U.S., however, cannot and should not—in the interests of fairness and international cooperation—trump the substantial interest of the Bahamian Government in the reorganization of the fourteen Bahamian Debtors.  Accordingly, comity principles also weigh in favor of dismissing these chapter 11 cases.

D.  Dismissal of these Chapter 11 Cases Is in the Best
    Interests of the Creditors and the Bahamian Debtors' Estates.

52.     Where a debtor is unable to effectuate a chapter 11 plan, dismissal is appropriate because "neither creditors nor the estate could conceivably benefit" from the continued adjudication of the chapter 11 proceedings.  *See Am. Capital*, 688 F.3d at 162, 163 (finding that the "best interest of creditors and the estate" warranted relief under section 1112(b) where "it is clear that  . . . no future plan would be able to be effectuated under Chapter 11."); *Monsour Medical Center, Inc. v. Stein (In re Monsour Medical Center, Inc.)*, 154 B.R. 201, 207 (Bankr. W.D. Pa. 1993) (holding that dismissal of the debtor's chapter 11 case was in the best interests of the creditors and the debtors' estate under section 305(a) of the Bankruptcy Code because it was "highly unlikely that debtor will put together a confirmable plan of reorganization if it remains in bankruptcy").  Indeed, prolonging a chapter 11 case under such circumstances would "only burden the estate with mounting attorney and administrative fees." *Monsour*, 154 B.R. at 207.  Moreover, when considering whether the interests of the creditors and debtor would be best served by dismissal, the Court should consider the interests of all of the debtor and creditors *as a whole*, not any particular constituency thereof.  *See id.* (discussing "best interests"

23

standard under section 305 of the Bankruptcy Code).  Here, continuance of the Bahamian

Debtors' chapter 11 cases serves no purpose.  The Bahamian Debtors and their creditors can only

benefit from an effective and enforceable restructuring, which can only be accomplished in The

Bahamas.

53.     Under the totality of the circumstances, this Court should dismiss the

Bahamian Debtors' chapter 11 cases because sufficient cause exists, and it is in the best interests

of the Bahamian Debtors' estates and their creditors for this Court to permit the parties to pursue

a restructuring in the Bahamian Court, unencumbered by this inefficient and uneconomic attempt

to reorganize the Bahamian Debtors' businesses in the U.S.

## II.    In the Alternative, the Bahamian Debtors' Chapter 11
## Cases Should Be Dismissed Under Section 305(a) of the Bankruptcy Code.

54.     Section 305(a)(1) of the Bankruptcy Code provides that the "court . . . may

dismiss a case under [chapter 11], at any time if – (1) the interests of the creditors and the debtor

would be better served by such dismissal or suspension."  11 U.S.C. § 305(a)(1).  "The decision

to abstain, either by suspension or dismissal, is committed to the Court's discretion."  *In re*

*Compania de Alimentos Fargo, S.A.*, 376 B.R. 427, 434 (Bankr. S.D.N.Y. 2007).  Courts look to

the following non-exclusive list of factors to gauge the overall best interests of the creditors and

debtor, including, among other things, (i) the economy and efficiency of administration; (ii)

whether another forum is available to protect the interests of the parties or there is already a

proceeding pending in another court; and (iii) whether there is an alternative means of achieving

an equitable distribution of assets.  *Id.*  "Although abstention under § 305 is considered an

extraordinary remedy . . . the pendency of a foreign insolvency proceeding alters the balance by

introducing considerations of comity into the mix."  *Id.* at 434 (abstaining from and dismissing

24

involuntary petitions filed against debtor that was already subject to Argentinian insolvency proceedings).

55.     Courts have dismissed chapter 11 cases under section 305(a) where (i) it is unlikely that the debtor could confirm a chapter 11 plan or (ii) the case would not result in an economical and expeditious administration of the debtor's estate.  *See, e.g.*, *Monsour*, 154 B.R. at 207 (dismissing a debtor's chapter 11 case under section 305(a) where "it [was] highly unlikely that debtor will put together a confirmable plan of reorganization" because the debtor's primary secured creditor holding liens on the debtor's primary asset would "almost certainly . . . vote against any plan proposed by the debtors"); *In re Xacur*, 219 B.R. 956, 969 (Bankr. S.D. Tex. 1998) (dismissing an involuntary chapter 11 case commenced against a Mexican debtor under section 305(a) where the chapter 11 proceeding would not "result in an economical and expeditious administration" of the debtor's estate because of "the doubtful enforceability of bankruptcy court orders" and the automatic stay over a Mexican debtor domiciled in Mexico).  In addition, when "litigation has been commenced in another forum and that forum is available to determine the parties' interests, dismissal is especially appropriate."  *In re Laurel Highlands Found., Inc.*, 473 B.R. 641, 654 (W.D. Pa. 2012) (dismissing a chapter 11 case under section 305(a) on the ground that the best interest of all parties was the expeditious resolution of a state court proceeding commenced prepetition).

56.     Here, for all of the reasons described above, dismissal under section 305(a) is in the best interests of the creditors and the Bahamian Debtors' estates.  This Court is unable to enforce its orders in The Bahamas and has no jurisdiction over the Bahamian Government or the Bahamian Debtors' foreign creditors.  Continuing these chapter 11 proceedings will only serve to deplete the assets of the Bahamian Debtors' estates through the

25

unnecessary accumulation of administrative and professionals' fees.  This Court can neither

enforce its own orders nor bind the parties necessary for a successful reorganization.

57.    There are proceedings underway in The Bahamas that will adequately

protect the parties' interests, while allowing for a successful reorganization of the Bahamian

Debtors' businesses and the equitable distribution of assets.  Accordingly, dismissal of these

chapter 11 cases is in the best interests of both the creditors and the Bahamian Debtors' estates,

and this Court should dismiss these cases pursuant to section 305(a) of the Bankruptcy Code.

### Notice

58.    Notice of the Motion has been provided to (i) the United States Trustee for

the District of Delaware, (ii) counsel for the Debtors, (iii) counsel to the Official Committee of

Unsecured Creditors, (iv) all parties who have filed appearances in the chapter 11 cases, and

(v) all creditors identified by the Debtors in their creditor matrix.

WEIL:\95409277\12\99910.5482

**Conclusion**

59.    For the reasons set forth above, CEXIM respectfully requests this Court

(i) enter an order dismissing the Bahamian Debtors' chapter 11 cases pursuant to sections 105(a),

305(a) and/or 1112(b) and (ii) grant such other relief as may be just and appropriate.


Dated: July 27, 2015                     MORRIS, NICHOLS, ARSHT & TUNNELL LLP
       Wilmington, Delaware

                                                    */s/ Curtis S. Miller*
                                                    Robert J. Dehney (Bar No. 3578)
                                                    Curtis S. Miller (Bar No. 4583)
                                                    1201 North Market Street
                                                    P.O. Box 1347
                                                    Wilmington, DE 19899-1347
                                                    Telephone: (302) 658-9200
                                                    Fax: (302) 658-3989

                                                    – and –

                                                    Gary T. Holtzer
                                                    Alfredo R. Pérez
                                                    Robert J. Lemons
                                                    WEIL, GOTSHAL & MANGES LLP
                                                    767 Fifth Avenue
                                                    New York, New York  10153
                                                    Telephone:  (212) 310-8000
                                                    Facsimile:  (212) 310-8007

                                                    *Attorneys for The Export-Import Bank of China*

27