# IN THE UNITED STATES BANKRUPTCY COURT
# FOR THE DISTRICT OF DELAWARE

_____

|  |  |  |
|---|---|---|
| | ) | |
| In re: | ) | Chapter 11 |
| | ) | |
| NORTHSHORE MAINLAND SERVICES INC., *et al.*,[1] | ) | Case No. 15-11402 (KJC) |
| | ) | |
| Debtors. | ) | (Jointly Administered) |
| | ) | |
| _____ | ) | **Re: Docket Nos. 206, 208, 246, 289** |

## DEBTORS' OMNIBUS OBJECTION TO DISMISSAL MOTIONS FILED BY CCA BAHAMAS, LTD. AND THE EXPORT-IMPORT BANK OF CHINA

---

[1]   The Debtors in these chapter 11 cases, along with the last four digits of the lead Debtor's federal tax identification number, are as follows:  Northshore Mainland Services Inc. (9087); Baha Mar Enterprises Ltd.; Baha Mar Entertainment Ltd.; Baha Mar Land Holdings Ltd.; Baha Mar Leasing Company Ltd.; Baha Mar Ltd.; Baha Mar Operating Company Ltd.; Baha Mar Properties Ltd.; Baha Mar Sales Company Ltd.; Baha Mar Support Services Ltd.; BML Properties Ltd.; BMP Golf Ltd.; BMP Three Ltd.; Cable Beach Resorts Ltd.; and Riviera Golf Ventures Ltd.

# TABLE OF CONTENTS

**Page**

PRELIMINARY STATEMENT ............................................................................................. 2

OBJECTION ....................................................................................................................... 4

I.  Every Debtor Qualifies as an Eligible "Debtor" under Section 109(a) of the
     Bankruptcy Code ................................................................................................... 4

     A.  The Debtors Satisfy the Eligibility Requirements ................................... 5

          (i)  The Debtors Own Property in the United States ........................... 5

          (ii)  Northshore Has a Place of Business in the United States ........... 7

     B.  CCA and CEXIM Bank Conveniently Ignore the Fact That Significant
          Ties Exist Between Both the Debtors and Their Creditors and the United
          States ...................................................................................................... 9

          (i)  The Key Parties in the Chapter 11 Cases Have Substantial Contacts
               with the United States ............................................................... 10

          (ii)  The Debtors Own Assets and Property in the United States ...... 16

II.  CCA and CEXIM Bank Fail to Establish that Cause Exists To Dismiss the
     Chapter 11 Cases as "Bad Faith" Filings Pursuant to Section 1112(b) of the
     Bankruptcy Code Based on the Totality of the Circumstances ......................... 18

     A.  The Debtors Had Valid Bankruptcy Purposes for Commencing the
          Chapter 11 Cases ................................................................................... 20

          (i)  CCA Caused Repeated Construction Delays and Breaches ...... 21

          (ii)  The Debtors and the Developer Attempted in Good Faith To
               Resolve CCA's Breaches and To Fund the Completion of the
               Project .................................................................................... 23

          (iii)  The Debtors Needed Funding To Pay Their Employees and Other
               Operational Expenses Given the Failure by the Movants and
               Others To Fund Their Outstanding Obligations to Debtors ...... 24

          (iv)  Chapter 11 Provides the Debtors with the Only True Option to
               Restructure .............................................................................. 26

     B.  CCA Fails To Prove that the Debtors Filed the Chapter 11 Cases To
          Obtain a Tactical Litigation Advantage ................................................. 28

i

C.      CCA and CEXIM Bank Filed Their Dismissal Motions To Achieve
        Tactical Advantages............................................................................................ 32

D.      All of the Primestone Factors Weigh in Favor of a Good Faith Filing
        Determination ..................................................................................................... 33

E.      Additional Considerations Demonstrate that the Debtors, Given the
        Totality of the Circumstances, Filed the Chapter 11 Cases in Good Faith........... 37

        (i)     The Debtors are Not Seeking To Avoid Their Obligations or Alter
                any Creditor Priorities............................................................................. 37

        (ii)    Management is Best Suited To Finish the Project .................................... 39

III.    CCA and CEXIM Bank Fail To Demonstrate that the Dismissal of the Chapter 11
        Cases Under Sections 1112(b) or 305 of the Bankruptcy Code Better Serves the
        Interests of All of the Creditors and the Debtors' Estates ................................................ 40

        A.      CCA and CEXIM Bank Fail To Demonstrate that the Dismissal of the
                Chapter 11 Cases is in the Best Interests of All of the Creditors......................... 42

        B.      CCA and CEXIM Bank Fail To Demonstrate that the Dismissal of the
                Chapter 11 Cases is in the Best Interests of the Debtors ...................................... 43

IV.     CCA Fails To Demonstrate Why the Dismissal of the Chapter 11 Cases Should
        Be with Prejudice Under Section 349(a) of the Bankruptcy Code ................................... 45

CONCLUSION.................................................................................................................... 46

## TABLE OF AUTHORITIES

**Page(s)**

**Cases**

Bank of Am. v. World of English,
  23 B.R. 1015 (N.D. Ga. 1982) ....................................................................5

Casse v. Key Bank Nat'l Ass'n (In re Casse),
  198 F.3d 327 (2d Cir. 1999)......................................................................46

Cross-Appellees in 09-1432 v. BEPCO, LP (In re 15375 Mem'l Corp.),
  589 F.3d 605 (3d Cir. 2009)..................................................19, 28, 29, 30

Eastman v. Eastman (In re Eastman),
  188 B.R. 621 (B.A.P. 9th Cir. 1995)........................................................41

Hall v. Vance,
  887 F.2d 1041 (10th Cir. 1989) ...............................................................45

In re Aerovias Nacionales de Colom. S.A. Avianca,
  303 B.R. 1 (Bankr. S.D.N.Y. 2003).............................................................6

In re Bd. of Dirs. of Multicanal S.A.,
  314 B.R. 486 (Bankr. S.D.N.Y. 2004).......................................................42

In re Cenargo Int'l, PLC,
  294 B.R. 571 (Bankr. S.D.N.Y. 2003).......................................................35

In re Corino,
  191 B.R. 283 (Bankr. N.D.N.Y. 1995) ......................................................41

In re G.S. Distrib., Inc.,
  331 B.R. 552 (Bankr. S.D.N.Y. 2005).......................................................18

In re Gen. Growth, Props., Inc.,
  409 B.R. 43 (Bankr. S.D.N.Y. 2009)....................................................18, 35

In re Global Ocean Carriers Ltd.,
  251 B.R. 31 (Bankr. D. Del. 2000) ..........................................................5, 6

In re Iglesias,
  226 B.R. 721 (Bankr. S.D. Fla. 1998) .........................................................6

In re Jer/Jameson Mezz Borrower II, LLC,
  461 B.R. 293 (Bankr. D. Del. 2011) ....................................................19, 30

In re L.F. Popell Co., Inc.,
   221 F. Supp. 534 (S.D.N.Y. 1963), aff'd sub nom., L.F. Popell Co., Inc. v.
   Delta, 323 F.2d 50 (2d Cir. 1963) ............................................................................5

In re Luftek,
   6 B.R. 539 (Bankr. E.D.N.Y. 1980) ........................................................................41

In re McTague,
   198 B.R. 428 (Bankr. W.D.N.Y. 1996) ....................................................................6

In re Monitor Single Lift I, Ltd.,
   381 B.R. 455 (Bankr. S.D.N.Y. 2008) ....................................................................41

In re Paper I Partners LP,
   283 B.R. 661 (Bankr. S.D.N.Y. 2002) ...............................................................6, 7, 9

In re Peregrine Sys., Inc.,
   314 B.R., 314 B.R. 31 (Bankr. D. Del. 2004) ........................................................11

In re Brierley,
   145 B.R. 151 (Bankr. S.D.N.Y. 1992) ......................................................................9

In re Primestone Inv. Partners, L.P.,
   272 B.R. 554 (D. Del. 2002) ...................................................................................20

In re Schur Mgmt. Co.,
   323 B.R. 123 (Bankr. S.D.N.Y. 2005) ....................................................................41

In re Scrub Island Dev. Grp. Ltd.,
   Case No. 8:12-bk-15285 (MGW) (Bankr. M.D. Fla. Dec. 6, 2013) ........................42

In re Spanish Cay Co., Ltd.,
   161 B.R. 715 (Bankr. S.D. Fla. 1993) ...........................................................8, 27, 44

In re Toyota of Yonkers, Inc.,
   135 B.R. 471 (Bankr. S.D.N.Y. 1992) ....................................................................35

In re Wine & Spirits Specialties,
   142 B.R. 345 (Bankr. W.D. Mo. 1992) ...................................................................42

In re Yukos Oil Co.,
   321 B.R. 396 (Bankr. S.D. Tex. 2005) .................................................................6, 38

In re Zais Inv. Grade Ltd. VII
   455 B.R. 839 (Bankr. D.N.J. 2011) .......................................................................7, 9

NMSBPCSLDHB, LP v. Integrated Telecom Express, Inc. (In re Integrated
  Telecom Express, Inc.),
  384 F.3d 108 (3d Cir. 2004) ................................................................................................... 19

Pennsylvania Ins. Guar. Ass'n v. Charter Abstract Corp.,
  790 F. Supp. 82 (E.D. Pa. 1992), aff'd, 44 F.3d 174 (3d Cir. 1994) ........................................ 5

RHTC Liquidating Co. v. Union Pac. R.R. (In re RHTC Liquidating Co.),
  424 B.R. 714 (Bankr. W.D. Pa. 2010) ............................................................................... 40, 41

Official Comm. v. Nucor Corp. (In re SGL Carbon Corp.),
  200 F.3d 154 (3d Cir. 1999) ............................................................................................. passim

Trans World Airlines, Inc. v. Mattox,
  897 F.2d 773 (5th Cir. 1990) ................................................................................................... 11

**Statutes**

11 U.S.C. § 101 ........................................................................................................................... 5

11 U.S.C. § 105 ..................................................................................................................... 1, 11

11 U.S.C. § 109 ................................................................................................................. passim

11 U.S.C. § 305 ................................................................................................................. passim

11 U.S.C. § 345 ......................................................................................................................... 31

11 U.S.C. § 349 ......................................................................................................................... 45

11 U.S.C. § 365 ................................................................................................................... 44, 45

11 U.S.C. § 1104 ....................................................................................................................... 39

11 U.S.C. § 1112 ............................................................................................................... passim

11 U.S.C. § 1121 ....................................................................................................................... 35

11 U.S.C. § 1129 ............................................................................................................ 3, 35, 44

Bankr. S.D.N.Y. Local Rule 2001-1(d) .................................................................................... 13

Bankr. S.D.N.Y. 2004-1 ........................................................................................................... 11

Fed. R. Bankr. P. 1007(b) ......................................................................................................... 15

Fed. R. Bankr. P. 2002 .............................................................................................................. 13

Fed. R. Bankr. P. 2004 ............................................................................................. 3, 11, 32, 46

v

Fed. R. Bankr. P. 9010 ................................................................................................................. 13

Fed. R. Civ. P. 30(b)(6) ............................................................................................................... 11

**Other Authorities**

Companies (Winding Up Amendment) Act, 2011 (Bah.) ..................................................... *passim*

Northshore Mainland Services Inc. ("Northshore"), Baha Mar Ltd. ("BML"), and their affiliated debtors and debtors in possession (each a "Debtor" and, collectively, the "Debtors") in the above-captioned chapter 11 cases (the "Chapter 11 Cases") file this omnibus objection (the "Objection") to (i) *CCA Bahamas, Ltd.'s Motion to Dismiss with Prejudice the Debtors' Chapter 11 Cases Pursuant to Sections 105(a), 305(a), and 1112(b) of the Bankruptcy Code*, dated July 20, 2015 [D.I. 206] (the "CCA Dismissal Motion"), (ii) *CCA Bahamas, Ltd.'s Motion, Pursuant to Sections 105(a) and 305(a) of the Bankruptcy Code, for Entry of an Order Deferring Consideration of All Pending Matters*, dated July 20, 2015 [D.I. 208] (the "Suspension Motion"),[2] each filed by CCA Bahamas, Ltd. ("CCA"), (iii) *Motion of CEXIM To Dismiss the Bahamian Debtors' Chapter 11 Cases Pursuant to Sections 105(a) and 1112(b) or, in the Alternative, Section 305(a) of the Bankruptcy Code*, dated July 27, 2015 [D.I. 246] (the "CEXIM Dismissal Motion"), filed by The Export-Import Bank of China ("CEXIM Bank"), and (iv) *Joinder of Stafford-Smith, Inc. to CCA Bahamas, Ltd.'s Motion to Dismiss with Prejudice the Debtors' Chapter 11 Cases Pursuant to Sections 105(a), 305(a), and 1112(b) of the Bankruptcy Code and Joinder to CEXIM Motion To Dismiss the Bahamian Debtors' Chapter 11 Cases Pursuant to Sections 105(a) and 1112(b) or, in the Alternative, Section 305(a) of the Bankruptcy Code* [D.I. 289] (the "Joinder" and, together with the CCA Dismissal Motion and CEXIM Dismissal Motion, the "Dismissal Motions").

In support of this Objection, the Debtors submit the (i) Declaration of Thomas M. Dunlap in Support of Debtors' Omnibus Objection to Dismissal Motions (the "Dunlap

---

[2]    The Objection does not separately address the Suspension Motion because the (a) relief requested therein was effectively rendered moot when the Court entered an order denying CCA's request to shorten the time required for notice of the hearing to consider approval the Suspension Motion and scheduled the hearing on the Suspension Motion for the same hearing date as the Dismissal Motions and (b) bases for the relief requested in the Suspension Motion are subsumed within the bases for the relief requested in the Dismissal Motions.

