IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| In re: | ) | Chapter 11 |
| NORTHSHORE MAINLAND | ) | Case No. 15-11402 (KJC) |
| SERVICES, INC., *et al.,*[1] | ) | |
| | ) | |
| Debtors | ) | Ref: D.I. 206, 246 |
| | ) | |

## MEMORANDUM REGARDING
## MOTIONS TO DISMISS CASES[2]

**BY:    KEVIN J. CAREY, UNITED STATES BANKRUPTCY JUDGE**

Before the Court are separate motions filed by CCA Bahamas, Ltd. ("CCA") and The

Export-Import Bank of China ("CEXIM") to dismiss the Debtors' bankruptcy cases with

prejudice pursuant to Sections 105(a), 109(a), 305(a) and 1112(b) of the Bankruptcy Code

(docket nos. 206 and 246) (the "Dismissal Motions").  The Debtors filed an omnibus objection to

the Dismissal Motions (docket no. 328), as did the Official Committee of Unsecured Creditors

(docket no. 329).[3]  The Debtors, CCA and CEXIM filed a Joint Pre-Hearing Stipulation (docket

no. 436) and an Amended Joint Pre-Hearing Stipulation (D.I. 456) (the "Stipulation"), which set

forth stipulated facts, disputed facts, and the parties' proposed exhibits, along with objections to

the exhibits. A hearing to consider the Motions to Dismiss was held on August 28, 2015.

---

[1] The Debtors in the jointly administered chapter 11 cases are: Northshore Mainland Services, Inc., Baha Mar Enterprises Ltd., Baha Mar Entertainment Ltd., Baha Mar Land Holdings Ltd., Baha Mar Leasing Company Ltd., Baha Mar Ltd., Baha Mar Operating Company Ltd., Baha Mar Properties Ltd., Baha Mar Sales Company Ltd., Baha Mar Support Services Ltd., BML Properties Ltd., BMP Golf Ltd., BMP Three Ltd., Cable Beach Resorts Ltd., and Riviera Golf Ventures Ltd. (the "Debtors").

[2] This Memorandum constitutes the findings of fact and conclusions of law, as required by Fed.R.Bankr.P. 7052. This Court has jurisdiction to decide the Motion pursuant to 28 U.S.C. §157 and §1334. This is a core proceeding pursuant to 28 U.S.C. §157(b)(2)(A).

[3] Stafford-Smith, Inc. filed a joinder in support of the Dismissal Motions. (D.I. 289.) Strategic Outsourcing, Inc. and Styleworks, LLC filed joinders to the omnibus objection of the Debtors.  (D.I.s 347 and 362.)

The Debtors' primary asset is a 3.3 million square foot resort complex located in Cable Beach, Nassau, The Bahamas (the "Project"), which is in the final stages of development. Once completed and fully operational, the Project will be one of the largest integrated destination resorts in the Caribbean. The central argument of the Dismissal Motions is that these proceedings belong in the Commonwealth of The Bahamas, not the United States.

More specifically, CCA and CEXIM (the "Movants") assert that the Debtors' bankruptcy cases should be dismissed on a number of grounds, including (i) that the Debtors are not eligible for chapter 11 relief in the United States under Bankruptcy Code §109(a) because all but one of the debtor corporations are organized under Bahamian law and hold few assets in the United States; (ii) that the Debtors filed these chapter 11 cases in bad faith or as a litigation tactic to avoid insolvency proceedings in The Bahamas; and (iii) that the best interests of the Debtors and creditors would be better served by dismissal of these cases so that the parties can proceed with insolvency proceedings in The Bahamas, which is the venue with the most significant contacts and interests in the Project, and it follows that most stakeholders would expect Bahamian law to apply to any winding up proceedings.

For the reasons that follow, the Dismissal Motions will be granted, in part, and denied, in part. The Dismissal Motions will be denied as to the chapter 11 case filed by Northshore Mainland Services, Inc. Pursuant to Bankruptcy Code §305(a), the Dismissal Motions will be granted, without prejudice, as to the remaining chapter 11 cases.

FACTS[4]

Northshore Mainland Services, Inc. ("Northshore") is incorporated under the laws of the State of Delaware. The other affiliated debtors are incorporated and organized under the laws of the Commonwealth of The Bahamas (the "Bahamian Debtors"). The Project's developer, Sarkis Izmirlian (the "Developer"), is the Chief Executive Officer and Chairman of some of the Debtors.

On March 9, 2009, the Developer and China State Construction Engineering Corp.Ltd. ("CSCEC") entered into the "Main Construction Contract" for the Project. Section 4.7 of the Main Construction Contract provides that it shall be governed by, and construed in accordance with, the laws of the State of New York, and, further, that any proceeding regarding the contract will be brought in a state or federal court located in the State of New York. On December 8, 2010, pursuant to an Assignment and Assumption Agreement, the respective rights and obligations under the Main Construction Contract were assigned to and assumed by Baha Mar Ltd. ("BML") and CCA.[5] The Assignment and Assumption Agreement is also governed by the laws of the State of New York.

On May 31, 2010, BML, as Obligor, and certain other Debtors, as Guarantors, entered into a Facility Agreement with CEXIM, pursuant to which CEXIM provided the Debtors with a

---

[4] Unless otherwise noted, most of the facts herein are taken from the stipulated facts in the Amended Joint Pre-Hearing Stipulation or in the Declarations admitted into evidence at the August 28, 2015 hearing.