Declaration") and (ii) Declaration of Mark Shinderman in Support of Debtors' Omnibus Objection to Dismissal Motions (the "<u>Shinderman Declaration</u>"), both of which are being filed contemporaneously herewith and are incorporated herein by reference.  In further support of this Objection, the Debtors respectfully represent as follows:[3]

<u>**PRELIMINARY STATEMENT**</u>

1.      The Court should deny the Dismissal Motions because (a) the Bankruptcy Court properly has jurisdiction over the Debtors and their assets and (b) dismissal would not be in the best interests of all creditors and the estates.

2.      As to jurisdiction, all of the Debtors own assets in the United States.   In addition, Northshore was incorporated and operates in the United States, and the entire enterprise regularly conducts business in the United States.  Moreover, approximately 60% in number and nearly 70% in amount of the unsecured claims against the Debtors (excluding CCA's alleged claims) are held by creditors located in the United States.

3.      As to the best interests of creditors and the estates, it is baffling how CCA and CEXIM Bank completely fail to explain how both the creditors and the estates would fare better in a liquidation under The Companies (Winding Up Amendment) Act, 2011 (the "<u>Winding Up Act</u>"), assuming the Bahamian Court even granted such relief as to all of the Debtors (which is not a foregone conclusion), than in the Chapter 11 Cases.  The Winding Up Act simply does not provide for restructuring (for if it did, the Chapter 11 Cases may not have been necessary in the first place) nor does it contain the tools necessary to permit an effective restructuring to take place (like a stay on secured creditors or the ability to confirm a plan over the objection of certain creditors).  Indeed, under the Winding Up Act, the Debtors would not be able to affect the

---

[3]    Capitalized terms used but not otherwise defined herein shall have the meanings ascribed to them in the Dismissal Motions and the Dunlap Declaration, as applicable.

rights of secured creditors and, thus, the most likely outcome would be a foreclosure by CEXIM Bank that would wipe out the claims and interests of all other parties in interest.

4.     Contrary to CCA's and CEXIM Bank's bald allegations that the Debtors commenced the Chapter 11 Cases for some unspecified tactical advantage and in bad faith, the Debtors commenced the cases because of, among other reasons, (a) the failure of CCA, CSCEC, CEXIM Bank, the Government of The Bahamas, and others to fund their respective outstanding obligations to the Debtors (totaling approximately $203 million) and (b) CCA's inability to complete construction. Such failures – particularly by CCA and CEXIM Bank themselves – led to liquidity constraints and the possibility of action by various parties that could have precluded any restructuring.

5.     Seen for what it really is, the CCA Dismissal Motion is nothing more than an attempt to avoid the prospects of having CCA's contract rejected, its conduct investigated under Bankruptcy Rule 2004, and the assertion of substantial claims against it determined by the Court overseeing the Chapter 11 Cases. In the case of CEXIM Bank, the CEXIM Dismissal Motion is an effort to avoid the stay of proceedings that precludes it from foreclosing on its security interests (and thus holding a hammer over other parties to the negotiating process) and to circumvent the possibility of being crammed down under a plan of reorganization.

6.     In bringing the Dismissal Motions, CCA and CEXIM Bank conveniently ignore that the Court can confirm a plan of reorganization, assuming the Debtors otherwise satisfy the requirements of section 1129 of the Bankruptcy Code, because (a) the Court has jurisdiction over the Debtors and their assets, (b) CCA and CEXIM Bank, the estates' largest purported creditors, have now appeared in the Chapter 11 Cases and, thus, are subject to the jurisdiction of the Court, (c) many other creditors, including most of the estates' other large

creditors, have appeared in the Chapter 11 Cases or are otherwise subject to this Court's reach, and (d) most of the estates' creditors, in number and dollar amount, as well as the counterparties to Debtors' contracts, are located outside of the Bahamas.

7.     In short, there are significant benefits to the Debtors and creditors in proceeding with a restructuring under chapter 11 of the Bankruptcy Code, rather than a liquidation under the Winding Up Act in The Bahamas, that CCA and CEXIM Bank would have the Court ignore for their own self-interests.

## OBJECTION

### I.     Every Debtor Qualifies as an Eligible "Debtor" under Section 109(a) of the Bankruptcy Code

8.     In the CCA Dismissal Motion, CCA contends that "the Debtors have failed to show that they meet the threshold requirement to be eligible debtors under the Bankruptcy Code."  CCA Dismissal Motion at ¶ 85.  First, the Debtors had no affirmative obligation to demonstrate that they were eligible debtors under section 109(a) of the Bankruptcy Code.  Rather, the Debtors only have to provide such proof upon a challenge of the Debtors' eligibility.  Second, CCA is mistaken because Northshore is a corporation incorporated under the laws of Delaware in 2005, conducts all of its business in the United States, and maintains a place of business in the United States.  In addition, Northshore and each of the other Debtors have assets and property interests in the United States.[4]

9.     Section 109 of the Bankruptcy Code governs who may be a debtor in the United States.  See 11 U.S.C. § 109.  Section 109(a) of the Bankruptcy Code provides that "only a person that resides or has a domicile, a place of business, property in the United States, or a

---

[4]    The Debtors' eligibility under section 109(a) of the Bankruptcy Code is such a foregone conclusion that it is not even raised as an issue in the CEXIM Dismissal Motion.

municipality, may be a debtor."  11 U.S.C. § 109(a).[5]  Eligibility is determined as of the date on which the bankruptcy petition is filed.  See In re Global Ocean Carriers Ltd., 251 B.R. 31, 37 (Bankr. D. Del. 2000) (citing In re Axona Int'l Credit & Commerce, Ltd., 88 B.R. 597, 614-15 (Bankr. S.D.N.Y. 1988)).  The eligibility test must be passed by each affiliated debtor.  See In re Global Ocean Carriers Ltd., 251 B.R. at 37 (citation omitted); Bank of Am. v. World of English, 23 B.R. 1015, 1019-20 (N.D. Ga. 1982).  Accordingly, to qualify as an eligible debtor under the Bankruptcy Code, each of the Debtors must have (a) a residence or domicile, (b) a place of business, or (c) property in the United States as of the date on which its bankruptcy petition was filed.  CCA's and CEXIM Bank's repeated contention that the Debtors are truly "Bahamian Companies," see CCA Dismissal Motion at ¶ 58; CEXIM Dismissal Motion at ¶ 2, simply is not relevant to the eligibility inquiry.

### A.    The Debtors Satisfy the Eligibility Requirements

10.    Each of the Debtors satisfies the eligibility requirements under section 109(a) of the Bankruptcy Code because, as of the Petition Date, each owned property that was located in the United States.  Moreover, Northshore maintains a place of business in the United States and satisfies the residence and domicile eligibility requirement by virtue of being a Delaware corporation.[6]

### (i)    The Debtors Own Property in the United States

11.    An entity that owns property in the United States qualifies as an eligible debtor under section 109 of the Bankruptcy Code.  "While the property in the United States must

---

[5]    The Bankruptcy Code defines "persons" to include partnerships and corporations.  11 U.S.C. § 101(41).

[6]    See In re L. F. Popell Co., Inc., 221 F. Supp. 534, 536 (S.D.N.Y. 1963) (stating that proper approach is to "treat the residence and domicile of a corporation as one; and the domicile is the state . . . [of] incorporation") (internal quotation marks and citation omitted); Pennsylvania Ins. Guar. Ass'n v. Charter Abstract Corp., 790 F. Supp. 82, 85 (E.D. Pa. 1992) ("It is the settled rule that . . . a corporation . . . is a resident of the state in which it is incorporated, and no other.") (citations omitted), aff'd, 44 F.3d 174, 181 (3d Cir. 1994).

be real and cannot be some type of remote or inchoate claim against property in the United States, there is no statutory requirement as to the property's minimum value." In re Paper I Partners, 283 B.R. at 674 (footnote omitted) (internal quotation marks omitted). "Cases that have construed the 'property' requirement with respect to foreign corporations and individuals have found [that] the eligibility requirement [may be] satisfied by even a minimal amount of property located in the United States." In re Aerovias Nacionales de Colombia S.A. Avianca, 303 B.R. 1, 8 (Bankr. S.D.N.Y. 2003). Indeed, "[s]everal courts have held that nominal amounts of property located in the United States enable a foreign corporation to qualify as a debtor under Section 109(a) of the Bankruptcy Code. The courts have noted that there is 'virtually no formal barrier' to having federal courts adjudicate foreign debtors' bankruptcy proceedings." In re Yukos Oil Co., 321 B.R. 396, 407 (Bankr. S.D. Tex. 2005) (citations omitted).

12.     Indeed, courts have held that bank accounts held in the United States, even those with nominal amounts, are sufficient to satisfy section 109(a) of the Bankruptcy Code. See, e.g., id. (finding that debtor's bank account in United States containing $480,000 constituted property in United States sufficient to satisfy section 109(a) of Bankruptcy Code notwithstanding being funded less than two hours prior to petition date); In re Global Ocean Carriers Ltd., 251 B.R. at 39 (finding that bank accounts constituted property in United States for purposes of eligibility under section 109(a) of Bankruptcy Code "regardless of how much money was actually in them on the petition date"); In re Iglesias, 226 B.R. 721, 722-23 (Bankr. S.D. Fla. 1998) (finding that bank account in Florida containing $522 was sufficient property in United States to satisfy section 109(a) of Bankruptcy Code); In re McTague, 198 B.R. 428, 432 (Bankr. W.D.N.Y. 1996) (finding that plain language of section 109 of Bankruptcy Code meant that

debtor was eligible to file, even where sole connection with United States was mere $194 in bank account).

13.     As part of the Debtors' cash management system, each Debtor maintained, and continues to maintain, at least one bank account in the United States.  See Dunlap Declaration at ¶ 9.  Attached to the Dunlap Declaration as Exhibit A is a schedule listing each of the Debtors' bank accounts and the amount on deposit as of the Petition Date.  Moreover, BML and Northshore each own additional property in the United States.  See id.  BML owns several trademarks registered in the United States, including Baha Mar®, Cable Beach Resorts®, and Crystal Palace Casino®.  See id.  It also has several applications pending for the registration of additional trademarks in the United States.  See id.  Northshore has leasehold interests in both Florida and New Jersey from which it operates its call center and marketing office, respectively. See id.

14.     Because each Debtor owned property in the United States as of the Petition Date, each Debtor satisfies the property ownership eligibility requirement under section 109(a) of the Bankruptcy Code.

(ii)     Northshore Has a Place of Business in the United States

15.     In addition to satisfying the property ownership requirement under section 109(a) of the Bankruptcy Code, Northshore meets the place of business requirement as well. When considering the place of business eligibility requirement of section 109(a) of the Bankruptcy Code, courts have found that the place of business does not need to be a principal place of business, but merely a place where a person conducts business.  See, e.g., In re Zais Inv. Grade Ltd. VII, 455 B.R. 839, 844 (Bankr. D.N.J. 2011) (citing In re Paper I Partners, L.P., 283 B.R. 661, 672 (Bankr. S.D.N.Y. 2002) (stating that section 109(a) of Bankruptcy Code requires "a" place of business and does not mention or require "principal" place of business for eligibility

purposes)).   In addition, a debtor can satisfy the place of business eligibility requirement notwithstanding its failure to comply with state business regulations.  See In re Spanish Cay Co., Ltd., 161 B.R. 715, 721 (Bankr. S.D. Fla. 1993) (finding that debtor had place of business in Florida houseboat where it sold property located in The Bahamas and conducted advertising, marketing, and other business despite non-compliance with state business registration requirements).

16.     Northshore clearly conducts business in the United States.  In fact, all of Northshore's business operations are located in the United States.  See Dunlap Declaration at ¶ 10.   As of the Petition Date, it managed the Debtors' call center operating primarily from leased premises located in Orlando, Florida.  See id.  The call center is responsible for, among other things, advanced-booking reservations for the various hotels and the convention center at the Project.  See id.  In addition, Northshore performs general sales and marketing duties for the entire Project primarily from its leased offices in Somers Point, New Jersey and Miami, Florida. See id.

17.     As of the Petition Date, Northshore employed approximately 64 employees (the "Northshore Employees"), all of whom were located either in the call center in Florida, the marketing office in New Jersey, or in the homes of individual Northshore employees located in Florida, Georgia, New Jersey, Nevada, Illinois, Connecticut, and Rhode Island.  See id. at ¶ 11.  Northshore Employees are paid on a bi-weekly basis.  The average bi-weekly gross payroll for the Northshore Employees is approximately $189,200.[7]  See id.

18.     In addition, Northshore incurs state and local taxes imposed on the sale of

---

[7]     The Northshore Employees also receive medical, dental, vision, life insurance, accidental death and dismemberment insurance coverage, as well as statutorily required workers' compensation coverage, for their full-time Northshore Employees and their eligible dependents.   See Dunlap Declaration at ¶11 .   Further, Northshore Employees are eligible for COBRA coverage.  See id.

certain goods and services and various other state or local taxes, charges, and fees, including, without limitation, amounts incurred or required to be collected pursuant to applicable law (collectively, the "Sales and Use Taxes").  See id. at ¶ 12.  Northshore's records indicate that, as of the Petition Date, it owed the Florida Department of Revenue approximately $100,000 for Sales and Use Taxes.  See id.