[5] The Declaration of Thomas M. Dunlap in support of Chapter 11 Petitions and First Day Pleadings (the "First Day Declaration) (CCA Ex. 83) asserts that CCA is a wholly owned subsidiary of China Construction America Inc. ("CC America"), and that CC America is a wholly owned subsidiary of CSCEC. (¶15.) The First Day Declaration further asserts that CSCEC is majority owned by China State Construction Engineering Corp., a state-owned enterprise of the People's Republic of China. (¶14.) The foregoing litany of ownership is listed as a Disputed Fact in the Amended Joint Pre-Hearing Stipulation (D.I.456, ¶158.) Mr. Dunlap was present in Court on August 28, 2015 and available for cross-examination on his Declarations, but no one chose to cross-examine him.

secured debt facility of up to $2.45 billion (the "Facility Agreement" or the "Prepetition Credit Agreement") to fund the development of the Project.  Section 42 of the Facility Agreement provides that it is governed by English law, and Section 43 sets forth the parties' agreement that the English courts are the most appropriate and convenient for resolving any dispute in connection therewith.  Some agreements ancillary to the Facility Agreement are governed by either English, British Colombia, Texas or New York law.

The Guarantors granted CEXIM a security interest in substantially all of their assets pursuant to a certain Debenture, dated January 11, 2011, between certain Bahamian Debtors, as Chargers, and Citibank N.A. Bahamas Branch, as Onshore Security Agent (the "Debenture"). The Debenture, as well as a Pledge of Shares and Charge Over Shares, are governed by Bahamian law.  The Project contemplated $3.5 billion of financing, consisting of, among other things: (a) a $2.45 billion secured debt facility provided by CEXIM, (b) a $150 million preferred equity commitment provided by a subsidiary of CSCEC, China State Construction Engineering Corporation (Bahamas) Ltd., and (c) an $850 million common equity investment by the Developer.  The common equity investment of the Developer consisted of cash, land for the Project along Cable Beach and the three hotels then-operating thereon, as well as other commitments.

The Project, known as the Baha Mar Resort, is one of the most significant single-phase resorts currently under development in the western hemisphere.  The Project will include four new hotels, including 2,333 guest rooms, a new Las Vegas-style casino, convention center, a new premier Jack Nicklaus Signature 18-hole golf course, as well as many other first class amenities.  Once completed, the Baha Mar Resort will generate nearly 5,000 jobs and is

projected to have an annual payroll in excess of $130 million, representing 12% of the GDP of
The Bahamas.

Construction on the Project broke ground in February 2011 and the initial completion
date for the Project was November 20, 2014.  By early 2013, the Debtors determined that, absent
corrective measures, CCA would not meet the construction completion schedule.  On May 17,
2013, BML and CCA entered into a Memorandum of Understanding setting out agreed items,
including increasing the amount of labor working on the Project, interior finish packages and
target construction completion dates.  These completion dates included a commitment by CCA
that the Debtors would receive 100% access to, at a minimum, the key ballrooms and meeting
rooms of the convention center on or before March 31, 2014.  However, the Debtors did not
obtain access to any part of the convention center by March 31, 2014.

On May 16, 2014, BML commenced proceedings to seek relief from the Dispute
Resolution Board ("DRB") pursuant to the Main Construction Contract with respect to the
convention center.  The DRB issued a Decision and Opinion on August 13, 2014 in which it
ruled, among other things that CCA had been proceeding in breach of the Main Construction
Contract "with respect to the timing and content of the Construction Schedules" and "by failing
to proceed expeditiously with adequate forces sufficient to comply with the [Main Construction]
Contract."  [CCA Ex. 83, ¶39.]

In November 2014, in-person negotiations were held in Beijing among the Debtors,
CEXIM, and CCA.  At the conclusion of the negotiations, on November 19, 2014, meeting
minutes were signed by BML, CCA and CEXIM reflecting (among other things) revised
completion dates.  On December 5, 2014, at a meeting of BML's board of directors, CCA re-
assured the board that the Project would open on March 27, 2015.  This opening date was

confirmed again in January 2015 at meetings in Beijing among the Developer, the Prime

Minister of The Bahamas, and representatives of CEXIM and CCA.

Construction was not completed by March 27, 2015. Since April 2015, without the

ability to generate revenue from the completed Project, the Debtors have been operating in a

severe liquidity crunch.

In June 2015, the Debtors opened seven bank depository accounts at JP Morgan Chase

Bank, N.A. (Delaware), one in the name of each of the following debtors: Cable Beach Resorts

Ltd., Baha Mar Entertainment Ltd., Baha Mar Land Holdings Ltd., Baha Mar Operating

Company Ltd., BMP Golf Ltd., BML Properties Ltd., and Riviera Golf Ventures Ltd. (the "JPM

Accounts"). Each of the JPM Accounts was funded on June 19, 2015 with a $10,000 opening

deposit. There have been no credits or debits to the JPM Accounts other than the initial deposits.

On June 29, 2015, the Debtors filed the chapter 11 cases. On or about the same date, the

Debtors filed the Originating Summons with the Supreme Court of the Commonwealth of The

Bahamas (the "Bahamian Supreme Court") seeking recognition of the chapter 11 cases and a

stay of all legal proceedings involving the Debtors pending the completion of the chapter 11

cases. Also on or about the same date, the Debtors filed a lawsuit before the High Court in

London, England against CSCEC seeking damages under a certain Completion Guarantee based

on CCA's alleged contractual breaches under the Main Construction Contract.

The Debtors' creditor matrix in the chapter 11 cases, prepared using information

provided by the Debtors, lists 5,172 creditors; approximately 3,523 of those creditors are listed

as having an address in the Bahamas and approximately 1,649 are listed as having an address

outside the Bahamas. Along with other "first day" relief, the Debtors sought an $80 million

debtor-in-possession financing facility within the context of the chapter 11 filing to fund their

payroll and other operating expenses, while attempting to negotiate resolutions to their disputes with CCA, CSCEC, and CEXIM.  The Developer owns and controls the DIP Lender.  On July 1, 2015, this Court entered the Interim Order approving the DIP Facility on an interim basis and authorizing the Debtors to borrow up to $30 million thereunder to fund maintenance of the Property, pay necessary operating expenses, and finance the administrative costs of the chapter 11 cases, subject to the terms and conditions of the Interim Order, the DIP Term Sheet and the Budget.