19.    Based upon the foregoing, Northshore clearly conducts its business, and therefore has a place of business, in the United States and, thus, satisfies the place of business eligibility requirement under section 109(a) of the Bankruptcy Code.[8]

**B.    CCA and CEXIM Bank Conveniently Ignore the Fact That Significant Ties Exist Between Both the Debtors and Their Creditors and the United States**

20.    Although not germane to the eligibility test, CCA's and CEXIM Bank's constant refrain in the Dismissal Motions is that the "Debtors, the assets, and the interested parties have no U.S. connections."  CCA Dismissal Motion at ¶ 3; see also CEXIM Dismissal Motion at ¶ 1 ("The lack of any meaningful connection to the United States is glaring . . . .").  Thus, CCA and CEXIM Bank assert that The Bahamas is the appropriate jurisdiction for any proceeding because the "Project, all the Debtors except for one and the vast majority of the key parties in interest in this matter are located in The Bahamas."  CCA Dismissal Motion at ¶ 27; see also CEXIM Dismissal Motion at ¶ 35.  In fact, the contrary is true.

---

[8]    Though not a necessary part of the eligibility inquiry given the satisfaction of the ownership of property factor for each of the other Debtors as discussed above, it also bears noting that some courts have found that a debtor's place of business may include a place where business is conducted on a debtor's behalf.  See, e.g., In re Zais, 455 B.R. at 845-46; In re Paper I Partners, 283 B.R. at 672-74 (finding that two foreign limited partnerships had place of business in United States because their general partner maintained office in New York City from which he conducted administrative and substantive business on behalf of two foreign limited partnerships); In re Brierley, 145 B.R. 151, 161-62 (Bankr. S.D.N.Y. 1992) (noting in dicta that United Kingdom-based debtor had place of business in United States because it employed accountant in United States who maintained books and records for debtor).  Therefore, considering that Northshore handles bookings and marketing on behalf of the entire Project in the United States, and that the Debtors contract extensively with United States-based companies and individuals, it can be said that all of the Debtors have a place of business in the United States as of the Petition Date such that they, too, satisfy the place of business eligibility requirement under section 109(a) of the Bankruptcy Code.  See In re Zais, 455 B.R. at 845-46; In re Paper I Partners, 283 B.R. at 672-74.

21.     Although the Project is located in The Bahamas, virtually all of the key parties in the Chapter 11 Cases have significant connections with the United States and throughout the world.  In addition, the Debtors have assets and hold property interests outside of The Bahamas, particularly in the United States.  Thus, the Court not only has *in rem* jurisdiction over all of the Debtors' assets and property, of any nature whatsoever, located anywhere in the world, but also *in personam* jurisdiction over a significant portion of the Debtors' creditors, including CCA and CEXIM Bank, as set forth below.

(i)     The Key Parties in the Chapter 11 Cases Have Substantial Contacts with the United States

22.     Substantially all of the critical parties in the Chapter 11 Cases have meaningful connections with the United States and throughout the world and are subject to the jurisdiction of this Court.

23.     CCA.  CCA, allegedly the second largest overall creditor and largest unsecured creditor of the Debtors, provides its services worldwide and, as set forth below, has substantial contacts with the United States:

- CCA is a wholly owned subsidiary of China Construction America Inc., a company incorporated and headquartered in New Jersey.

- New York law governs the contract entered into by the Developer and China State Construction Engineering Corp. Ltd. ("CSCEC"), dated March 9, 2009 (the "Main Construction Contract").[9]  By an Assignment and Assumption Agreement, dated December 8, 2010 (the "Assignment"), the respective rights and obligations under the Main Construction Contract were assigned and assumed by BML and CCA.  New York law also governs the Assignment.[10]

---

[9]     See Shinderman Declaration at Ex. C.

[10]     See id. at Ex. D.

- Substantially all of the agreements ancillary to the Main Construction Contract are governed by either New York or English law.[11]  Moreover, the jurisdiction and venue provisions contained in those agreements invariably mirror the governing law provisions; i.e., provide for jurisdiction in New York or England.[12]

- CCA has at least one bank account in the United States.[13]

- Notwithstanding its pro forma disclaimers, CCA submitted to this Court's jurisdiction when it (a) appeared in the Chapter 11 Cases[14] and (b) actively participated in the Chapter 11 Cases by seeking various forms of relief, including filing the CCA Dismissal Motion, the Suspension Motion, the Rule 30(b)(6) Deposition Notice,[15] and objecting to the Debtors' 2004 Motion.[16]  Indeed, courts have found that a party has submitted to a court's jurisdiction if it voluntarily seeks relief from such court.  See Trans World Airlines, Inc. v. Mattox, 897 F.2d 773, 786-87 (5th Cir. 1990) (holding that voluntarily seeking affirmative relief constituted a waiver of objection to court's jurisdiction); In re Peregrine Sys., Inc., 314 B.R., 314 B.R. 31, 35 n.5 (Bankr. D. Del. 2004) ("[Movant] specially appeared for the purpose of its motions before this court asserting that it has not submitted to personal jurisdiction here.  However [movant] has filed substantive motions with the court (motion for determination that stay does not apply and motion for reconsideration).  By doing so [movant] has submitted to the jurisdiction of this court.").

24.    CEXIM Bank.    CEXIM Bank, a Chinese policy bank that provides financing to support the investment of Chinese capital and employment of Chinese labor forces throughout the world, not just in The Bahamas, is the Debtors' largest creditor.  See Dunlap

---

[11]    See id.  Only the Pledge of Shares Agreement and Charge Over Shares Agreement are governed by Bahamian law.  See id.

[12]    See id.

[13]    See Dunlap Declaration at ¶ 15.  On several occasions, Baha Mar reimbursed CCA for expenses incurred pursuant to the Main Construction Contract by wiring funds into a United States bank account in the name of CCA.  See id.  Attached to the Dunlap Declaration as Exhibit B are examples of payment details evidencing such reimbursement.

[14]    See Court Sign-In Sheet for July 1, 2015 hearing [D.I. 59]; Notice of Appearance and Demand for Notices and Papers, dated July 1, 2015 [D.I. 68]; Motions and Orders for Admission Pro Hac Vice, dated July 1, 2015 [D.I. 70, 71, 73, 138, 139, 182]; Amended Notice of Entry of Appearance and Demand for Notices and Papers, dated July 10, 2015 [D.I. 113].

[15]    See Notice of 30(b)(6) Deposition Directed to the Debtors, dated July 22, 2015 [D.I. 229].

[16]    See China Construction America Inc. and CCA Bahamas, Ltd.'s Objection to the Debtors' Motion for Entry of Order, Pursuant to Section 105(a) of the Bankruptcy Code, Bankruptcy Rule 2004, and Local Bankruptcy Rule 2004-1, Authorizing the Examination of China Construction America Inc. and Certain Related Entities [D.I. 179].

Declaration at ¶ 16.  CEXIM Bank also has substantial contacts with the United States and other

non-Bahamian jurisdictions relating to the Chapter 11 Cases, as set forth below:

- The Prepetition Credit Agreement and substantially all of the agreements ancillary thereto are governed by either New York, Texas, English, or British Columbian law.[17]  Again, unless silent, the jurisdiction and venue provisions contained in all such agreements typically follow the location selected for governing law.[18]

- Notwithstanding its pro forma disclaimer, CEXIM Bank submitted to the Court's jurisdiction when it appeared in the Chapter 11 Cases by actively participating in the Chapter 11 Cases in filing the CEXIM Dismissal Motion and Cross-Rule 30(b)(6) Deposition Notice.[19]

- As described below, Citicorp International Limited ("Citicorp"), the facility agent and offshore security agent under the Prepetition Credit Agreement, and its affiliates have contacts with the United States.

25.    The Citibank Entities.  Citicorp serves as the facility agent and offshore

security agent for and on behalf of CEXIM Bank, as the lender under the Prepetition Credit

Agreement.    Citibank N.A., Bahamas Branch ("Citibank Bahamas") serves as the onshore

security agent for and on behalf of CEXIM Bank under the Prepetition Credit Agreement.  See

Dunlap Declaration at ¶ 17.  As of the Petition Date, 36 of the Debtors' 56 bank accounts were

maintained at Citibank, N.A.  See id.  Citigroup Inc. is the ultimate parent of all "Citi" entities

(collectively, the "Citi Group"), including, without limitation, Citicorp, Citibank Bahamas, and

Citibank, N.A.  See id.  The Citi Group has substantial contacts with the United States relating to

the Chapter 11 Cases and other non-Bahamian jurisdictions throughout the world, as set forth

below:

- Citigroup Inc. is a multinational banking and financial services corporation headquartered in the United States.

---

[17]    See Shinderman Declaration at Ex. A.  Only the Debenture, Pledge of Shares Agreement, and Charge Over Shares Agreement are governed by Bahamian law.  See id. at Ex. B.

[18]    See id.

[19]    See Cross-Notice of 30(b)(6) Deposition Directed to the Debtors, dated July 31, 2015 [D.I. 279].

- Citibank Bahamas submitted to the Court's jurisdiction when it (a) appeared in the Chapter 11 Cases[20] and (b) actively participated in the Chapter 11 Cases by (i) sending correspondence to the Debtors acknowledging the effectiveness of the automatic stay upon the commencement of the Chapter 11 Cases[21] and (ii) requesting certain revisions to the final order approving the debtor-in-possession financing.[22]

- Citibank, N.A., on behalf of itself and its affiliates and related entities, including, but not limited to, its parents and subsidiaries, entered into the Citibank Stipulation.[23]

- Citibank Bahamas is party to deposit account control agreements relating to the Debtors' bank accounts located in the United States.[24]

- Citicorp is party to both deposit account control agreements and deposit account pledge agreements relating to the Debtors' bank accounts located in the United States.[25]

- As of the Petition Date, 17 of the Debtors' 56 bank accounts were maintained at Citibank, N.A. in the United States.

26.     Brands.   As described in the Dunlap Declaration, once completed and fully operational, the Project will include four new hotels (in addition to the Melia® hotel (the "Melia")) with 2,333 guest rooms (inclusive of 284 condos and villas), a casino (the "Casino"), and a convention center.  See Dunlap Declaration at ¶ 18.  In that regard, the Debtors entered into management and cooperation agreements (the "Brand Agreements") with key brands Hyatt®, Rosewood®, SLS Lux®, and Melia® (collectively, the "Brands") to operate four of the hotels, with the Debtors deciding to self-brand (i.e., "Baha Mar") the fourth new hotel and casino.  See id. at ¶ 18.  Each Brand Agreement is governed by New York law.  See Shinderman

---

[20]   See *Entry of Appearance and Request for Notices of Citibank, N. A., Bahamas Branch, Pursuant to Fed. R. Bankr. P. 2002 and 9010 and Del. Bankr. L.R. 2002-1(d)*, dated July 9, 2015 [D.I. 102]; *Motion and Order for Admission Pro Hac Vice* filed by Citibank Bahamas's counsel, dated July 9, 2015 [D.I. 103].

[21]   See Shinderman Declaration at Ex. E.

[22]   See id.

[23]   See *Stipulation and Agreement Between Debtors and Citibank, N.A. Clarifying Cash Management Order*, dated July 2, 2015 [D.I. 78].

[24]   See Shinderman Declaration at Ex. B.

[25]   See id.

Declaration at Exs. F-I.   In conjunction with certain of those agreements, the relevant Brands also entered into Subordination, Non-Disturbance and Attornment Agreements (each, an "SDNA") with Citicorp, Citibank Bahamas, and BML.   See id. at Ex. J.   The SDNAs are also governed by New York law.   See id.   Moreover, each of the Brands represents a truly global enterprise, operating hotels throughout the world.   Hyatt®, Rosewood®, and SLS Lux® maintain their respective corporate headquarters in the United States.   See Dunlap Declaration at ¶ 18.

27.   Spa, Golf Course, Racquet Club.   The Project will also include a 30,000 square foot destination spa and equipped aerobic gym facility, as well as a full salon (the "Spa"), a premier Jack Nicklaus Signature 18-hole golf course (the "Golf Course") designed by Nicklaus Design, LLC, a United States corporation, and nine tennis courts, including grass, clay, and hard courts (the "Racquet Club").   See id. at ¶ 7.   Espa International (US) Inc. and PGA Tour Golf Course Properties, Inc., each a United States corporation, will operate and maintain the Spa and Golf Course, respectively, pursuant to agreements governed by Florida law.   See Shinderman Declaration at Exs. K, L.   Peter Burwash International, Inc., a United States corporation, will operate and maintain the Racquet Club pursuant to an agreement governed by New York law. See id. at Ex. M.

28.   Casino.   The Project will include a new Las Vegas-style casino.   See Dunlap Declaration at ¶ 6.   As of the petition date, the Debtors have an agreement (the "GGAM Agreement"), which is governed by New York law, with Global Gaming Asset Management ("GGAM"), a Nevada company, to operate the Casino.   See id. at ¶ 6; see also Shinderman Declaration at Ex. N.[26]

---

[26]   GGAM assigned its rights and obligations under the GGAM Agreement to its affiliate GGAM Bahamas Holdings, LLC.   See Dunlap Declaration at ¶ 6; see also Shinderman Declaration at Ex. N.