On July 16, 2015, the Bahamian Attorney General presented a petition to the Bahamian Supreme Court seeking orders for the winding up of all the Bahamian Debtors' business.  At the same time, the Bahamian Attorney General issued an application for the appointment of provisional liquidators for the Bahamian Debtors.

Several parties, including secured and unsecured creditors and the Bahamian Attorney General, filed written submissions and attended and made oral argument in opposition to the Debtors' Originating Summons, as amended by the Amended Summons (the "Bahamian Summons").  On July 22, 2015, the Bahamian Supreme Court rejected the Debtors' Bahamian Summons "with reasons to follow."  On July 31, 2015, Justice Winder of the Bahamian Supreme Court issued a written Judgment memorializing the Court's reasons for denying and dismissing the Bahamian Summons, including the following:

> Where (a) the place of incorporation and domicile of the corporations; (b) the center of main interest or principal place of business; (c) the residence or domicile of the bulk of the creditors; and (d) location of the assets, are in The Bahamas there can be no reason to subordinate local proceedings to proceedings in a locale with such limited connection to the subject companies. . . . The only insolvency proceedings, which can give true effect to the principal of modified universality, would be a unitary insolvency proceedings in The Bahamas.  (¶¶ 62-63.)
> . . . .
> [I]n the context of this dispute, . . . none of the Applicants' 2,500 employees, the Government, the Lender, the Contractor, CBL or any of the other creditors (whose

7

numbers have been described as legion) could ever have had an expectation that if insolvency should intervene the laws of the District of Delaware of the United States would govern or be engaged at all. The predictability, which the Applicants speak about as a tenant of the principle of universalism, could not be supported by insolvency proceedings in the District of Delaware. (¶58.)

. . . .

For the court to extend this automatic stay, to a foreign insolvency, in the absence of a winding-up order or appointment of a provisional liquidator, in the context of this matter, would amount to adjusting the legislation to suit the Applicants case in a manner not permitted by the legislation. (¶79.)

. . . .

Notwithstanding that the Order granted by Bankruptcy Court Judge Hon. Kevin [Carey] imposed an automatic stay against all creditors, the stay sought and reflected in the Amended Originating Summons carved out an exception for the Government of The Bahamas. Such an Order for a stay, which restrains the secured creditor and all other creditors, whilst carving out an exception for the Government, an unsecured creditor, will create an inequitable result which skews the usual priorities in the distribution process. This exception, would also appear to offend public policy by according preferential treatment to an unsecured creditor. (¶84.)

Bahamian Court Ruling, July 31, 2015 (D.I. 435).

On July 31, 2015, the Debtors filed for leave to appeal the Judgment and were subsequently granted such leave. On August 25, 2015, the Debtors filed a notice of appeal of the Judgment with the Court of Appeal Registry.

Accordingly, the Debtors were unable to obtain entry of a court order in The Bahamas extending the automatic stay to secured and unsecured creditors in The Bahamas within seven days of the Petition Date. Failure to do so was an event of default under the Interim DIP Order and the DIP Term Sheet. However, on July 22, 2015, the DIP Lender provisionally waived the requirement for Bahamian court order, along with other required approvals by the Central Bank of The Bahamas and the Bahamas Investment Authority (together, the "Bahamian Approvals"), and each event of default then existing under the Interim DIP Order, solely with respect to a single funding in the aggregate principal amount of $436,000 in the form of a term loan to

Northshore. The DIP Lender also provisionally waived the condition precedent that requires the payment of all fees and expenses then owing to the DIP Lender.

On July 27, 2015, the DIP Lender made a subsequent funding under the DIP Facility in the amount of $5 million to Northshore and on August 12, 2015, the DIP Lender made a further subsequent funding under the DIP Facility in the amount of $9.5 million.

On August 19, 2015, the Bahamian Court commenced a hearing to consider certain aspects of the Provisional Liquidator Summons and the Winding Up Petitions. During the course of such hearing, the Bahamian Court indicated that it would dismiss the Winding Up Petitions filed in respect of the following Debtor entities upon the request of the respondents (and without any objection) because the Bahamian Attorney General, petitioning in a representative capacity, did not allege on behalf of those parties for whom she was petitioning that they were creditors of such entities: (i) BML Properties Ltd., (ii) Baha Mar Operating Company Ltd., (iii) Riviera Golf Ventures Ltd., (iv) Baha Mar Entertainment Ltd., (v) Baha Mar Support Services Ltd., (vi) Baha Mar Leasing Company Ltd., (vii) Baha Mar Sales Company Ltd. (collectively, the "Dismissed Entities"). As a result, the Provisional Liquidator Summonses relating to the Dismissed Entities would be dismissed as well.