29.   <u>General Unsecured Creditors</u>.   Approximately 60% in number of the Debtors' creditors (other than employees) are located in the United States and more than 95% of all debt – both secured and unsecured – is owed to creditors located outside of The Bahamas. <u>See</u> Dunlap Declaration at ¶ 19.   Moreover, nearly 70% in amount (<u>i.e.</u>, approximately $75 million of $110 million) of the unsecured claims against the Debtors (excluding CCA' alleged claims) are held by creditors located in the United States.   <u>See</u> <u>id.</u>   In addition, not only is every member of the official committee of unsecured creditors appointed in the Chapter 11 Cases (the "<u>Creditors' Committee</u>") a United States-based creditor, but 14 of the 20 unsecured creditors listed on the *Debtors' Consolidated List of Creditors Holding 20 Largest Unsecured Claims* (holding, in the aggregate, approximately $28,575,610 of claims) are located outside of The Bahamas.   <u>See</u> <u>id.</u>   In fact, 13 of the top 20 unsecured creditors are located in the United States. <u>See</u> <u>id.</u>

30.   <u>Contract Parties</u>.   In addition, a review of the third party contracts entered into by the Debtors reveals that most of the Debtors' counterparties are not Bahamian companies.   <u>See</u> <u>id.</u> at ¶ 20.   Specifically, in preparing their schedules of executory contracts and unexpired leases in accordance with Rule 1007(b) of the Federal Rules of Bankruptcy Procedure, the Debtors have identified approximately 540 individual companies with whom they contract. <u>See</u> <u>id.</u>   Approximately 430, or 80%, of those companies are not primarily located, or located at all, within The Bahamas.   <u>See</u> <u>id.</u>

31.   <u>Employees</u>.   As of the Petition Date, the Debtors employed approximately 3,600 employees.   <u>See</u> <u>id.</u> at ¶ 21.   Although most of the Debtors' employees are Bahamian citizens, approximately 270 are either expatriates (<u>i.e.</u>, not citizens of The Bahamas) or are located outside of The Bahamas.   <u>See</u> <u>id.</u>   Of those, (a) approximately 138 are United States

citizens, see id. and (b) as noted above, as of the Petition Date, Northshore employed approximately 64 employees (of the 270 described above) in various states in the United States (i.e., in Florida, Georgia, New Jersey, Nevada, Illinois, Connecticut, and Rhode Island). See id. Furthermore, as of the Petition Date, a significant portion of the Debtors' senior management and director level employees were expatriates. See id.

32.    Customer Base. Once complete, the Project will provide a world-class destination getaway for a global clientele – the overwhelming majority of which will come from the United States. In fact, the Debtors forecast that over 80% of their customers will be based in the United States. In addition, as discussed below, due to CCA's failure to timely finish construction of the Project, the Debtors were forced to cancel months' of room reservations and group meeting events. The Debtors paid more than 90% (approximately $3.6 million) of the reimbursements for cancellations to customers based in the United States. See id. at ¶ 22.

(ii)    The Debtors Own Assets and Property in the United States

33.    In addition to voluntarily subjecting themselves and all of their assets wherever located to the jurisdiction of this Court, the Debtors own assets and hold property interests in the United States and world-wide. See id. at ¶ 23.

34.    Bank Accounts. As described above, on the Petition Date each of the Debtors had, and continues to have, bank accounts containing substantial deposits in the United States as part of the Debtors' cash management system. See id. at ¶ 24. Specifically, as of the Petition Date, 27 of the Debtors' 56 bank accounts are located in the United States. See id.

35.    Intellectual Property. As previously described, BML owns several trademarks registered in the United States and also has several applications pending for the registration of additional trademarks in the United States and elsewhere. See id. at ¶ 25. In addition, BML owns numerous trademarks – such as, among others, Baha Mar®, Baha Mar The

16

Bahamian Riviera®, Baha Mar The New Riviera®, The Bahamian Riviera®, and Royal Blue® –
that are registered in various jurisdictions throughout the world, including, among others,
Bahrain, China, Hong Kong, The Bahamas, Singapore, Kuwait, Macao, Mexico, Panama, the
United Arab Emirates, Argentina, Qatar, Saudi Arabia, Russia, and Lebanon.  See id.  BML also
has applications pending for the registration of trademarks in other jurisdictions, including,
Canada, Brazil, and the European Union.  See id.

36.    Call Center.  As described above, as of the Petition Date, Northshore
operated the Debtors' call center and performed general sales and marketing duties for the entire
Project, all from United States locations.  See id. at ¶ 26.

37.    Leasehold interests.  As noted previously, Northshore holds two leasehold
interests in Florida (one in connection with its call center located in Orlando and one in
connection with its marketing office located in Miami) and one leasehold interest in connection
with its marketing office located in New Jersey.  See id. at ¶ 27.

38.    Based upon the foregoing, it is simply wrong for CCA and CEXIM Bank
to seek dismissal of the Chapter 11 Cases on the basis that this Court lacks jurisdiction and that
the Debtors do not have sufficient connections to the United States.  Indeed, (a) the Debtors own
assets and have property interests in the United States, (b) it is quite evident that the Debtors
have significant connections with the United States, (c) in essence, the United States is the fuel in
the engine that runs the business that is Baha Mar, and (d) many creditors, including most of the
estates' large creditors, have appeared in the Chapter 11 Cases and the Court otherwise has
jurisdiction over many of them.

II.     **CCA and CEXIM Bank Fail to Establish that Cause Exists To Dismiss the Chapter 11 Cases as "Bad Faith" Filings Pursuant to Section 1112(b) of the Bankruptcy Code Based on the Totality of the Circumstances**

39.     In the CCA Dismissal Motion, CCA argues that the Chapter 11 Cases should be dismissed under section 1112(b) of the Bankruptcy Code because "the Debtors filed their petitions in bad faith."  CCA Dismissal Motion at ¶ 47.  As discussed below, the Debtors had valid bankruptcy purposes for filing the Chapter 11 Cases – restructuring their financial affairs so that construction at the Project could recommence and be completed, thereby allowing the Project to be opened to the public as quickly as possible.  The filings were not made as a litigation tactic.  Rather, they were made after considering the best interests of all parties.  See Dunlap Declaration at ¶ 28.  Indeed, chapter 11 of the Bankruptcy Code continues to provide the most appropriate forum to achieve a successful restructuring for the Debtors.

40.     Section 1112(b) of the Bankruptcy Code provides, in relevant part:  "on request of a party in interest, and after notice and a hearing, the court shall convert a case under this chapter to a case under chapter 7 or may dismiss a case under this chapter, whichever is in the best interest of creditors and the estate, for cause . . . ."   11 U.S.C § 1112(b)(1).  Significantly, "[t]he statute provides for dismissal for cause, if it is in the best interest of the creditors and the estate."  In re SGL Carbon Corp., 200 F.3d 154, 159 (3d Cir. 1999).  Courts have found that dismissal of a bankruptcy petition for lack of good faith should be done "only sparingly and with great caution."  See, e.g., In re Gen. Growth, Props., Inc., 409 B.R. 43, 56 (Bankr. S.D.N.Y. 2009) (citing Carolin Corp. v. Miller, 886 F.2d 693, 700 (4th Cir.1989)); In re G.S. Distrib., Inc., 331 B.R. 552, 566 (Bankr. S.D.N.Y. 2005).

41.     Although section 1112(b)(4) of the Bankruptcy Code sets forth a list of examples that may constitute cause for dismissal, none are applicable here.  Indeed, CCA does not allege otherwise.  Instead, CCA contends that the Chapter 11 Cases should be dismissed

because they were not filed in good faith.  See CCA Dismissal Motion at ¶ 47.  Not one iota of evidence, however, is presented to support that contention.

42.     The Third Circuit has held that "[c]hapter 11 bankruptcy petitions are subject to dismissal under 11 U.S.C. § 1112(b) unless filed in good faith."  Cross-Appellees in 09-1432 v. BEPCO, LP (In re 15375 Mem'l Corp.), 589 F.3d 605, 618 (3d Cir. 2009) (internal quotation marks and citation omitted).  "Whether the good faith requirement has been satisfied is a 'fact intensive inquiry' in which the court must examine 'the totality of facts and circumstances' and determine where a 'petition falls along the spectrum ranging from the clearly acceptable to the patently abusive.'"  In re Integrated Telecom Express, Inc., 384 F.3d 108, 118 (3d Cir. 2004) (quoting In re SGL Carbon Corp., 200 F.3d at 162).  Courts in the Third Circuit generally "focus[ ] on two inquiries that are particularly relevant to the question of good faith: (1) whether the petition serves a valid bankruptcy purpose, e.g., by preserving a going concern or maximizing the value of the debtor's estate, and (2) whether the petition is filed merely to obtain a tactical litigation advantage."  Id. at 119-20 (citing In re SGL Carbon Corp., 200 F.3d at 165).

43.     Courts in the Third Circuit "consider various factors that indicate whether the case has been filed for a legitimate reorganization purpose or only as a litigation tactic or for some other improper purpose."  In re Jer/Jameson Mezz Borrower II, LLC, 461 B.R. 293, 299 (Bankr. D. Del. 2011).  The District Court of Delaware articulated the following 13 factors (the "Primestone Factors") for the foregoing determination:

> (a) Single asset case;
> (b) Few unsecured creditors;
> (c) No ongoing business or employees;
> (d) Petition filed on eve of foreclosure;
> (e) Two party dispute which can be resolved in pending state court action;
> (f) No cash or income;
> (g) No pressure from non-moving creditors;
> (h) Previous bankruptcy petition;

(i) Prepetition conduct was improper;
(j) No possibility of reorganization;
(k) Debtor formed immediately prepetition;
(l) Debtor filed solely to create automatic stay; and
(m) Subjective intent of the debtor.

In re Primestone Inv. Partners, L.P., 272 B.R. 554, 557 (D. Del. 2002) (citing In re SGL Carbon

Corp., 200 F.3d at 165; In re Phoenix Piccadilly, Ltd., 849 F.2d 1393, 1394-95 (11th Cir. 1988);

In re SB Props., 185 B.R. 198, 205 (E.D. Pa. 1995)).  "The focus of the inquiry is whether the

petitioner sought 'to achieve objectives outside the legitimate scope of the bankruptcy laws'

when filing for protection under Chapter 11."  In re Primestone Inv. Partners, L.P., 272 B.R. at

557 (quoting In re SGL Carbon Corp., 200 F.3d at 165) (citations omitted).  "Therefore, no

single factor is determinative of a lack of good faith in filing a petition."  Id. at 558 (citations

omitted).

44.     As shown below, CCA fails to demonstrate that (a) the Debtors did not

have a valid bankruptcy purpose for commencing the Chapter 11 Cases, (b) the Debtors filed the

Chapter 11 Cases merely to obtain a tactical litigation advantage, and (c) the totality of the

circumstances surrounding the Chapter 11 Cases, including weighing of the Primestone Factors,

definitively support the extraordinary relief of dismissal of the Chapter 11 Cases.

**A.     The Debtors Had Valid Bankruptcy Purposes for Commencing the Chapter 11 Cases**

45.     Contrary to CCA's bald assertion that "the Debtors have shown no valid

purpose for these proceedings to take place in a United States bankruptcy court," see CCA

Dismissal Motion at ¶ 80; see also CEXIM Dismissal Motion at ¶ 52, the Debtors had perfectly

valid bankruptcy purposes for seeking to restructure pursuant to chapter 11 of the Bankruptcy

Code – they needed to restructure and to borrow money to pay employees and fund other

operational expenses in the face of unsubstantiated monetary claims being asserted by CCA.  See

Dunlap Declaration at ¶ 28. A cursory examination of the circumstances surrounding the filings of the Chapter 11 Cases, and the events that led up to them, dispel any notion that the filings were made in bad faith. Rather, (a) a rapidly approaching liquidity crunch due to the many missed construction deadlines and broken promises made by CCA – resulting in the Developer incurring significant additional costs, (b) the failure of CCA, CSCEC, CEXIM Bank, the Government of The Bahamas, and others to fund their respective outstanding obligations to the Debtors (totaling approximately $203 million), and (c) the potential default and exercise of remedies under the Prepetition Credit Agreement, left the Debtors with no viable alternative other than to seek a restructuring under chapter 11 of the Bankruptcy Code. See id.

(i)      CCA Caused Repeated Construction Delays and Breaches

46.     As detailed in the Dunlap Declaration, the history of the Project is a litany of missed deadlines and broken promises on the part of the Project's main contractor, CCA.

47.     Initially, CCA had agreed to a schedule for the Project which anticipated construction completion by November 20, 2014 as well as to liquidated damages for late completion. See Dunlap Declaration at ¶ 33. However, by early 2013, notwithstanding CCA's repeated assurances to not only the Debtors but also the Government of The Bahamas and CEXIM Bank, it had become abundantly clear that, absent corrective measures, CCA would not meet the construction completion schedule. See id. Consequently, on May 17, 2013, BML and CCA entered into a Memorandum of Understanding ("MOU") setting out agreed items, including increasing the amount of labor working on the Project and target construction completion dates. See id. Within a short period after it was executed, however, CCA breached the MOU. See id.

48.     On May 16, 2014, BML commenced proceedings to seek relief from the Dispute Resolution Board ("DRB") pursuant to the Main Construction Contract with respect to

CCA's breaches regarding the convention center.  See id. at ¶ 34.  On August 13, 2014, the DRB issued a Decision and Opinion in which it ruled, among other things, that CCA had breached the Main Construct Contract "with respect to the timing and content of the Construction Schedules" and by "failing to proceed expeditiously with adequate forces sufficient to comply with the [Main Construction] Contract."  See id.  The DRB also ruled that CCA had a continuing obligation to maintain a workforce at the levels demonstrated during the DRB hearings.