On September 4, 2015, the Bahamian Supreme Court issued its ruling appointing joint provisional liquidators for seven of the Debtors: (i) Baha Mar Enterprises Ltd.; (ii) Baha Mar Land Holdings Ltd.; (iii) BML; (iv) Baha Mar Properties Ltd.; (v) BMP Golf Ltd.; (vi) BMP Three Ltd.; and (vii) Cable Beach Resorts Ltd. (the "PL Entities"). In the ruling, Justice Winder wrote:

> In all the circumstances therefore, I find that it would be an appropriate exercise of my discretion to make the appointment of provisional liquidators. As to the question of compelling stakeholders (creditors and contributories) to accept a compromise. Even if the power exists to impose a compromise upon stakeholders,

> I am not convinced that such a power ought to be exercisable in the absence of an agreement between all stakeholders impacted, in the absence of a winding up order. I am satisfied nonetheless that the facts of this case warrant the empowering of provisional liquidators to promote a scheme/plan of compromise between all stakeholders which could result in the reversal of the company's insolvent status. Such a solution would surely result in the prevention of the dissipation of the assets of the Respondents. (¶114)
>
> . . . .
>
> I propose to appoint provisional liquidators with considerably limited power. Whilst I will permit the promotion of a scheme of arrangement and/or compromise with all stakeholders (contributories and creditors). The provisional liquidators' powers will be limited to such powers as may be necessary for the prevention of the dissipation of the assets of the Respondents and preserving them pending the hearing of the Petition to wind up the Respondents. (¶120)

Bahamian Court Ruling, Sept. 4, 2015 (D.I. 483). Justice Winder scheduled the hearing on the Winding Up Petitions for November 2, 2015. (*Id.* at ¶123.)

On September 9, 2015, the Bahamian Supreme Court entered orders appointing the joint provisional liquidators for each PL Entity and specifying the powers of the joint provisional liquidators. (D.I. 488.)

DISCUSSION

CCA and CEXIM move for dismissal of the chapter 11 bankruptcy cases arguing that the core issues arise out of the development and construction of the Project in The Bahamas and lack any meaningful connection to the United States. The Debtors counter this by arguing that the key players in the chapter 11 cases have substantial contacts in the United States. However, the Debtors' main argument is that there are significant benefits to the Debtors and the majority of creditors in proceeding with a restructuring under chapter 11 of the Bankruptcy Code, rather than a liquidation under the Winding Up Act in The Bahamas.

(1)     Eligibility under Bankruptcy Code Section 109(a)

Bankruptcy Code §109(a) provides that "only a person that resides or has a domicile, a

place of business, or property in the United States . . . may be a debtor under this title." In the

decision *In re Global Ocean Carriers Ltd.,* the Court wrote:

> The test for eligibility is as of the date the bankruptcy petition is filed. *See, e.g., In
> re Axona International Credit & Commerce, Ltd.*, 88 B.R. 597, 614–15 (Bankr.
> S.D.N.Y. 1988). The test must be applied to each debtor. *Bank of America v. World
> of English,* 23 B.R. 1015, 1019–20 (N.D. Ga. 1982) (even where parent is eligible
> to file, [a] subsidiary must be tested separately to see if it is eligible). The burden
> of establishing eligibility is on the party filing the bankruptcy petition, in this case
> the Debtors. *See, e.g., In re Secured Equipment Trust of Eastern Air Lines, Inc.,*
> 153 B.R. 409, 412 (Bankr. S.D.N.Y. 1993) and cases cited therein.

*In re Global Ocean Carriers Ltd.,* 251 B.R. 31, 37 (Bankr. D.Del. 2000).

Courts construing the "property" requirement of §109(a) to foreign corporations and

individuals have determined that the eligibility requirement is satisfied by even a minimal

amount of property located in the United States. *In re Aerovias Nacionales De Colombia S.A.

Avianca,* 303 B.R. 1, 8 (Bankr. S.D.N.Y. 2003). *See Global Ocean Carriers,* 251 B.R. at 38-39

(deciding that a few thousand dollars in a bank account and the unearned portions of retainers

provided to local counsel constituted property sufficient to form a predicate for a filing in the

United States); *In re Iglesias,* 226 B.R. 72, 722-23 (Bankr. S.D.N.Y. 1998) (deciding that a bank

account with $500 is a sufficient predicate for filing by a citizen of Argentina).

The Declaration of Thomas Dunlap filed in support of the Debtors' Omnibus Objection

to the Dismissal Motions (CCA Ex. 84; Debtors' Ex. 106) (the "Dunlap Objection Declaration"),

introduced into evidence at the August 28, 2015 hearing, states that "[a]s part of the Debtors'

cash management system, each Debtor maintained and continues to maintain, at least one bank

account in the United States. . . . As of the Petition Date, the Debtors had in the aggregate

approximately $11.8 million cash in their Bank Accounts." (*Id.* ¶9.) Northshore and BML also

own additional property in the United States.  BML owns several trademarks registered in the United States and has several applications pending for the registration of additional trademarks in the United States.  (*Id.*)  "Northshore has leasehold interests in both Florida and New Jersey from which it operates its call center and marketing office, respectively." (*Id.*)

The Debtors also assert that Northshore has a place of business in the United States.  The "place of business" requirement in §109(a) need not be a principal place of business.

> A principal place of business is not required to satisfy Section 109(a)'s requirement, rather it is merely "a" place of business (emphasis added). *In re Paper I Partners, L.P.*, 283 B.R. 661, 672 (Bankr.S.D.N.Y.2002). Further, "[a] person has a place of business in the United States if such person conducts business in the United States or business is conducted in the United States on the person's behalf." *Id.* . . . In *In re Paper I Partners*, the court found that having a general partner in the United States who conducted administrative and substantive business on behalf of the general partnership was sufficient to find that the United States was "a place of business." 283 B.R. at 670–71.

*In re Zais Inv. Grade Ltd. VII,* 455 B.R. 839, 845 (Bankr. D.N.J. 2011).

In the Dunlap Objection Declaration, Mr. Dunlap avers that:

> [A]ll of Northshore's business operations are located in the United States.  As of the Petition Date, it managed the Debtors' call center operating primarily from leased premises located in Orlando, Florida.  The call center is responsible for, among other things, advanced-booking reservations for the various hotels and the convention center at the Project.  In addition, Northshore performs general sales and marketing duties for the entire Project primarily from its leased offices in Somers Point, New Jersey and Miami, Florida.