49.     By September 2014, following CCA's blatant disregard for the DRB ruling, it became clear that CCA would not complete the Project in time to open by its December 2014 target date.  See id. at ¶ 35.  In November 2014, in-person negotiations were held in Beijing among CEXIM Bank, the Debtors, and CCA.  See id.  At the conclusion of those negotiations, meeting minutes were signed on November 19, 2014 among BML, CCA, and CEXIM Bank (the "Meeting Minutes").  See id.  The Meeting Minutes reflected the agreement of the Debtors to essentially "buy" dates certain for the construction completion of the Project in an effort to mitigate the impact of CCA's breaches of its commitments to achieve such completion as required by the Main Construction Contract.  See id.

50.     Specifically, in exchange for receiving from the Debtors a total of $54 million of advances on disputed claims, CCA agreed (a) that "upon January 19, 2015, except for the wedding chapel and elevator tower, the rest of the Convention Centre will be Substantially Complete and ready for operational start for paying guests," and (b) to "Substantial Completion of the Project . . . to achieve operational start for paying guests in hotels including amenities" by March 27, 2015.  See id. at ¶ 36.  In essence, the agreement meant that, regardless of the claims by and between the parties that led to the initial delays, CCA would finish construction by the end of March.  See id.

51.     Despite the repeated assurances by CCA and its representatives, however, CCA failed to complete construction by March 27, 2015.  See id. at ¶ 37.

52.     As a result, the Debtors were forced to cancel months' worth of room reservations and group meeting events and provide numerous customers with vouchers, refunds, and, in certain cases, were required to find customers suitable accommodations elsewhere, all at a significant cost.  See id. at ¶ 38.  The Debtors suffered many other damages as well, including significant harm to the Baha Mar name and reputation.  See id.  The Debtors also incurred substantial sunk costs that they must expend once again to open the Project.  See id.  In short, the missed opening date of March 27, 2015 was devastating for the Debtors.  See id.

53.     During this time, CCA executives also began asking the Debtors to release retainage amounts – funds the Debtors are contractually obligated to pay only when the Project is "Substantially Completed" – which amount is currently approximately $70 million.  See id. at ¶ 39.  In addition, CCA began to submit inflated invoices for work.  See id.  For example, the Debtors received monthly pay applications from CCA for the period February through May 2015 in an aggregate amount of $343.8 million for work in respect of which CEXIM Bank's own independent project monitor countersigned at a value stated to be worth only $76.1 million, or less than 25% of what was sought.  See id.

(ii)     The Debtors and the Developer Attempted in Good Faith To Resolve CCA's Breaches and To Fund the Completion of the Project

54.     Since the beginning of April 2015, without the ability to generate revenue from the completed Project, the Debtors began to face a severe liquidity crunch.  See id. at ¶ 40.  Adding to the Debtors' growing financial crisis, CCA refused to repay the Debtors the portion of the $54 million it received pursuant to the November 19, 2014 Meeting Minutes, which it had agreed to pay back if it missed its completion milestones.  See id.  Moreover, CEXIM Bank

refused to advance the remaining amount of approximately $112 million available under the Prepetition Credit Facility absent certain unattainable conditions.  See id.

55.    The Developer, on the other hand, took steps to enable BML to make an equity contribution of $15 million.   See id. at ¶ 41.   At that time, an additional equity contribution of $30 million was required for the Debtors to continue to borrow under the terms of the Prepetition Credit Agreement.[27]   See id.   Nevertheless, despite demands by the Debtors, CSCEC never made its corresponding $15 million equity shortfall contribution under the Sponsor Support Agreement.   See id.   Furthermore, the construction completion delays caused by CCA continue to postpone the contribution of as much as $52 million of "key money" that the Brands agreed to pay the Debtors under the Brand Agreements before and upon opening of the Project.  See id.

     (iii)    **The Debtors Needed Funding To Pay Their Employees and Other Operational Expenses Given the Failure by the Movants and Others To Fund Their Outstanding Obligations to Debtors**

56.    The Debtors' immediate liquidity crunch could have been avoided if:

- CEXIM Bank had advanced the remaining amount of approximately $112 million available under the Prepetition Credit Facility;

- CSCEC had made its corresponding $15 million equity shortfall contribution under the Sponsor Support Agreement;

- CCA repaid to the Debtors the portion of the $54 million it received pursuant to the Meeting Minutes, which it had agreed to pay back if it missed its completion milestones; and

- the Government of The Bahamas had repaid approximately $22 million owed to the Debtors on account of the roads project.

See id. at ¶ 42.

---

[27]    Pursuant to the Sponsor Support Agreement dated January 28, 2011 (the "Sponsor Support Agreement"), BML and CSCEC had agreed to make such contributions equally.  See Dunlap Declaration at ¶ 41.

57.     With the non-payment of these many millions of dollars, the Debtors were compelled to pursue other sources of financing.  See id. at ¶ 43.  Unfortunately, an additional equity infusion from the Developer, beyond its initial investment commitment of almost $900 million, was not a viable option in light of, among other things, the sizable alleged monetary claims being asserted by CCA.  See id.  Given all of these issues, it was unlikely that anyone or any entity would provide the Debtors funding for wages and operational expenses without the protection of a court order.  See id.  Thus, the Debtors decided to seek an $80 million debtor-in-possession financing facility within the context of a chapter 11 filing to fund their payroll and other operating expenses, while attempting to negotiate resolutions to their disputes with CCA, CSCEC, and CEXIM Bank.  See id.

58.     In that regard and in anticipation of the commencement of the Chapter 11 Cases, the Debtors identified the Developer as the most likely source of debtor-in-possession financing, given the urgency of the liquidity situation and taking into account the Developer's in-depth knowledge of the assets and history with, and substantial investments in, the Debtors.  See id. at ¶ 44.  To that end, in mid-June 2015, the Debtors and their advisors began negotiations with the Developer regarding debtor-in-possession financing.  See id.  Following good faith negotiations, the Debtors ultimately concluded (after consultation with their advisors) that the Developer's proposed post-petition financing facility was the best post-petition financing option available to them.  See id.  As noted above, based on the short amount of time that would have been available to complete the necessary due diligence and negotiate and document alternative DIP financing, no third-party lender would have been able to provide DIP financing in time to meet the Debtors' needs given the size and complexity of the Project.  See id.  Moreover, in light of such time constraints and the lack of Project construction completion, any form of third party

post-petition financing on either an unsecured or fully-subordinated basis would plainly have been unobtainable.  See id.

       (iv)     Chapter 11 Provides the Debtors with the Only True Option to Restructure

59.     By the end of May 2015, it had become clear to the Debtors that, without a negotiated resolution, they would run out of cash by the end of June 2015, if not sooner.  See id. at ¶ 45.  The Debtors believed that a negotiated solution was possible among the existing parties to the Project that would lead to its completion and successful opening.  See id.  Nevertheless, as a result of their strained liquidity and the need for breathing space within which negotiations could occur, the Debtors began contingency planning.  See id.

60.     The Debtors possessed limited options.  Unfortunately, Bahamian statutory law provides only for a winding up – i.e., liquidation – proceeding, a process that would not be in the best interests of the Debtors' creditors, employees, investors, or the people and Government of The Bahamas.  See id. at ¶ 46.

61.     Much press has been given by various parties to the mistaken notion that a restructuring can occur in The Bahamas.  Notably, however, neither Dismissal Motion cites any authority for the proposition that Bahamian law contemplates restructuring rather than liquidation.  Indeed, in his address on July 17, 2015, the Prime Minister of The Bahamas cited to only one case (i.e., Charter Oil), a 1979 case that was governed by a different statutory scheme than the Winding Up Act.  In fact, Charter Oil does not support the proposition for which it was cited.

62.     In Charter Oil, rather than restructuring within the then-existing statutory framework under the guidance of the provisional liquidators as the Government of The Bahamas is seeking to do with the Debtors (other than Northshore), after the commencement of a winding up proceeding and the appointment of provisional liquidators, the parent company as the sole

shareholder of the company that was the subject of the winding up proceeding proposed a plan to save the company by, among other things, (a) paying creditors in full, (b) paying the liquidators' fees and expenses in full, (c) permanently staying the winding up proceedings, and (d) restoring the corporate powers to the debtor's officers and directors.  See In re Grand Bahama Petroleum Co. Ltd., 1 L.R.B. 225, 227-28, 233-35 (1979).  Essentially, Charter Oil was a sale that allowed the parent company to repurchase its equity interests in the company by paying all creditors in full.

63.     In reality, insolvency proceedings in The Bahamas are liquidation proceedings, not restructuring proceedings.  See Section III.B below.  The Bahamas has no restructuring regime which is analogous or similar to Chapter 11 in the United States.  In the case at hand, as in Spanish Cay, "[i]f the [United States chapter 11] case is dismissed, there can only be a liquidation proceeding in the Bahamas."  In re Spanish Cay, 161 B.R. at 724 (finding that debtor movant failed to satisfy dismissal requirement under section 305(a)(1) of Bankruptcy Code) .

64.     The Debtors firmly believe that the Project, which is more than 97% complete, employing thousands of trained employees, should not be liquidated.  See Dunlap Declaration at ¶ 48.  Indeed, liquidation could very well destroy the value the Project is intended to generate, including the thousands of jobs it has already created.  See id.  Instead, to maximize value for all stakeholders, the Debtors commenced the Chapter 11 Cases with the primary goal of putting the Project on a firm financial foundation so that construction could be completed and the Project opened to the public as soon as possible, thereby realizing the objective of becoming a fully operational world-class resort.  See id.  The Debtors believe this goal to be in the best interest of all interested parties.  See id.

65.     A restructuring that re-establishes a sound financial foundation for the Project will unlock its significant value as a going concern for the benefit of all interested parties, including the social and economic welfare of The Bahamas.  See Dunlap Declaration at ¶ 49. Indeed, once completed, Baha Mar will generate nearly 5,000 new jobs and have an annual payroll in excess of $130 million, representing 12% of the GDP of The Bahamas.  See id.

66.     Within two weeks after the Petition Date, the Debtors sent emissaries to Beijing, China to meet with representatives from the Developer, CEXIM Bank, CSCEC, CCA, and the Government of The Bahamas and, in good faith, the Debtors engaged in negotiations to resolve the primary disputes in the Chapter 11 Cases.  See id. at ¶ 51.  During the course of those negotiations, and those that occurred in late July, the Developer indicated a willingness to invest an additional $200 million to complete the Project notwithstanding the substantial cost overruns already incurred as a result of CCA's malfeasance.  See id.  Such actions taken by the Developer and the Debtors in response to CCA's missed deadlines and broken promises, and CSCEC's failure to fund its required equity contributions, underscore the Developer's and the Debtors' good faith in trying to maintain the status quo through a chapter 11 filing.  See id.

**B.     CCA Fails To Prove that the Debtors Filed the Chapter 11 Cases To Obtain a Tactical Litigation Advantage**

67.     CCA contends that the Chapter 11 Cases "should be dismissed because the Debtors filed [sic] Chapter 11 in the United States for the primary purpose of obtaining a tactical advantage."  CCA Dismissal Motion at ¶ 66 (citation omitted).  Once again, however, CCA offers no evidence to support that mistaken contention.

68.     CCA correctly states that a chapter 11 case is subject to dismissal if it was commenced primarily to obtain a tactical litigation advantage.  CCA Dismissal Motion at ¶ 65 (citing In re 15375 Mem'l Corp., 589 F.3d at 605; In re SGL Carbon Corp., 200 F.3d at 165).

Further, "[w]here 'the timing of the filing of a Chapter 11 petition is such that there can be no doubt that the primary, if not sole, purpose of the filing was a litigation tactic, the petition may be dismissed as not being filed in good faith.'"   In re 15375 Mem'l Corp., 589 F.3d at 625 (quoting In re SGL Carbon Corp., 200 F.3d at 165 (internal quotation marks omitted)).

69.     CCA, however, completely fails to meet its burden of proof – it merely points to the filing of the KEIP Motion[28] and its "Preserve and Maintain Alternative" as evidence "that the Debtors are using the Chapter 11 Cases as a bargaining chip in negotiations with CEXIM Bank, the Bahamian Government and other parties-in-interest."   See CCA Dismissal Motion at ¶¶ 80-84.   Once again, CCA is severely misguided in its characterization of the Debtors' motives behind filing the Chapter 11 Cases generally (discussed above) and the KEIP Motion specifically.  The KEIP Motion, by its own terms, explains that the Debtors are making every effort to achieve a breakthrough in negotiations with CCA, CSCEC, CEXIM Bank, and the Government of The Bahamas.  See KEIP Motion at ¶ 22.  However, if no meaningful progress is made in the near term, the Debtors would not have sufficient liquidity to operate at current levels and, thus, would be forced to downsize their operations, archive a substantial portion of their current property, and reduce their workforce to a skeletal staff necessary to maintain the Project's assets as they seek alternative paths to complete the Project.  See id. at ¶ 24.

70.     Ironically, as noted above, the Debtors may have avoided filing the Chapter 11 Cases had CEXIM Bank not refused to advance the remaining amount of approximately $112 million available under the Prepetition Credit Facility, CSCEC not refused to make its corresponding $15 million equity shortfall contribution under the Sponsor Support Agreement, CCA not refused to repay the Debtors the portion of the $54 million it received

---

[28]   *Debtors' Motion for Entry of Order (i) Authorizing and Approving Debtors' Key Employee Incentive Program and (ii) Granting Related Relief* [D.I. 117].

pursuant to the November 19, 2014 Meeting Minutes, or the Government of The Bahamas not failed to pay the approximately $21 million it owes the Debtors on account of the roads project. <u>See</u> Dunlap Declaration at ¶ 42.