Dunlap Objection Declaration, ¶10.

The foregoing demonstrates that the Debtors owned property in the United States, and Northshore had employees and conducted business in the United States as of the date the chapter 11 petitions were filed.  The stipulated facts note that seven of the Debtors opened their accounts in the weeks leading up to the bankruptcy filing.  However, the relevant date for making a determination of eligibility is the petition date.

The Debtors meet the eligibility requirements of Bankruptcy Code §109(a).  Whether the cases should be dismissed in favor of Bahamian proceedings is more appropriately decided pursuant to Bankruptcy Code §§305 and 1112.

(2)    "Cause" for dismissal under Bankruptcy Code Section 1112(b)

CCA and CEXIM argue that the Debtors' bankruptcy cases were filed in an attempt to gain a tactical advantage and maintain control over the Project, rather than submit to a winding up proceeding in The Bahamas.  The Movants assert that manipulating the place of filing to achieve a "perceived legal advantage" shows that the chapter 11 cases were filed in bad faith.

The Debtors do not dispute that they filed chapter 11 petitions to obtain a "true" option of restructuring, which the Debtors argue is in the best interests of the Debtors and their creditors. They claim: "[t]o maximize value for all stakeholders, the Debtors commenced the Chapter 11 Cases with the primary goal of putting the Project on a firm financial foundation so that construction could be completed and the Project opened to the public as soon as possible, thereby realizing the objective of becoming a fully operational world-class resort." (Dunlap Objection Decl. ¶48.)  The Debtors also assert that the Dismissal Motions seek to further CCA's and CEXIM's interests over the interests of other creditors. The Debtors contend that CCA and CEXIM are the parties seeking a tactical advantage.

The Bankruptcy Code provides that a court may dismiss a chapter 11 bankruptcy case for cause. 11 U.S.C. §1112(b)(1).  The Third Circuit Court of Appeals has decided that:

> Chapter 11 bankruptcy petitions are "subject to dismissal under 11 U.S.C. §1112(b) unless filed in good faith and the burden is on the bankruptcy petitioner to establish [good faith]." *In re Integrated Telecom Express, Inc.,* 384 F.3d [108] at 118 [(3d Cir. 2004)] (citations omitted). "Whether the good faith requirement has been satisfied is a 'fact intensive inquiry' in which the court must examine 'the totality of the facts and circumstances' and determine where a 'petition falls along the spectrum ranging from the clearly acceptable to the patently abusive.'" *Id.*

(*quoting In re SGL Carbon Corp.,* 200 F.3d [154], at 162 [(3d Cir. 1999)].

*In re 15375 Memorial Corp. v. BEPCO, L.P.,* 589 F.3d 605, 618 (3d Cir. 2009) (footnote

omitted). *See also In re Tamecki,* 229 F.3d 205, 207 (3d Cir. 2000) ("Once a party calls into

question a petitioner's good faith, the burden shifts to the petitioner to prove his good faith.")

To determine whether a chapter 11 petition is filed in good faith, a court should focus on

two factors: (1) whether the petition serves a valid bankruptcy purpose, and (2) whether the

petition is filed merely to obtain a tactical litigation advantage. *Id.*

Just prior to filing the chapter 11 cases, the Debtors were experiencing a rapidly

worsening liquidity problem due to missed construction deadlines and the absence of payments

to the Debtors from other parties (CCA, CSCEC, CEXIM, the Government of The Bahamas and

others) totaling $203 million. (Dunlap Objection Decl. ¶28.) Further, the Debtors were

concerned about the potential default and exercise of remedies under the Prepetition Credit

Agreement. (*Id.*) The Debtors also argue that the chapter 11 cases serve a valid reorganization

purpose by allowing the Debtors to take advantage of Bankruptcy Code §365, which allows the

Debtors to reject executory contracts. The Debtors also assert that they will be able to obtain

confirmation of a reorganization plan under Bankruptcy Code §1129.

CCA and CEXIM argue that the Bahamian Court's refusal to enter a recognition order in

connection with the chapter 11 cases prevents the Debtors from any prospect of successful

reorganization. The Movants further argue that, even if the Debtors could obtain confirmation of

a Plan, the Plan would not be enforceable in The Bahamas.

The Debtors argue that their proposed plan will not impair the claims of Bahamian

creditors, including the Bahamian Government; instead, those claims will "pass through" the

chapter 11 bankruptcy cases unaffected by the Plan.[6]  Moreover, the Plan assumes that this Court

can exercise jurisdiction over and provide for treatment of the Movants under United States

Bankruptcy law.

The events leading up to the bankruptcy filing clearly show Debtors on the edge of a

financial precipice.  The Debtors contemplate using the rights and protections offered by the

Bankruptcy Code to reorganize their financial affairs and complete the Project, which is in the

best interests of all stakeholders.  The Debtors admit that they filed chapter 11 cases in an effort

to maintain control of the Project and to reorganize, rather than liquidate.  Without more, this is

not the type of "tactical advantage" that constitutes bad faith.  Although many of the Debtors'

troubles arise out of their dealings with CCA, this is hardly a two-party dispute.  When

considering the spectrum of good faith and bad faith filings, the Debtors' chapter 11 filings do

not fall in or near the range of "patently abusive."  The totality of the facts and circumstances

surrounding the Debtors' chapter 11 filings do not support a determination of bad faith.  The

cases will not be dismissed under Bankruptcy Code §1112.

(3)    The best interests of the Debtors and creditors under Bankruptcy Code Section 305(a)

Bankruptcy Code § 305 provides, in pertinent part, that a bankruptcy court "may dismiss

a case under this title or may suspend all proceedings in a case under this title, at any time,

if … the interests of creditors and the debtor would be better served by such dismissal or

suspension." 11 U.S.C. §305(a)(1).