71.    In addition, as of the Petition Date, there was no pending litigation against any of the Debtors commenced by CEXIM Bank, CCA, CSCEC, or the Government of The Bahamas in respect of which the Debtors might obtain a tactical advantage as a result of their chapter 11 filings.[29]  <u>See</u> <u>id.</u> at ¶ 50.

72.    Interestingly, each of the cases cited in CCA's Dismissal Motion involved a dismissal of the chapter 11 case under section 1112(b) of the Bankruptcy Code in situations where (a) litigation was already pending against the debtor and/or (b) the debtor had absolutely no intention of restructuring, neither of which is present here.  <u>See, e.g.,</u> <u>In re 15375 Mem'l Corp.</u>, 589 F.3d at 614-15 (finding that debtors used chapter 11 filings as litigation tactic to avoid liability relating to litigation), 589 F.3d at 619 (petitions were filed by affiliated debtors who were no longer operating and, therefore, had no going concern to preserve (<u>i.e.</u>, no employees, offices, or business)); <u>In re JER/Jameson</u>, 461 B.R. at 299 (debtors had no ongoing business and no possibility of reorganizing because debtors' sole creditor would have voted to reject any such plan); <u>In re SGL Carbon Corp.</u>, 200 F.3d at 156-57 (debtor admitted to filing chapter 11 case to protect itself against excessive demands made by plaintiffs in civil antitrust litigation), 200 F.3d at 166 (finding "[a]bsence of a valid reorganizational purpose and the consequent lack of good faith by SGL Carbon [was] evident" due to "no indication that the company needed to reorganize under chapter 11").

---

[29]    Rather, BML filed a lawsuit against CSCEC in the United Kingdom seeking $190 million in damages under the completion guarantee that CSCEC provided to BML when it assigned its rights under the Main Construction Contract to CCA.  That litigation will continue unaffected by the filing of the Chapter 11 Cases.  <u>See</u> Dunlap Declaration at ¶ 50.

73.    Finally, courts in some of the cases cited by CCA in its dismissal motion identified the debtor's failure to file more than a mere petition as support for the proposition that the debtor commenced its bankruptcy case solely to obtain a tactical litigation advantage.   In contrast, the Debtors in these Chapter 11 Cases sought a full panoply of first day relief from the Court.   Indeed, on the Petition Date, the Debtors filed a full complement of typical first day pleadings to, among other things, (a) establish certain administrative procedures to promote a seamless transition into the Chapter 11 Cases, (b) continue the Debtors' ongoing operations and preserve the Project's viability,[30] (c) obtain debtor-in-possession financing and use cash collateral in the operation of the Debtors' businesses,[31] and (d) protect the Debtors' assets and

---

[30]    See, e.g., *Debtors' Motion for Entry of Order (i) Authorizing Debtors To (a) Pay Prepetition Wages and Other Compensation, and Employee Benefits, and (b) Continue Existing Employee Benefit Plans and Programs, (ii) Authorizing Banks and Financial Institutions To Pay All Checks and Electronic Payment Requests, (iii) Scheduling Hearing Date for Approval of Incentive Program, and (iv) Granting Related Relief* [D.I. 14] (as supplemented); *Debtors' Motion for Entry of Order (i) Authorizing Debtors To, in Ordinary Course, (a) Use Cash Management System, Bank Accounts, and Business Forms and (b) Perform Intercompany Transactions, (ii) Authorizing Banks* and *Financial Institutions To Honor and Process All Related Check and Electronic Payment Requests, (iii) Waiving Guidelines of Section 345(b) of Bankruptcy Code, and (iv) Granting Related Relief* [D.I. 6]; *Debtors' Motion for Entry of Order (i) Authorizing, but not Directing, Debtors To Pay Taxes and Fees, (ii) Authorizing Banks and Financial Institutions To Honor and Process All Related Checks and Electronic Payment Requests, and (iii) Granting Related Relief* [D.I. 13]; *Debtors' Motion for Entry of Order (i) Authorizing, but not Directing, Payment of Critical Vendor Claims in Ordinary Course of Business, (ii) Authorizing Payment of 503(b)(9) Claims, (iii) Authorizing Banks and Financial Institutions To Honor and Process all Related Checks and Electronic Payment Requests, and (iv) Granting Related Relief* [D.I. 4]; *Debtors' Motion for Entry of an Order (i) Authorizing, but not Directing, Debtors To (a) Maintain Certain Customer Programs and (b) Honor or Pay Obligations in Respect Thereof, (ii) Authorizing Banks and Financial Institutions To Process all Related Checks and Electronic Payment Requests, and (iii) Granting Related Relief* [D.I. 5]; *Debtors' Motion for Entry of Order (i) Authorizing, but not Directing, Debtors To (a) Maintain Existing Insurance Programs and (b) Pay all Obligations in Respect Thereof, (ii) Authorizing Banks and Financial Institutions To Honor and Process all Related Checks and Electronic Payment Requests, and (iii) Granting Relief* [D.I. 11]; and *Debtors' Motion for Entry of Interim and Final Orders (i) Determining that Utility Providers Have Been Provided with Adequate Assurance of Payment, (ii) Approving Proposed Adequate Assurance Procedures, (iii) Prohibiting Utility Providers from Altering, Refusing, or Discontinuing Utility Services, (iv) Determining that Debtors Are Not Required to Provide any Additional Assurance, (v) Scheduling Hearing To Consider Entry of Final Order, and (vi) Granting Related Relief* [D.I. 12].

[31]    See *Debtors' Motion for Entry of Interim and Final Orders (i) Authorizing Debtors and Debtors in Possession To Obtain Postpetition Financing, (ii) Granting Liens and Super-Priority Claims, (iii) Authorizing Use of Cash Collateral, (iv) Granting Adequate Protection to Prepetition Secured Lenders, (v) Scheduling Hearing To Consider Entry of Final Order, and (vi) Granting Related Relief* [D.I. 9].

interests from any improper actions that may be taken by third parties.[32]

74.    For all of the reasons noted above, any allegation that the Chapter 11 Cases were filed as a litigation tactic is baseless.  Rather, the Debtors had valid bankruptcy purposes for commencing the Chapter 11 Cases and the "totality of the circumstances" surrounding the Chapter 11 Cases categorically demonstrate that the Debtors should be permitted to avail themselves of the benefits of the Bankruptcy Code to restructure.

**C.    CCA and CEXIM Bank Filed Their Dismissal Motions To Achieve Tactical Advantages**

75.    CCA's unfounded accusations regarding the Debtors chapter 11 filings being done for tactical litigation purposes are ironic given that the Dismissal Motions appear to have been filed for that very purpose.  Indeed, as is evident from their actions and arguments in their respective Dismissal Motions, CCA and CEXIM Bank seek the dismissal of the Chapter 11 Cases to further their own interests and not those of other creditors.

76.    In the case of CCA, the CCA Dismissal Motion is nothing more than an attempt to escape a possible rejection of the Master Construction Contract, the Bankruptcy Rule 2004 investigation into their prepetition conduct, and possible affirmative claims against them being heard and determined in the Chapter 11 Cases.  Indeed, if the Debtors rejected the Master Construction Contract, they would then be free to complete construction of the Project with the Bahamian contractors, Bahamian trade workers, and others.

77.    In the case of CEXIM Bank, the CEXIM Dismissal Motion is a thinly-disguised effort to do away with (a) the world-wide stay of proceedings that prevents it from having the absolute negotiating leverage that it seeks and (b) the possibility of a cram down plan

---

[32]    See *Debtors' Motion for Entry of Order (i) Enforcing and Restating Automatic Stay and Ipso Facto Provisions, (ii) Authorizing Northshore Mainland Services Inc. To Act as Foreign Representative, and (iii) Granting Related Relief* [D.I. 8].

being confirmed over its objection.  Indeed, a winding up proceeding in The Bahamas does not affect a secured creditors rights in any material manner.  It does not implicate an automatic stay, does not allow a debtor to incur priming debt, and does not allow a Bahamian court to approve a plan without the secured creditor's consent.  See Winding Up Act, Shinderman Declaration at Ex. O.

78.    If the Court were to dismiss the Chapter 11 Cases and eliminate the Debtors' protections and safeguards provided by the Bankruptcy Code, CCA and CEXIM Bank would be free to exert unlimited control and authority over the future of the Debtors and the fate of their employees and creditors.  For CEXIM Bank, this would allow it to own the Project free and clear by foreclosing on the collateral allegedly securing its debt and wiping out everyone below them in the capital structure.  As described herein, such a tactical advantage would be wholly inappropriate given the facts and circumstances that led to the commencement of the Chapter 11 Cases.

**D.    All of the Primestone Factors Weigh in Favor of a Good Faith Filing Determination**

79.    As discussed above, courts in the Third Circuit consider the "Primestone Factors" in determining whether the totality of circumstances surrounding the filing of a debtor's chapter 11 case demonstrate whether or not it was filed in good faith.  In the cases at hand, all of the Primestone Factors confirm that the Debtors commenced the Chapter 11 Cases in good faith:

- The Chapter 11 Cases are not single asset cases:  The Project is a 3.3 million square foot resort complex located in Cable Beach, Nassau, The Bahamas, which will consist of four new hotels, including 2,323 guest rooms, a new Las Vegas-style casino, convention center, a new premier Jack Nicklaus Signature 18-hole golf course, as well as many other first class amenities.  See Dunlap Declaration at ¶¶ 6-7.

- The Debtors have more than a few unsecured creditors:  Attached to each Debtor petition filed, the Debtors submitted a copy of the 71-page Creditor Matrix listing

all of the Debtors' creditors.  The Creditor Matrix contains thousands of creditors.
<u>See</u> Shinderman Declaration at Ex. P.

- <u>The Debtors have ongoing businesses and numerous employees</u>:  The Project is 97% complete.  <u>See</u> Dunlap Declaration at ¶ 6.  The Debtors currently operate (a) the Melia as a hotel and an all-inclusive resort and (b) a call center in the United States.  <u>See id.</u> at ¶¶ 9, 26.  Additionally, in anticipation of the Project's March 27, 2015 opening, the Debtors ramped up their operations and currently employ over 3,600 employees, many of whom are performing work streams throughout the Project and The Bahamas pending the restarting of construction and completion of the Project.  <u>See id.</u> at ¶ 21.

- <u>The Debtors did not commence the Chapter 11 Cases on the eve of foreclosure</u>: No creditor had initiated any foreclosure proceedings against the Debtors when they filed the Chapter 11 Cases.  <u>See id.</u> at ¶ 50.

- <u>This is not a two party dispute that can be resolved in a pending state court action</u>: There are many parties in interest in the Chapter 11 Cases – the principal parties include CEXIM Bank, CCA, CSCEC, the Government of The Bahamas, the Brands, and the Developer.  <u>See id.</u>  There is no pending state court action that could resolve the multi-party disputes that led to the financial crisis that precipitated the bankruptcy filing.  <u>See id.</u>

- <u>The Debtors have cash and income</u>:  As of the Petition Date, the Debtors had in the aggregate approximately $11.8 million cash in their Bank Accounts.  <u>See id.</u> at ¶ 9.  The Debtors currently generate income from their operation of the Melia as a hotel and an all-inclusive resort.  <u>See id.</u>  The plan, of course, is to complete construction and open the Project.  <u>See id.</u> at ¶ 48.

- <u>There had been no legal pressure from non-moving parties</u>:  As of the Petition Date, there was no pending or threatened litigation against any of the Debtors commenced by CEXIM Bank, CCA, CSCEC, or the Government of The Bahamas.  <u>See id.</u> at ¶ 50.  Instead, the Debtors participated in ongoing negotiations with the Developer, CEXIM Bank, CCA, CSCEC, and the Government of The Bahamas in an effort to achieve a consensual resolution to their disputes that would bring CCA back to work to finish the Project as soon as possible, while also providing the Debtors with the necessary liquidity to fund their operations.  <u>See id.</u>

- <u>The Debtors have never previously filed bankruptcy petitions</u>.  <u>See id.</u>

- <u>The Debtors' prepetition conduct was proper</u>:  By way of example, the Debtors participated in many rounds of negotiations with the various parties, including traveling to Beijing on three separate occasions in the two months prior to the Petition Date, as well as immediately after the Petition Date, to meet and negotiate with the key parties' representatives.  <u>See id.</u> at ¶¶ 35, 51.

As noted above, by the end of May 2015, it had become clear that, without a negotiated resolution, the Debtors would run out of cash by the end of June 2015, if not sooner.  See id. at ¶ 45.  Given the issues with CCA, including the sizable alleged monetary claims being asserted by CCA against the Debtors, it was unlikely that anyone or any entity would provide the Debtors funding for wages and operational expenses without the protection of a court order.  See id. at ¶ 43.  Knowing that Bahamian statutory law provides only for a winding up (i.e., a liquidation) proceeding, the Debtors commenced contingency planning.  See id. at ¶¶ 45-46.  As part of that process, in the weeks prior to the Petition Date, the Debtors opened bank accounts in the United States for seven of the fifteen Debtors.  See id. at ¶ 47.  Northshore, BML, and six of the other potential Debtors already maintained bank accounts in the United States as part of the Debtors' ordinary course cash management system.  See id.  The Debtors did not open the new bank account to frustrate legitimate creditors' rights but, rather, as part of necessary, prudent, and appropriate contingency planning – to provide the Debtors with the greatest amount of optionality – should the negotiations not succeed.  See id.; see, e.g., In re Cenargo Int'l, PLC, 294 B.R. 571, 580, 603 (stating that "record establishes that [debtor] did not file under chapter 11 for nefarious reasons" despite opening bank accounts in United States merely months prior to petition date for purposes of section 109(a) of Bankruptcy Code, as "funding of the U.S. accounts . . . might be viewed as prudent planning" and "responsive[] to the most pressing issues pertaining to its need to restructure . . .").