---

[6] Less than two days prior to the hearing on the Dismissal Motions, the Debtors filed a Joint Chapter 11
Plan of Northshore Mainland Services, Inc. and its Affiliated Debtors (D.I. 442) (the "Proposed Plan") and
a Motion for Leave to File a Joint Chapter 11 Plan of Reorganization without Concurrent Filing of a
Disclosure Statement (D.I. 443).

"Whether to dismiss a case or abstain pursuant to section 305 is committed to the discretion of the bankruptcy court, and is determined based upon the totality of the circumstances." *In re Mylotte, David & Fitzpatrick,* No. 07-14109bf, 2007 WL 3027352, *5 (Bankr. E.D.Pa. Oct. 11, 2007). Courts agree that abstention under §305(a)(1) is a form of "extraordinary relief." *Avianca,* 303 B.R. at 9; *In re Paper I Partners, L.P.,* 283 B.R. 661, 678 (Bankr. S.D.N.Y. 2002).

"Granting an abstention motion pursuant to § 305(a)(1) requires more than a simple balancing of harm to the debtor and creditors; rather, the interests of both the debtor and its creditors must be served by granting the requested relief." *In re AMC Investors, LLC,* 406 B.R. 478, 488 (Bankr. D.Del. 2009) quoting *In re Monitor Single Lift I, Ltd.,* 381 B.R. 455, 462 (Bankr. S.D.N.Y. 2008). Courts have recognized that §305(a)(1) "was designed to be utilized where, for example, a few recalcitrant creditors attempted to interfere with an out-of-court restructuring that had the support of a significant percentage of the debtor's creditors." *In re Stillwater Asset Backed Offshore Fund Ltd.,* 485 B.R. 498, 509 (Bankr. S.D.N.Y. 2013). *See also Mylotte, David & Fitzpatrick,* 2007 WL 3027352, *5. In *Stillwater,* the Court further recognized that "[t]here is also no question that abstention may be proper where, as here, the debtor is an entity formed under the laws of, or doing business in, a foreign country." *Stillwater,* 485 B.R. at 509.

Courts consider the following non-exclusive factors "to gauge the overall best interests" of the debtor and creditors:

(1)    the economy and efficiency of administration;

(2)    whether another forum is available to protect the interests of both parties or there is already a pending proceeding in state court;

(3)    whether federal proceedings are necessary to reach a just and equitable solution;

(4)     whether there is an alternative means of achieving an equitable distribution of assets;

(5)     whether the debtor and creditors are able to work out a less expensive out-of-court arrangement which better serves all interests in the case;

(6)     whether a non-federal insolvency has proceeded so far in those proceedings that it would be costly and time consuming to start afresh with the federal bankruptcy process; and

(7)     the purpose for which bankruptcy jurisdiction has been sought.

*AMC Investors*, 406 B.R. at 488. *See also Mylotte David & Fitzpatrick,* 2007 WL 3027352, *6;

*Paper I Partners,* 283 B.R. at 679.

The Movants argue that the Winding Up Petitions in The Bahamas would better serve the interests of both the Debtors and the creditors because (i) it is more economical and efficient to address the issues surrounding the Project in The Bahamas because a majority of the parties-in-interest are either incorporated in or located in The Bahamas; (ii) the majority of the money invested in the Project was put at risk under Bahamian and other foreign laws and the parties have "legitimate expectations" that Bahamian law would apply; (iii) the Bahamian Supreme Court's refusal to recognize the chapter 11 cases or to enforce the automatic stay in The Bahamas effectively means that any orders entered by this Court will not be enforceable in The Bahamas; (iv) the Debtors' position that the Bahamian winding up proceeding only allows for liquidation (not restructuring) is ill-founded since the Bahamian Act permits a provisional liquidator to implement a court-sanctioned "compromise or arrangement" with creditors, and the

Bahamian Government's Provisional Liquidator Summonses specifically seeks appointment of a provisional liquidator to restructure, not liquidate, the Debtors' affairs.[7]

The Debtors' object strenuously to abstention under §305(a)(1) claiming that The Bahamas are not necessarily the most economical and efficient location for restructuring since a number of the stakeholders have connections and interests outside of The Bahamas.  In particular, the Debtors contend that (i) CCA is a wholly owned subsidiary of China Construction America Inc., a company incorporated and headquartered in New Jersey; (ii) CEXIM Bank, the Debtors' largest creditor, is a Chinese policy bank that provides financing to support the investment of Chinese capital and employment of Chinese labor forces throughout the world, not just in The Bahamas; (iii) Citibank, N.A. Bahamas Branch,  which serves as the onshore security agent for and on behalf of CEXIM, is owned by Citigroup, Inc., which has substantial contacts with the United States and other non-Bahamian jurisdictions throughout the world; and (iv) nearly 70% of the amount of general unsecured claims are held by creditors located in the United States.  Indeed, the Official Committee of Unsecured Creditors also filed an objection to the Dismissal Motions.

The Debtors also dispute the contention that creditors would expect Bahamian law to apply to a reorganization, since some significant contracts are subject to New York law (*i.e.,* the Main Construction Contract and the Assignment of the Main Construction Contract).  Further, the Debtors claim that the Prepetition Credit Agreement and substantially all agreements ancillary thereto are governed by either New York, Texas, English or British Columbian law.

---

[7] Paragraph 2 of the Provisional Liquidator Summons states:  "[t]he intended purpose of the provisional liquidation will be to empower the provisional liquidators to engage with the major stakeholders and creditors in this matter, with the objective of formulating proposals for restructuring the Respondents' affairs and working with key interested parties to achieve the completion of the resort and to make it operational within the shortest practicable timescale." (CCA Ex. 59.)