- There is a high probability of a successful reorganization:  Once the Debtors establish a sound financial foundation and resolve the finishing of the final 3% of the Project, the Project's significant value as a going concern will be unlocked for the benefit of all interested parties, as well as the social and economic welfare of The Bahamas.  See Dunlap Declaration at ¶ 49.  Although CEXIM Bank asserts that the Chapter 11 Cases should be dismissed because the Debtors allegedly cannot effectuate a chapter 11 plan at this time, due to the mistaken assumption that the Court cannot enforce its orders on parties due to a lack of jurisdiction, such a determination is premature given the infancy of the Chapter 11 Cases.  Indeed, the Debtors' current inability to propose a plan is neither atypical nor fatal to their cases.  It neither means nor implies that (a) the Debtors will not be able to do so or (b) the Debtors filed the Chapter 11 Cases in bad faith.  See, e.g., In re Gen. Growth, 409 B.R. at 65 (holding that "[t]here is no requirement in the Bankruptcy Code that a debtor must prove that a plan is confirmable in order to file a petition") (citations omitted); In re Toyota of Yonkers, Inc., 135 B.R. 471, 477 (Bankr. S.D.N.Y. 1992) (concluding that "[t]he movants are premature in seeking to dismiss the debtor's Chapter 11 case at this time because the debtor should at least be afforded the 120-day exclusivity period permitted under 11 U.S.C. § 1121(b) to propose a Chapter 11 plan.") (citations omitted).

- Moreover, at this time, the Debtors believe that they ultimately can satisfy all of the requirements of section 1129 of the Bankruptcy Code.  See Dunlap Declaration at ¶ 52.  As such, the Debtors maintain that they will be able to

confirm and implement a plan of reorganization because (a) the Court has jurisdiction over the Debtors and their assets, (b) CCA and CEXIM Bank, the estate's largest purported creditors, have appeared in the Chapter 11 Cases and, thus, are subject to the jurisdiction of the Court, (c) many other creditors, including most of the estates' other large creditors, have appeared in the Chapter 11 Cases and the Court otherwise has jurisdiction over many of them, and (d) most of the creditors are located outside of The Bahamas.  See id.

- The Debtors were not formed or organized immediately prior to filing their chapter 11 petitions:  All of the Debtors were formed between 2004 and 2012.  See id. at ¶ 8.  None were formed immediately prior to the filing.  See id.  Thus, there is no evidence of "new debtor syndrome" whereby an entity was created and received property solely for the purpose of filing for bankruptcy.

- The Debtors did not file solely to obtain the benefits of the automatic stay:  No creditor was attempting to foreclose or seize property of the Debtors when the Debtors filed their bankruptcy petitions.  See id. at ¶ 50.  The Debtors' purpose for seeking protection under chapter 11 was to establish a sound financial foundation for the Project that would allow for its completion and opening to the public, thereby maximizing value for all stakeholders.  See id. at ¶ 48.  Moreover, as a result of the Debtors' strained liquidity, with the need for breathing space within which negotiations could occur, and Bahamian statutory law providing only for a winding up or liquidation proceeding (as opposed to a restructuring proceeding), the Debtors had limited options.  See id. at ¶¶ 45-46.  Accordingly, the Debtors commenced the Chapter 11 Cases to maximize value for all stakeholders by virtue of a restructuring and to obtain much-needed debtor-in-possession financing to pay their employees and fund their other operational expenses.  See id. at ¶¶ 28, 45-46.

- The subjective intent of the Debtors cannot be viewed as anything but good faith:  As noted above, on many occasions the Debtors tried to negotiate a resolution of the multi-party disputes out of court, but unfortunately, were unsuccessful.  See id. at ¶¶ 35, 51.  With (a) the Debtors' cash rapidly depleting due to CCA's failure to complete construction as repeatedly agreed and the failure of CCA, CSCEC, CEXIM Bank, the Government of The Bahamas, and others to fund their respective outstanding obligations to the Debtors (totaling approximately $203 million), (b) the potential default and exercise of remedies under the Prepetition Credit Agreement, and (c) no other viable options for obtaining the financing necessary to continue their businesses, the Debtors commenced the Chapter 11 Cases on the Petition Date with a view to restructuring, not liquidating.  See id. at ¶ 28.

E.    **Additional Considerations Demonstrate that the Debtors, Given the Totality of the Circumstances, Filed the Chapter 11 Cases in Good Faith**

(i)    The Debtors are Not Seeking To Avoid Their Obligations or Alter any Creditor Priorities

80.    In the Dismissal Motions, CCA and CEXIM Bank assert that "the Debtors' decision to file for insolvency in the United States is nothing more than an attempt to circumvent the effects of a Bahamian insolvency in order to retain control over the Project and to modify or avoid their obligations to their creditors." CCA Dismissal Motion at ¶ 51; see also CEXIM Dismissal Motion at ¶ 37. While it is true that the Debtors did not file under the Winding Up Act in The Bahamas because they did not want to wind up or liquidate, there is no evidence whatsoever that the Debtors are in any way using the chapter 11 restructuring process to avoid their obligations to or to alter the priorities of the claims against them. Rather, as noted above, the Debtors filed under chapter 11 of the Bankruptcy Code as a means to obtain the necessary financing to once again establish a firm foundation for the Project. See Dunlap Declaration at ¶ 44. Chapter 11 is a well-trodden path that has been used by countless international companies that have a connection to the United States to reorganize financial affairs. Indeed, chapter 11 presents the best available forum for the Debtors to restructure their financial affairs.

81.    Contrary to CCA's and CEXIM Bank's assertions that the Debtors filed the Chapter 11 Cases to avoid their obligations to their creditors, see CCA Dismissal Motion at ¶ 51; CEXIM Dismissal Motion at ¶ 37, the Debtors sought and received approval of first day orders that authorized them to make payments on account of their obligations, including all of their obligations to their employees that arise under Bahamian law.[33]    Moreover, the Debtors

---

[33]    See, e.g., supra note 30.

fully intend to comply with all applicable laws in formulating a plan of reorganization for consideration by their stakeholders and approval by the Court. See Dunlap Declaration at ¶ 52.

82.    Finally, CCA's and CEXIM Bank's reliance on <u>Yukos Oil</u> is misplaced. In <u>Yukos Oil</u>, the debtor had no assets in, connections to, or business in the United States prior to commencing its chapter 11 case. See <u>In re Yukos Oil Co.</u>, 321 B.R. at 411. In addition, there, an officer of the company fled to the United States to file for chapter 11 to prevent the Russian government from nationalizing and selling off certain of the debtor's substantial assets following litigation that the company had lost and was appealing. See <u>id.</u> at 402. In essence, <u>Yukos Oil</u>'s filing was a litigation tactic to avoid a government edict. As the <u>Yukos Oil</u> court found, Yukos was not seeking a financial restructuring. See <u>id.</u> at 411. Moreover, the court determined that the debtor commenced its chapter 11 case with the intent of avoiding obligations and altering creditor priorities (<u>i.e.,</u> its obligations to the government), which certainly is not the case here. See <u>id.</u> Here, not only do the Debtors have extensive ties to the United States and own assets and have property interests in the United States, thereby affording the Court *in rem* jurisdiction, but, as described in detail above, (a) the Debtors have significant connections with the United States, (b) the Court has *in personam* jurisdiction over a significant portion of the Debtors' creditors, including CCA and CEXIM Bank, (c) there was no pending or threatened litigation against the Debtors by CEXIM Bank, CCA, CSCEC, or The Government of The Bahamas, (d) and no creditor had initiated any foreclosure proceedings against the Debtors, or attempted to sell off any of the Debtors' assets, when the Debtors filed the Chapter 11 Cases. Perhaps the biggest difference between the situation in <u>Yukos Oil</u> and here is that the Debtors here commenced the Chapter 11 Cases to restructure their financial

affairs (instead of liquidating) and intend to satisfy their obligations to the government (and have already obtained a Court order authorizing the payment of taxes).

(ii)    Management is Best Suited To Finish the Project

83.    The Debtors' current management team ("Management"), as opposed to court-appointed provisional liquidators, is clearly in the best position to finish the Project.  See Dunlap Declaration at ¶ 53.  Management possesses both the requisite industry expertise and Project-specific knowledge necessary to oversee the most cost-effective and efficient completion of the Project.  See id.  For a project this complex and massive in size, it would be a formidable task for anyone injected into the process at this late stage to educate themselves on all aspects and intricacies of the Project and to restart construction in a timely fashion.  See id.  Indeed, it would take many months and significant resources for that to occur.  See id.  Therefore, replacing Management can only result in unnecessary disruption, unavoidable delays, significant increases in costs, and many uncertainties.  See id.  This cannot be anyone's goal.

84.    Regardless, if CCA and CEXIM Bank adamantly want to replace Management, the appropriate avenue for such relief would be to seek the appointment of a trustee pursuant to section 1104 of the Bankruptcy Code.  There is no need to dismiss the Chapter 11 Cases and apply to the Bahamian court for the appointment of provisional liquidators if the goal is to replace Management.  Instead, this Court can address any gross mismanagement issues by appointing a trustee under section 1104 of the Bankruptcy Code, which provides for such appointment if, among other grounds, it "is in the interests of creditors, any equity security holders, and other interests of the estate."  11 U.S.C. § 1104(a)(2).  Accordingly, the Dismissal Motions, by their own import, reveal CCA's and CEXIM Bank's true motives – eliminating the tools and protections available to the Debtors under the Bankruptcy Code, so that CCA and

CEXIM Bank can wield as much power and leverage as possible as the Debtors attempt to negotiate a plan to complete the Project.

85.     Based on the foregoing analysis of the relevant issues and additional considerations, as well as considering all of the Primestone Factors, the Debtors submit that the totality of the circumstances surrounding the Chapter 11 Cases unquestionably demonstrate that the Debtors sought the protections of chapter 11 in good faith.

**III.   CCA and CEXIM Bank Fail To Demonstrate that the Dismissal of the Chapter 11 Cases Under Sections 1112(b) or 305 of the Bankruptcy Code Better Serves the Interests of All of the Creditors and the Debtors' Estates**

86.     In the Dismissal Motions, CCA and CEXIM Bank contend that dismissal of the Chapter 11 Cases pursuant to section 1112(b) of the Bankruptcy Code is in the best interests of the Debtors' creditors and estates.  See CCA Dismissal Motion at ¶ 81; CEXIM Dismissal Motion at ¶ 52.  Neither CCA nor CEXIM Bank provides any meaningful support to satisfy the requirements of section 1112(b) of the Bankruptcy Code.

87.     Likewise, in the Dismissal Motions, CCA and CEXIM Bank also assert that the Chapter 11 Cases should be dismissed pursuant to section 305(a)(1) of the Bankruptcy Code because "the interests of the Debtors and their creditors would be better served if the proceeding is conducted in The Bahamas."  CCA Dismissal Motion at ¶ 48; see also CEXIM Dismissal Motion at ¶ 56.  Again, neither CCA nor CEXIM Bank has satisfied its considerable burden of establishing that the Debtors' and their creditors' interests would be better served by the dismissal of the Chapter 11 Cases.  The failure of CCA and CEXIM Bank to meet their burdens under both sections 1112(b) and 305(a) of the Bankruptcy Code is not surprising since both standards are virtually the same.

88.     As described above, section 1112(b) of the Bankruptcy Code requires that, regardless of whether cause exists to dismiss a case (which the Debtors submit is not the case

here), a court may only dismiss the case if doing so is in the best interests of creditors and the estate. See 11 U.S.C. § 1112(b). Similarly, section 305(a)(1) of the Bankruptcy Code grants courts the authority to forgo the exercise of appropriate jurisdiction and dismiss or suspend proceedings in a case if "the interests of creditors and the debtor would be better served by such dismissal or suspension." 11 U.S.C. § 305(a)(1). The moving party bears the burden to demonstrate that dismissal or suspension benefits the debtor and its creditors. See In re RHTC Liquidating Co., 424 B.R. 714, 720-721 (Bankr. W.D. Pa. 2010); In re Monitor Single Lift I, Ltd., 381 B.R. 455, 462-63 (Bankr. S.D.N.Y. 2008). However, given that dismissal or suspension under section 305(a)(1) of the Bankruptcy Code is an extraordinary remedy with limited appellate review, see 11 U.S.C. § 305(c), courts sparingly exercise such power. In re Schur Mgmt. Co., Ltd., 323 B.R. 123, 129 (Bankr. S.D.N.Y. 2005); In re Corino, 191 B.R. 283, 287 (Bankr. N.D.N.Y. 1995); In re Luftek, 6 B.R. 539, 548 (Bankr. E.D.N.Y. 1980) ("There is an inherent risk to our system of jurisprudence in any Act of Congress which gives the court such broad powers to refuse jurisdiction over a case.").