The Debtors agree, however, that Bahamian law governs the Debenture, Pledge of Shares Agreement and Charge Over Shares Agreements.

The Debtors also argue that the chapter 11 cases are necessary for the reorganization, rather than liquidation, of the Project. The Debtors note that chapter 11 provides several options and protections to the Debtors that are not available in a Bahamian winding up proceeding including: (i) flexibility in developing and seeking confirmation of a chapter 11 plan, so long as it satisfies all requirements of Bankruptcy Code §1129; (ii) continuity of management, (iii) debtor-in-possession financing; and (iv) assumption/rejection of executory contracts and unexpired leases.

At bottom, the Debtors argue that dismissing the chapter 11 cases and abstaining in favor of the Bahamian proceeding is not in the best interests of the Debtors and all creditors, but only in the best interests of the Movants.

The matter before me is truly an international case with the main contestants hailing from Wilmington, Delaware, to Beijing, China, to Nassau, The Bahamas. The central focus of this proceeding, however, is the unfinished Project located in The Bahamas. The Debtors argue that Bahamian law limits their options to a liquidation proceeding. This argument has been challenged by the Movants, who argue that a provisional liquidator may work with the parties to come to an arrangement or compromise that involves a restructuring. [8] The Movants' argument

---

[8] The Movants argue that this matter is similar to the facts presented in *In re Spanish Cay Co., Ltd.,* 161 B.R. 715 (Bankr. S.D.Fla. 1993). In that case, the Court issued a supplemental opinion on the Motion to Dismiss Petition or, in the Alternative, to Abstain from Exercising Jurisdiction and for Relief from Automatic Stay filed by Canadian Imperial Bank of Commerce ("CIBC") in the bankruptcy case of a debtor that was a Bahamian corporation whose principal asset was an island located in the Bahamas. The debtor sought to develop the island into a residential development and member-owned resort (the "Spanish Cay Resort"). Part of the financing for the Spanish Cay Resort was a $3 million loan funded by a Bahamian branch of CIBC. *Spanish Cay,* 161 B.R. at 720. The *Spanish Cay* Court decided that abstention under

is supported by the September 4, 2015 ruling by the Bahamian Supreme Court, which appointed

provisional liquidators with limited powers to preserve the Debtors' assets while promoting a

scheme/plan of compromise among all stakeholders.

I acknowledge the deep and important economic interest of the Government of The

Bahamas in the future of the Project.  However real and important as that interest is, it is no more

important than the right of a company incorporated in the United States to have recourse to relief

in a United States Bankruptcy Court.   The Debtors' preference for restructuring under the

protections of the United States Bankruptcy Code is understandable and entitled to some weight.

Chapter 11 of the United States Bankruptcy Code, with all stakeholders participating, under

these circumstances, would be an ideal vehicle for the restructuring of this family of related

companies with the ultimate goal of finishing a project said to be 97% complete and, upon its

exit from chapter 11, to be in sound financial footing, with appropriate treatment of creditors.  I

am consequently disappointed that the parties have been so far unable to formulate a consensual

---

§305(a)(1) clearly was *not* in the best interests of both the debtor and the creditors, since the debtor would
be limited to a liquidation proceeding in the Bahamas.

However, the *Spanish Cay* Court ultimately decided to abstain under (now repealed) §305(a)(2)
and the §304(c).  The Court wrote:  "The fact that Bahamian law does not contemplate or allow a
reorganization process comparable to our chapter 11 is not reason to deny abstention.  In determining
whether to defer to a Bahamian liquidation, the issue is not whether a reorganization is possible under
Bahamian law.  Rather, under [now repealed] §304(c), the Court must determine whether the creditors will
be justly treated and protected from prejudice. . . . The liquidation laws of the Bahamas are in harmony
with those of the United States." *Spanish Cay,* 161 B.R. at 726.  Although the considerations of §304(c)
are not directly applicable here, I agree that an important consideration for abstention - - even under
§305(a)(1) - - is whether the creditors and debtor will be justly treated and protected from prejudice.  There
is no evidence before me to indicate that the Bahamian Courts would not treat the Debtors and creditors
justly and impartially.

exit strategy, whether that would involve taking a plan to confirmation or providing for an agreed dismissal as part of a consensual resolution of their disputes.[9]

The Debtors, cleverly, have proposed a plan that leaves treatment of the Bahamian creditors for disposition outside of this Court. However, the proposed plan provides for treatment of the Debtors' two main adversaries (CCA and CEXIM) to be determined by this Court under the United States Bankruptcy Code. The Debtors' proposed plan, in effect, only invites further dispute, that is, litigation in this forum and in others. If I were convinced that denying the Dismissal Motions would have the effect desired by the Debtors - - bringing CCA, CEXIM and the government of The Bahamas back to the bargaining table, I might consider denying the Dismissal Motions. But the evidence does not reflect this and I am not convinced this will happen in short order. I am convinced, however, that prompt judicial action will enhance the likelihood of a successful outcome.

Notwithstanding some agreed venue provisions in some of the relevant documents, I agree with Justice Winder's determination in his July 31, 2015 ruling that many stakeholders in the Project would expect that any insolvency proceedings would likely take place in The Bahamas, the location of this major development Project. I perceive no reason - - and have not been presented with any evidence - - that the parties expected that any "main" insolvency

---

[9] Justice Winder also expressed his disappointment in the parties' inability to work out a compromise, writing: "It is extremely regrettable that the parties have not found a way to resolve this dispute given what is at stake for all parties and the numerous opportunities afforded for a resolution to happen. It is well known to all that everyone ordinarily takes a loss in insolvency proceedings whether judicially managed in this jurisdiction or by the courts of our friends to the North." (Bahamian Court Ruling, Sept. 4, 2015, ¶119, D.I. 483.)

proceeding would take place in the United States.[10]  In business transactions, particularly now in today's global economy, the parties, as one goal, seek certainty. Expectations of various factors - - including the expectations surrounding the question of *where* ultimately disputes will be resolved - - are important, should be respected, and not disrupted unless a greater good is to be accomplished.   Under these circumstances, I can perceive no greater good to be accomplished by exercising jurisdiction over these chapter 11 cases, except for that of Northshore.