89. The statutory language and the legislative history make clear that "the test under § 305(a) is not whether dismissal would give rise to a substantial prejudice to the debtor. Nor is the test whether a balancing process favors dismissal. Rather, the test is whether both the debtor **and** the creditors would be 'better served' by a dismissal." Eastman v. Eastman (In re Eastman), 188 B.R. 621, 625 (B.A.P. 9th Cir. 1995) (reversing order dismissing case under section 305(a)(1) of Bankruptcy Code because lower court employed balancing test and failed to determine that dismissal was in best interest of debtor as well as creditors). Given the standard that must be met by a moving party under section 305(a)(1) of the Bankruptcy Code, it is not surprising that few fact patterns fall within such section. Indeed, the "legislative history

indicates that the provision was designed to be utilized where, for example, a few recalcitrant creditors attempted to interfere with an out-of-court restructuring that had the support of a significant percentage of the debtor's creditors."   In re Bd. of Dirs. of Multicanal S.A., 314 B.R. 486, 522 (Bankr. S.D.N.Y. 2004) (citing H.R. Rep. No. 95–595, 95th Cong., 1st Sess. 325 (1977); S. Rep. No. 95–989, 95th Cong., 2d Sess. 35 (1979); In re Wine & Spirits Specialties of Kansas City, Inc., 142 B.R. 345, 346-47 (Bankr. W.D. Mo.1992)).   In fact some courts have limited the application of section 305(a)(1) of the Bankruptcy Code to involuntary cases.   If, however, section 305(a)(1) of the Bankruptcy Code is applicable to the Chapter 11 Cases, CCA and CEXIM Bank both fail to satisfy their substantial burdens of proving that the Debtors' and their creditors' interests would be better served by the dismissal of the Chapter 11 Cases.

### A.   CCA and CEXIM Bank Fail To Demonstrate that the Dismissal of the Chapter 11 Cases is in the Best Interests of All of the Creditors

90.   As noted above, neither CCA nor CEXIM Bank has established any evidence whatsoever that a dismissal of the Chapter 11 Cases is in the best interests of all creditors.   Instead, if the Chapter 11 Cases are dismissed and the Bahamian court allows the winding up proceedings in The Bahamas to proceed, the result will be either the Project will be liquidated or, possibly, CEXIM Bank might choose to foreclose on its security interests in the Project.   Although these alternatives may provide a benefit to CEXIM Bank and possibly CCA, it would provide no guarantee that general unsecured creditors, including employees, would be paid anything at all, or if paid something, that payment would be in the near term.   See Transcript of Hearing at 15, In re Scrub Island Dev. Grp. Ltd., Case No. 8:12-bk-15285 (MGW) (Bankr. M.D. Fla. Dec. 6, 2013) (refusing to dismiss chapter 11 cases in favor of foreign liquidation proceeding and finding that such proceeding "would be directly contrary to the interests of the [d]ebtor[s] and every creditor in th[e] case, other than [the debtors' major secured

creditor]").   In addition, should the Court dismiss the Chapter 11 Cases, neither CCA nor

CEXIM Bank has advised the Court regarding how the winding up proceedings in The Bahamas

would be funded.  In light of the foregoing, it is obvious that CCA and CEXIM Bank are only

considering their own self-interests in total disregard for the best interests of the other creditors

of the Debtors' estates.

91.     Furthermore, dismissal of the Chapter 11 Cases would result in the

disbandment of the Creditors' Committee, thereby removing the one entity specifically tasked

with safeguarding the interests of the Debtors' general unsecured creditors.   As a result,

individual general unsecured creditors would no longer have the benefit of the Creditors'

Committee's ability to investigate claims against and interests in the Debtors' property and assets

(e.g., the scope and validity of CEXIM Bank's security interests) and to negotiate the terms of a

plan of reorganization on their behalf.

92.     Based upon CCA's and CEXIM Bank's inability to demonstrate that

dismissal of the Chapter 11 Cases is in the best interests of all of the Debtors' creditors, they fail

to satisfy the requirements of sections 1112(b) and 305(a)(1) of the Bankruptcy Code and,

therefore, the Court must deny the extraordinary relief requested in the Dismissal Motions.[34]

**B.      CCA and CEXIM Bank Fail To Demonstrate that the Dismissal of the
        Chapter 11 Cases is in the Best Interests of the Debtors**

93.     In the CCA Dismissal Motion, CCA makes a conclusory statement that

"the interests of the Debtors and their creditors would be better served if the proceeding is

---

[34]  The Government of The Bahamas mistakenly believes that the Winding Up Act provides for restructuring, that
the Chapter 11 Cases are an attack on its sovereignty, and that the Debtors plan to use the chapter 11 process to
avoid their obligations to the Government of The Bahamas, none of which is true.  Nonetheless, the Debtors
note that the Bahamian court has not yet entered an order to wind up the Debtors pursuant to the omnibus
petition dated July 16, 2015 upon which the movants rely.  The Debtors intend to contest the petition.  In
addition to defenses to be asserted, the Debtors note that the Government of The Bahamas concedes in the
evidence and submissions accompanying the omnibus petition that the alleged debts are only owed by some –
but not all of – the Debtors.  The Bahamian court, therefore, cannot grant relief as to all of the Debtors.

conducted in The Bahamas."   CCA Dismissal Motion at ¶ 48.   Not only does CCA fail to establish any evidence whatsoever that the Debtors' interests would be better served by the dismissal of the Chapter 11 Cases, but CCA does not even attempt to support its statement with any arguments.   Similarly, CEXIM Bank asserts tenuous statements to the same effect, see CEXIM Dismissal Motion ¶ 52, again without offering any actual support.

94.      In fact, the Chapter 11 Cases provide several options and protections to the Debtors that are not otherwise available to them in a Bahamian winding up proceeding:

- Restructuring.  There is no reorganization or restructuring concept akin to chapter 11 in The Bahamas.  In a winding up proceeding, a court may appoint provisional or permanent liquidators that will supplant a debtor's management essentially to liquidate the debtor's assets.  See Spanish Cay, 161 B.R. at 724 (finding that "[i]f the [United States chapter 11] case is dismissed, there can only be a liquidation proceeding in The Bahamas).

- Plan Flexibility.  In chapter 11, a plan proponent has a great deal of latitude in developing and seeking confirmation of a plan, so long as it satisfies all of the requirements of section 1129 of the Bankruptcy Code.  For example, a court can confirm a chapter 11 plan notwithstanding the fact that the plan has not received unanimous creditor support.   Under the Bahamian law, however, there is no statutory framework or mechanism by which a court could actually provide a similar approval. It cannot because there is no such thing under Bahamian law.  Similarly, in chapter 11, a court can cram a plan down or up over the objection of non-consenting unsecured or secured creditors, respectively.   No cramming mechanisms exist under Bahamian law.

- Continuity of Management.  As described above, Management is clearly in the best position to finish the Project in the most cost-effective and efficient manner.  It has the requisite knowledge, background, and history with the Project that is crucial to restarting and overseeing the construction and completion of the Project.

- Debtor-in-possession financing.  Chapter 11 provides a court-protected means for obtaining much-needed funding to entities facing a liquidity crisis.

- Assumption/Rejection of Executory Contracts and Unexpired Leases.   The Bankruptcy Code provides a debtor with substantial power to shed burdensome "executory" contracts and unexpired leases.  In particular, section 365 of the Bankruptcy Code (a) grants the debtor the power to reject, assume, or assume and assign such contracts and leases, (b) stays, restrains, and enjoins non-debtor counterparties from terminating or modifying any and all contracts and leases to

44

which the debtor is a party or signatory, notwithstanding any provision in such contract or lease or any applicable law that permits such contract or lease to be terminated based upon the insolvency or financial condition of the debtor, and (c) requires non-debtor counterparties to such contracts and leases to perform their obligations thereunder during the pendency of the case until the debtor decides whether to assume or reject such contracts and leases.  See 11 U.S.C. § 365.  No similar mechanisms exist – in conjunction with a restructuring – under Bahamian law, only in a liquidation.

95.    As discussed above, CCA and CEXIM Bank have not established any evidence whatsoever that the interests of the Debtors would be better served by the dismissal of the Chapter 11 Cases.  Rather, the opposite appears to be the case.  Accordingly, CCA and CEXIM Bank fail to satisfy the requirements of sections 1112(b) and 305(a)(1) of the Bankruptcy Code.  Therefore, the Court must deny the extraordinary relief requested in the Dismissal Motions.

## IV.    CCA Fails To Demonstrate Why the Dismissal of the Chapter 11 Cases Should Be with Prejudice Under Section 349(a) of the Bankruptcy Code

96.    In the CCA Dismissal Motion, CCA argues that the Chapter 11 Cases should be dismissed with prejudice because the Debtors commenced the Chapter 11 Cases "for an improper purpose and in bad faith."  CCA Dismissal Motion at ¶ 95.  CCA has not provided any evidence whatsoever that the Debtors commenced the Chapter 11 Cases for an improper purpose or in bad faith or engaged in egregious conduct warranting such a severe sanction.

97.    Section 349(a) of the Bankruptcy Code provides that "[u]nless the court, for cause, orders otherwise, the dismissal of a case under this title does not bar discharge, in a later case under this title . . . ; nor does the dismissal of a case under this title prejudice the debtor with regard to filing a subsequent petition . . . ."  11 U.S.C. § 349(a).  Courts have found that dismissing a case with prejudice "is a severe sanction to which the courts should resort only infrequently" and only upon a showing of bad faith and prejudice to creditors.  Hall v. Vance, 887 F.2d 1041, 1045 (10th Cir. 1989) (citations omitted) (finding that debtors' failure to timely

45

file objections to proofs of claim, reorganization plan, and monthly reports did not warrant dismissal with prejudice as there was no showing, beyond, mere conclusory allegations, of bad faith or prejudice to creditors by the delays); see also Casse v. Key Bank Nat'l Ass'n (In re Casse), 198 F.3d 327, 341-42 (2d Cir. 1999) (affirming bankruptcy court's findings that debtors acted in bad faith in connection with serial filings in attempt to avoid foreclosure and thus dismissal with prejudice was warranted and would bar future bankruptcy filings).

98.    CCA has not submitted any evidence whatsoever to support the extraordinary relief requested for dismissal of the Chapter 11 Cases with prejudice.  In fact, evidence exists to the contrary.  As described in Section II above, the Debtors had valid bankruptcy purposes for commencing the Chapter 11 Cases – to obtain necessary debtor-in-possession financing with a view to restructuring – and the "totality of the circumstances" surrounding the Chapter 11 Cases unquestionably demonstrate that the Debtors sought the protections of chapter 11 in good faith.

99.    Based on the foregoing, the Court must deny CCA's request to dismiss, particularly with prejudice, the Chapter 11 Cases.

## CONCLUSION

100.    CCA and CEXIM Bank seek the dismissal of the Chapter 11 Cases to further their own pecuniary interests.  In the case of CCA, the CCA Dismissal Motion is nothing more than an attempt to escape the possible rejection of the Master Construction Contract, the Bankruptcy Rule 2004 investigation into their conduct, and possible affirmative claims against them.  In the case of CEXIM Bank, the CEXIM Dismissal Motion is an endeavor to do away with the continued imposition of the stay that precludes it from owning the Project free and clear by foreclosing on its security interests and eliminating all other claims and interests.

101.    CCA and CEXIM, however, fail to establish that jurisdiction in this Court is improper or that dismissal would be in the best interest of creditors – for it is not.  Only the Chapter 11 Cases provide a fully developed, time-tested, often-used scheme that permits the orderly restructuring of a company with protections and tools provided to all parties in interest. Indeed, dismissal of the Chapter 11 Cases would be harmful to creditors and the Debtors and benefit no one other than CCA and CEXIM.

102.    For the foregoing reasons, the relief requested in the Dismissal Motions is not warranted and must be denied.[35]

---

[35]    Similarly, for the reasons set forth herein, the relief requested in the Suspension Motion is not warranted and must be denied.  See supra note 2.

Dated:  Wilmington, Delaware
           August 10, 2015

**PACHULSKI STANG ZIEHL & JONES LLP**


*/s/ Laura Davis Jones*
Laura Davis Jones (Bar No. 2436)
James E. O'Neill (Bar No. 4042)
Colin R. Robinson (Bar No. 5524)
Peter J. Keane (Bar No. 5503)
919 North Market Street, 17th Floor
Wilmington, DE 19801
Telephone:  (302) 652-4100
Facsimile:  (302) 652-4400
Email:     ljones@pszjlaw.com
             joneill@pszjlaw.com
             crobinson@pszjlaw.com
             pkeane@pszjlaw.com


-and-

**MILBANK, TWEED, HADLEY & McCLOY LLP**
Paul S. Aronzon (admitted *pro hac vice*)
Mark Shinderman (admitted *pro hac vice*)
601 S. Figueroa Street, 30th Floor
Los Angeles, CA 90017
Telephone: (213) 892-4000
Facsimile:  (213) 629-5063
Email:     paronzon@milbank.com
             mshinderman@milbank.com


-and-

**MILBANK, TWEED, HADLEY & McCLOY LLP**
Tyson M. Lomazow (admitted *pro hac vice*)
Thomas J. Matz (admitted *pro hac vice*)
Steven Z. Szanzer (admitted *pro hac vice*)
28 Liberty Street
New York, NY 10005
Telephone: (212) 530-5000
Facsimile:  (212) 530-5219
Email:     tlomazow@milbank.com
             tmatz@milbank.com
             sszanzer@milbank.com


*Proposed Counsel to Debtors and Debtors in Possession*