Northshore is a Delaware corporation with operations in the United States.  Parties would expect Northshore's financial difficulties to be addressed in a proceeding in the United States. Furthermore, Northshore is not one of the PL Entities, since it is not the subject of any winding up proceeding in The Bahamas.  Therefore, I will not dismiss the chapter 11 case for Northshore, unless upon further proceedings, upon separate motion, I am convinced that I should do so.[11]

(4)    Comity

"'Comity,' in the legal sense, is neither a matter of absolute obligation, on the one hand, nor of mere courtesy and good will, upon the other. But it is the recognition which one nation allows within its territory to the legislative, executive or judicial acts of another nation, having due regard both to international duty and convenience, and to the rights of its own citizens, or of other persons who are under the protection of its laws. *Hilton v. Guyot,* 159 U.S. 113, 163-64,

---

[10] This is not to say that parties, such as the Movants, would not expect to be subject to jurisdiction in another forum for disputes concerning contracts with provisions submitting to venue in the United States or elsewhere.

[11] Whether allowing the Northshore chapter 11 case to proceed on its own in this Court will ultimately serve any practical purpose for the family of Debtor corporations remains to be seen, but I leave that for later consideration.  It may well be that the Northshore chapter 11 case could serve as a useful vehicle for the parties as part of an overall resolution of the corporate family's difficulties, in concert with the proceedings in The Bahamas.

22

16 S. Ct. 139, 143, 40 L. Ed. 95 (1895). *See also In re Yukos Oil Co.,* 321 B.R. 396, 408 (Bankr.

S.D. Tex. 2005). Although abstention under §305 is considered an extraordinary remedy, "the

pendency of a foreign insolvency proceeding alters the balance by introducing considerations of

comity into the mix." *In re Compania de Alimentos Fargo, S.A.,* 376 B.R. 427, 434 (Bankr.

S.D.N.Y. 2007). In *Alimentos Fargo,* the Court wrote:

> The Second Circuit, in this regard, has frequently underscored the importance of
> judicial deference to foreign bankruptcy proceedings. *See, e.g., Finanz AG Zurich
> v. Banco Economico S.A.,* 192 F.3d 240, 246 (2d Cir.1999); *Maxwell Commc'n
> Corp. v. Societe Generale (In re Maxwell Commc'n Corp.),* 93 F.3d 1036, 1048 (2d
> Cir.1996); *Allstate Life Ins. Co. v. Linter Group Ltd.,* 994 F.2d 996, 999 (2d
> Cir.1993); *Cunard S.S. Co. v. Salen Reefer Servs. AB,* 773 F.2d 452, 458 (2d
> Cir.1985). "[D]eference to foreign insolvency proceedings will, in many cases,
> facilitate 'equitable, orderly and systematic' distribution of the debtor's assets."
> *Maxwell Commc'n Corp.,* 93 F.3d at 1048 (quoting *Cunard S.S. Co.,* 773 F.2d at
> 458); *accord JP Morgan Chase Bank v. Altos Hornos de Mexico, S.A. de C.V.,* 412
> F.3d 418, 424 (2d Cir.2005) ("We have repeatedly held that U.S. courts should
> ordinarily decline to adjudicate creditor claims that are the subject of a foreign
> bankruptcy proceeding....In such cases, deference to the foreign court is appropriate
> so long as the foreign proceedings are procedurally fair and (consistent with the
> principles of Lord Mansfield's holding) do not contravene the laws or public policy
> of the United States."); *Finanz AG Zurich,* 192 F.3d at 246 ("We have repeatedly
> noted the importance of extending comity to foreign bankruptcy proceedings. Since
> '[t]he equitable and orderly distribution of a debtor's property requires assembling
> all claims against the limited assets in a single proceeding,' American courts
> regularly defer to such actions.") (quoting *Victrix S.S. Co., S.A. v. Salen Dry Cargo
> A.B.,* 825 F.2d 709, 713–14 (2d Cir.1987); *Cunard S.S. Co.,* 773 F.2d at 458
> ("American courts have consistently recognized the interest of foreign courts in
> liquidating or winding up the affairs of their own domestic business entities.")

*Alimentos Fargo,* 376 B.R. at 434. Here, considerations of comity support abstention pursuant to

§305(a). The proceedings that have occurred to date in the Bahamian Supreme Court

demonstrate that the Debtors are being treated fairly and impartially. Although there are clear

differences between the Bahamian insolvency proceedings and the United States' chapter 11

process, there has been no evidence that the Bahamian laws contravene the public policy of the

United States.

CONCLUSION

Based on the foregoing, I conclude that dismissal of the chapter 11 cases and abstention under §305(a) is in the best interests of the Debtors and the creditors of all of the chapter 11 Debtors, except Northshore. The Dismissal Motions will be granted, in part, and the chapter 11 cases of all of the Debtors, except Northshore, will be dismissed without prejudice. The Dismissal Motions will be denied with respect to the chapter 11 case of Northshore. An appropriate order follows.

BY THE COURT:

_____
KEVIN J. CAREY
UNITED STATES BANKRUPTCY COURT

DATED:  September 15, 2015